# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEBRASKA BOOK COMPANY, INC., *et al.*,[1] | ) | Case No. 11-12005 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF ALAN G. SIEMEK IN SUPPORT OF DEBTORS'
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Alan G. Siemek, hereby declare under penalty of perjury:

1.     I am the Chief Financial Officer of Nebraska Book Company, Inc., one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I have served in this capacity since 1999 and I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age, and I am competent to testify.

2.     I submit this Declaration (this "Declaration") to provide an overview of the Debtors and these chapter 11 cases and to support the Debtors' petitions and "first day" motions (each a "First Day Motion" and, collectively, the "First Day Motions"), and I am authorized to submit this Declaration on behalf of the Debtors. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number include: Nebraska Book Company, Inc. (9819); Campus Authentic LLC (9156); College Bookstores of America, Inc. (9518); NBC Acquisition Corp. (3347); NBC Holdings Corp. (7477); NBC Textbooks LLC (1425); Net Textstore LLC (6469); and Specialty Books, Inc. (4807). The location of the debtors' service address is: 4700 South 19th Street, Lincoln, Nebraska 68512.

finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management or the Debtors' advisors. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

## Preliminary Statement

3.      The Debtors are one of the leading providers of new and used textbooks for college students in the United States. The Debtors provide textbooks to students throughout the United States using a sophisticated retail and wholesale distribution network, which includes approximately 280 on- and off-campus "brick and mortar" bookstores on or near college campuses across the country, numerous online and interactive channels, and wholesale used textbook sales to both their own bookstores as well as bookstores operated by independent third parties. The Debtors have a long history of stable growth, but over the last several years, certain student buying habits shifted towards online textbook providers, including most recently online rental textbook providers, areas outside the Debtors' core business model. In response, the Debtors focused on aggressively growing their online presence and developing a textbook rental business, both of which position the Debtors to thrive in the near future. However, the changing marketplace has had a negative effect on the Debtors' off-campus stores and left the Debtors with reduced Earnings Before Interest Taxes Depreciation and Amortization ("EBITDA"), which approximates cash flows from operations. The Debtors also have significant debt obligations coming due in late-2011 that the Debtors have been unable to refinance due to (a) the banks' unwillingness to finance the Debtors given the Debtors' recent decline in financial performance and increased competition;  (b) potential lenders fearing the Debtors' financial performance

would not rebound; and (c) market perception that the growth of digital books will have a long-term negative impact on textbooks as it already has with general interest books.

4. Further compounding the Debtors' refinancing efforts, the Debtors' business model typically calls for publishers and other merchandise vendors to provide approximately $200 million of new books and other merchandise on normal credit terms in July and August in advance of the "back to school" rush. These normal credit terms, which may not be available to the Debtors during the 2011 "back to school" rush because of the uncertainty regarding the refinancing of their debt structure, usually allow the Debtors the opportunity to sell the textbooks (or return them) and sell other merchandise prior to having to pay for the items. This trade credit has been less available to the Debtors in the last several months as publishers and vendors became increasingly concerned about the Debtors' refinancing process. Absent some action by the Debtors to de-lever their capital structure, the Debtors believe that it is highly unlikely that the publishers and vendors will extend the normal credit terms during the upcoming "back to school" rush. In fact, in the weeks leading up to the Petition Date, all five of the Debtors' largest suppliers of new textbooks requested that the Debtors pay cash in advance for new textbook orders.

5. Without refinancing a substantial portion of their outstanding debt obligations, the Debtors lack sufficient cash on hand to satisfy their potential working capital and debt obligations. As a result, the Debtors proactively undertook extensive efforts to right-size their capital structure and position themselves for ongoing success in the changing textbook industry landscape. On the business side, the Debtors implemented cost-saving programs that ultimately will save the Debtors' approximately $5 million over the next 12 months and engaged a third-party operational consulting firm to analyze the Debtors' inventory practices. In addition,

the Debtors retained an investment banker and restructuring counsel to engage creditors and other potential partners for a refinancing or restructuring transaction. After considering all available strategic alternatives to ensure that they were maximizing stakeholder value, the Debtors determined it was in their best interests to explore debt restructuring options with their major creditor constituents and on a parallel path, search for partners to execute a restructuring transaction.

6.     Over the last seven months, the Debtors and their advisors engaged in discussions with numerous stakeholders, parties in interest, and potential partners for a comprehensive recapitalization, which led to multiple indications of interest and various restructuring proposals (including proposals from certain of the Debtors' existing lenders, noteholders, and equity holders). After considering the indications of interest and the various proposals, the Debtors were able to negotiate terms for a consensual transaction. The concurrent filing of these chapter 11 cases and the Restructuring and Support Agreement (the "RSA"), dated June 26, 2011, attached hereto as **Exhibit A** is the culmination of good faith negotiations by and among the Debtors and holders of an aggregate amount of over 95% of their 8.625% senior subordinated notes due 2012, holders of over 75% of their 11% senior discount notes due 2013 (such holders, collectively, the "Plan Support Parties").

7.     The RSA contemplates a pre-arranged restructuring in chapter 11 through which the Debtor will remove approximately $150 million in debt from their prepetition balance sheet while paying general unsecured creditors in full. The Plan Support Parties have agreed to support a plan of reorganization (the "Plan") consistent with the Plan attached as Exhibit B to the RSA. To facilitate enforcement of the Plan, the Debtors have obtained commitments for a $200 million debtor-in-possession financing facility, which, together with cash on hand, will

provide the Debtors with sufficient liquidity to fund the administration of these chapter 11 cases and continue their day-to-day operations.

8.     While the Debtors are working hard to maintain the stability of their businesses at this critical juncture, a prolonged stay in chapter 11 will undermine those efforts. As a result, the Debtors plan to file the Plan within a few days of the Petition Date and related disclosure statement (the "Disclosure Statement") within the next 20 days and seek authority to move forward with the solicitation and confirmation process swiftly. Given the lengthy and extensive negotiations between the Debtors' and their creditor constituencies prior to the filing of these chapter 11 cases, the Debtors believe their estates, their creditors, and all parties in interest will benefit from the swift consummation of their financial restructuring and hope to emerge from chapter 11 as quickly as possible.

9.     To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these chapter 11 cases, this Declaration is organized as follows. Part I of this Declaration describes the Debtors' businesses and their capital structure. Part II of this Declaration details the circumstances surrounding the commencement of these chapter 11 cases. Finally, Part III of this Declaration sets forth the relevant facts in support of each First Day Motion.

**I.     The Debtors.**

    **A.     Overview of the Debtors' Corporate History and Business Operations.**

        **1.     The Debtors' Corporate History.**

10.     Nebraska Book Company, Inc. ("Nebraska Book") was founded in 1915 with a single bookstore near the University of Nebraska campus. Following World War II, when the supply of new textbooks could not meet the demand created by returning soldiers attending

college, Nebraska Book began buying books back from students at the end of the term and reselling them, thus becoming an integral part in the earliest years of the used textbook industry.

11. In 1964, Nebraska Book became a national, rather than a regional, wholesaler of used textbooks by acquiring The College Book Company of California. During the 1970's, Nebraska Book continued to focus on the wholesale business, however, throughout 1980's the Debtors expanded their efforts in the college bookstore market with the operation of primarily off-campus bookstores near larger campuses, typically where the institution-owned college bookstore was contract-managed by a competitor or where the Debtors did not have a significant wholesale presence. In the last several years, the Debtors revised their college bookstore strategy to expand their efforts in the contract-management of on-campus bookstores.

12. The Debtors continue to develop innovative strategies to remain at the forefront of the college bookstore industry, including pioneering new technology-savvy retail software with e-commerce capabilities and entering the textbook rental market. Today, the Debtors service the college bookstore industry through their bookstore, textbook, and complementary services divisions, each as described more fully below.

13. In an effort to remain a competitive player in the college services market, the Debtors include a diverse network of companies. Effective July 1, 2002, the Debtors' distance learning division was separately incorporated under the laws of the State of Delaware as Specialty Books, Inc., a wholly-owned subsidiary of Nebraska Book ("Specialty Books"). On January 1, 2005, the textbook division was separately formed under the laws of the State of Delaware as NBC Textbooks LLC, a wholly-owned subsidiary of Nebraska Book. On May 1, 2006, Nebraska Book added another wholly-owned subsidiary through the acquisition of all of the outstanding stock of College Book Stores of America, Inc. ("CBA"), an entity separately

formed under the laws of the State of Illinois. On April 24, 2007, Nebraska Book established Net Textstore LLC, a wholly-owned subsidiary separately formed under the laws of the State of Delaware. Finally, effective January 26, 2009, Nebraska Book established Campus Authentic LLC, a wholly-owned subsidiary separately incorporated under the laws of the State of Delaware.

14.     On March 4, 2004, a group of jointly managed private equity funds, including Weston Presidio Capital III, L.P., Weston Presidio Capital IV, L.P., WPC Entrepreneur Fund, L.P., and WPC Entrepreneur Fund II, L.P. (collectively "Weston Presidio") gained a controlling interest in NBC Acquisition Corp. ("NBC"), and hence in Nebraska Book.

### 2.     The Debtors' Operations.

15.     The Debtors operate one of the largest wholesale distributions of used college textbooks in North America, offering over 105,000 textbook titles and selling over 6.3 million books annually, primarily to bookstores serving campuses located in the United States. The Debtors' principal executive offices are located in Lincoln, Nebraska. As of March 31, 2010, the Debtors employed approximately 1,300 full time employees, 800 part time employees, and 500 temporary workers. Since its founding in 1915, the Debtors have successfully adapted to the changing landscape of American colleges and universities, including the increase in student enrollment, and the advancement of technology and e-commerce. Today, the Debtors serve the college bookstore industry through the operation of three main divisions, their on- and off-campus bookstore locations (the "Bookstore Division"), their wholesale of textbooks business (the "Textbook Division"), and their various other products and services for the college bookstore market, including distance education services, bookstore management, e-commerce software development, and other services (collectively, the "Complementary Services

Division"). For the 12 months ended March 31, 2010, the Debtors generated approximately $605 million in total revenues.

### a. The Bookstore Division.

16.     As of December 31, 2010, the Debtors operated approximately 280 college bookstores on or adjacent to college campuses throughout the United States. The Debtors' bookstores include on-campus locations leased from the educational institution that they serve, as well as owned or leased off-campus bookstores. The Bookstore Division encompasses a number of operations, including: (a) selling and renting a wide variety of used and new textbooks; (b) selling assorted merchandise, including apparel, sundries, and gift items; (c) selling various technology items such as calculators and computers; and (d) selling general books. Over the past three fiscal years, bookstore revenues from activities other than used and new textbook sales and rentals have been between 16.6% and 17.4% of total revenues. The Debtors tailor each of their bookstores to fit the needs and lifestyles of each campus. While the individual managers have significant planning and managing responsibilities, the Debtors' staff also includes specialists to assist bookstore managers in store planning, merchandise purchasing, media buying, inventory control, and layout. In addition to in-store sales, the Debtors sell textbooks and other merchandise via the internet through each store's individual website as well as the Debtors' consolidated website, known as Neebo.com, and numerous third-party websites such as Amazon.com and Half.com.

17.     The Debtors have enhanced the Bookstore Division within the last year by implementing a new focus on textbook rentals. Several years ago textbook rentals were uncommon, either online or in a bookstore. However, the availability and popularity of textbook rentals has rapidly increased with online companies such as Chegg, Inc. and BookRenter.com

leading that change. The college bookstore industry is quickly reacting to this new competition and the Debtors have been testing various textbook rental models for the past two years. As a result of that testing, the Debtors implemented the "Rent Every Book" model in the vast majority of their stores this past January. Given that the textbook rental model is in its nascent state, the Bookstore Division's full potential utilizing that model remains to be seen. However, with the "Rent Every Book" model, the Debtors remain a competitive and innovative player in the college bookstore arena.

18.     In addition, the Debtors introduced a new website. Prior to implementing their new website, Neebo.com, the Debtors maintained over 250 separate web sites, each representing the inventory offered by the Debtors' bookstore serving a college or university where the Debtors had a brick–and–mortar store. However, the websites were not connected to each other so a customer on one web site could not access the inventory of the other Debtor bookstore locations. The Debtors had significant viewership on the individual websites, but were unable to leverage that volume—Neebo.com will allow the Debtors to better capitalize on that traffic volume.

19.     Through the "Rent Every Book" initiative and Neebo.com, the Debtors' Bookstore division continues to adapt to the increasingly competitive marketplace and changes in customer demands. The Bookstore Division produced approximately $472 million in total revenues over the 12 months ended March 31, 2010.

### b.     The Textbook Division.

20.     The Debtors also serve the college bookstore industry through their Textbook Division. The Textbook Division utilizes three avenues to effectively service the Debtors' customers and to remain a pioneer of the college bookstore industry. First, the Debtors engage in

the procurement and redistribution of used textbooks on college campuses primarily across the United States and through third-party websites. Second, the Textbook Division focuses on maintaining current catalogs of textbooks. The Debtors publish a buyer's guide which lists approximately 52,000 textbooks according to author, title, and price. The guide is an important part of the Debtors' inventory control and textbook procurement system. The Debtors maintain a staff dedicated to gathering information from all over the country to make the guide a comprehensive and up-to-date pricing and buying aid for college bookstores. Third, the Debtors maintain a database of approximately 174,000 titles to better serve their customers. For the 12 months ended March 31, 2010, the Textbook Division produced approximately $141 million in revenue.

### c.     The Complementary Services Division.

21.     The Debtors further expanded their services through their Complementary Services Division. Among other things, the Complementary Services Division provides the Debtors with access to the market for distance education products and services. As of June 2010, the Debtors provided students at approximately 30 colleges and private high schools with textbooks and materials for use in distance education and other education courses, and provided textbooks to nontraditional programs. In addition, the Debtors offer services and specialty course materials to the distance education marketplace.

22.     The Complementary Services Division also provides the Debtors' customers with access and services related to the Debtors' "turnkey" bookstore management software (the "Turnkey Software"). The Turnkey Software incorporates point of sale, inventory control, and accounting modules that collectively generate revenue. When utilized by third-party bookstores, the Turnkey Software assists the Debtors with developing and maintaining

relationships with those third-party bookstores, enhancing the Debtors' ability to gain access to new sources of used textbooks. In total, including the Debtors' own bookstores, almost 1,200 college bookstore locations use the Turnkey Software products. In addition, the Debtors have developed and deployed software for e-commerce capabilities. This software allows college bookstores to launch their own e-commerce sites to compete against other online textbook and general merchandise sellers by offering textbooks and both in-store and certain other virtual inventory online. As of June 2010, there were approximately 640 stores, including the Debtors own stores, licensing the Debtors' e-commerce technology through their e-commerce software CampusHub. Also, the Debtors offer a variety of other services to college bookstores, including distance education fulfillment, digital delivery solutions enabling college bookstores to offer students the option of purchasing E-books via download, and certain marketing, consulting, and buying group services. Through the Debtors' continued software innovation, the Debtors are able to adjust to the rapidly changing college bookstore landscape.

23. The Complementary Services Division generated approximately $35 million in revenue during the 12 months ended March 31, 2010.

### 3. The Debtors' Customers.

24. The Debtors have a broad and diversified customer base. The Debtors' college bookstores are located at college and university campuses of all sizes, including some of the country's largest campuses, such as Arizona State University, The Ohio State University, Michigan State University, Texas A&M University, University of Michigan, University of Nebraska, and Pennsylvania State University. In addition, the Textbook Division purchases from and resells used textbooks to independent third-party college bookstores at a variety of campus sizes, including the University of Virginia, Oregon State University, University of

11

Illinois, and the University of Southern California. In the fiscal year 2010, the Debtors' 25 largest Textbook Division customers accounted for approximately 2.7% of the fiscal year's consolidated revenues and no single Textbook Division customer accounted for more than 1.0% of the Debtors' fiscal year 2010 consolidated revenues.

25. The Debtors' distance education program is, among other things, a supplier of textbooks and educational material to students enrolled in online courses offered through approximately 30 colleges and private high schools. For the fiscal years ending in March 31, 2010, 2009, and 2008, one institution accounted for approximately 68%, 69%, and 63%, respectively, of distance education program revenues.

### 4. Competition.

26. Due to the diverse nature of the Debtors' business, the Debtors compete with a variety of companies and individuals, all of whom seek to provide products and/or services to the college marketplace. The Debtors' main corporate competitors, who provide products and services to colleges and universities, college bookstores, and directly to students include Follett Higher Education Group, Inc. ("Follett"), MBS Textbook Exchange, Inc. ("MBS"), and MBS' sister company, Barnes & Noble College Booksellers, LLC ("B&N, along with MBS "MBS/B&N"). In addition, competition continues to grow from websites that enable student-to-student transactions over the Internet and from online textbook rental companies, such as Chegg, Inc. and Bookrenter.com.

27. The Bookstore Division competes with Follett, MBS/B&N, and a number of smaller companies for the opportunity to contract-manage institutional on-campus college bookstores. As of June 2010, Follett and MBS/B&N managed more than 700 and 600 stores, respectively. In addition, the Bookstore Division competes with: (a) local bookstores located on

the individual campuses the Debtors serve, (b) other companies that rent or sell textbooks and e-books directly to students, (c) student-to-student transactions, and (d) course packs and electronic media such as on-line resources, e-books, print-on-demand textbooks, and CD-ROMs, which may replace or modify the need for students to purchase textbooks through the traditional college bookstore.

28. The Textbook Division also competes in the used textbook market, which includes the purchase and resale of used textbooks. Primarily, the Textbook Division competes in the wholesale business with Follett, MBS/B&N, and other smaller regional companies, including Budgetext Corporation, Texas Book Company, Tichenor College Textbook Company, and South Eastern Book Company. In addition, the Textbook Division competes with independent college bookstores that normally repurchase textbooks from students to be reused on that campus the following semester. Finally, the Textbook Division competes with student-to-student transactions and a number of individuals and companies that buy textbooks directly from students through e-commerce, bypassing the traditional college bookstores who are the Textbook Division's suppliers and customers.

29. The Complementary Services Division competes with many of the same companies, including MBS in the sale and installation of college bookstore information technology, as well as in the distance education textbook distribution market. In addition, the Debtors compete with college bookstores that provide their own e-commerce solutions in competition with CampusHub. Finally, the Debtors compete with a variety of smaller organizations and individuals involved in marketing and consulting services.

## B. Overview of the Debtors' Capital Structure

30. As of December 31, 2010, the Debtors reported approximately $657.2 million in total assets in book value and approximately $564 million in total liabilities in book value. As of the Petition Date, the Debtors have approximately $450 million in indebtedness and related obligations, consisting of secured obligations of $216.4 million under their First Lien Revolving Credit Facility and Second Lien Notes, and unsecured obligations of $175 million under OpCo Notes, and additional AcqCo unsecured obligations of $77 million of AcqCo Notes (each as defined herein). These obligations are discussed in turn.

### 1. Secured Indebtedness.

#### a. First Lien Revolving Credit Facility.

31. Nebraska Book Company, Inc. ("NBC"), as borrower, NBC Holdings Corp., NBC Acquisition Corp. ("AcqCo"), and all NBC subsidiaries, as guarantors, JP Morgan Chase Bank, N.A., as administrative agent (the "First Lien Agent"), and the lenders party thereto (the "First Lien Lenders") are parties to that certain amended and restated First Lien Credit Agreement (as amended, the "First Lien Facility"), dated as of March 22, 2010.

32. The First Lien Facility provides the Debtors with an asset-based revolving credit facility with $75.0 million of maximum availability. Borrowings under the First Lien Facility are subject to the Eurodollar interest rate (with a 1.5% floor) plus an applicable margin ranging from 4.25% to 4.75% or a base interest rate. In addition, the applicable margin increases 1.5% during the time periods from April 15 to June 29 and from December 1 to January 29 of each year. As of the Petition Date, approximately $26.3 million was outstanding under the First Lien

Facility (including $3.7 million in issued and undrawn letters of credit). The interest rate as of the Petition Date was 8.25%.

33.     The First Lien Facility is secured by a first priority interest in substantially all of the Debtors' property and assets, in addition to a pledge of all capital stock held by the Debtors. The First Lien Facility matures on the earlier of October 2, 2012 or 91 days prior to the earliest maturity of any current outstanding debt obligations. The Second Lien Notes mature on December 1, 2011; as a result the First Lien Facility matures 91 days prior, or on September 1, 2011.

### b.     Second Lien Notes.

34.     NBC, as borrower, and Wilmington Trust FSB, as trustee and collateral agent, are parties to that certain indenture (the "Second Lien Notes Indenture"), dated as of October 2, 2009. The Debtors issued $200 million senior secured notes at a discount of $1.0 million with unamortized bond discount of $0.5 million (collectively, the "Second Lien Notes" and the noteholders thereunder, the "Second Lien Noteholders," together with the First Lien Lenders, the "Prepetition Secured Lenders"). The Second Lien Notes are secured by a second priority interest in substantially all of the Debtors' property and assets and a subordinated pledge of all capital stock held by the Debtors. The Second Lien Notes require semi-annual interest payments at a fixed rate of 10% and mature on December 1, 2011. Each of NBC's subsidiaries guarantees the Second Lien Notes, pursuant to the Second Lien Notes Indenture. As of the Petition Date, the outstanding principal balance of the Second Lien Notes was $200 million.

### c. Intercreditor Agreement

35.    The Debtors, the First Lien Agent, and the Second Lien Notes Trustee are parties

to that certain intercreditor agreement (the "Intercreditor Agreement"), dated as of

October 2, 2009.  The Intercreditor Agreement assigned relative priorities to claims arising under

the First Lien Facility and the Second Lien Notes Indenture.  The Intercreditor Agreement

provides that claims arising under the Second Lien Notes Indenture are junior to claims arising

under the First Lien Facility.  The Intercreditor Agreement also imposes certain limitations on:

(a) the rights and remedies available to the Second Lien Noteholders in an event of default under

the Second Lien Notes Indenture; (b) the Second Lien Noteholders' ability to challenge the

validity or priority of liens arising under the First Lien Facility; (c) the Second Lien Noteholders'

ability to object to debtor-in-possession financing under section 363 or section 364 of the

Bankruptcy Code provided or consented to by one or more of the First Lien Lenders; and (d) the

extent to which the Second Lien Noteholders may be entitled to request adequate protection

during a bankruptcy proceeding.

36.    In the event of a bankruptcy proceeding, the Second Lien Noteholders have

agreed not to object to use of Cash Collateral permitted by the First Lien Lenders and to

subordinate their liens in the Common Collateral (as defined in the Intercreditor Agreement) to

secure postpetition financing provided or consented to by one or more of the First Lien Lenders.

Specifically, section 5.2 of the Intercreditor Agreement provides that:

> If any Loan Party becomes subject to any Insolvency Proceeding at
> any time prior to the First Priority Obligations Payment Date, and
> if the First Lien Agent or the other First Lien Lenders desire to
> consent (or not object) to the use of cash collateral under the
> Bankruptcy Code or to provide financing to any Loan Party under
> the Bankruptcy Code or to consent (or not object) to the provision

of such financing to any Loan Party by any third party (any such financing, "DIP Financing"), then the Second Priority Representative agrees, on behalf of itself and the other Second Lien Noteholders, that each Second Lien Noteholders:

(a) will be deemed to have consented to, will raise no objection to, nor support any other Person objecting to, the use of such cash collateral or to such DIP Financing,

(b) will not request or accept adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing except as set forth in Section 5.4 below,

(c) will subordinate (and will be deemed hereunder to have subordinated) the Second Lien Noteholders' Liens on any Common Collateral (i) to such DIP Financing on the same terms as the First Lien Lenders' Liens are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (ii) to any adequate protection provided to the First Lien Lenders and (iii) to any "carve-out" agreed to by the First Lien Agent or the other First Lien Lenders, and

(d) agrees that notice received two calendar days prior to the entry of an order approving such usage of cash collateral or approving such financing shall be adequate notice so long as the Second Priority Representative retains its Lien on the Common Collateral to secure the Second Priority Obligations (in each case, including proceeds thereof arising after the commencement of the case under the Bankruptcy Code) and (B) all Liens on Common Collateral securing any such DIP Financing shall be senior to or on a parity with the Liens of the First Lien Agent and the First Lien Lenders on Common Collateral securing the First Priority Obligations."[2]

37.     Section 5.4(a) of the Intercreditor Agreement provides that the Second Lien Noteholders will not contest the First Lien Lenders' ability to request adequate protection in a bankruptcy proceeding.  Section 5.4(b) also provides that the Second Lien Noteholders will not contest any objections made by the First Lien Lenders to any motions based on a claim of a lack of adequate protection.  Further, section 5.4(c) provides that the Second Lien Noteholders will

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Intercreditor Agreement.

not contest the payment of any interest or fees owed to the First Lien Agent or the First Lien Lenders under section 506 of the Bankruptcy Code.

38.     Section 5.4 of the Intercreditor Agreement also limits the Second Lien Noteholders' ability to request adequate protection of their security interests in the Debtors' assets.  In particular section 5.4 provides that the only forms of adequate protection the Second Lien Noteholders may seek are:  (a) subordinated replacement liens or (b) superpriority claims that are junior to the superpriority claims granted to the First Lien Lenders.  Other Liens.

39.     In the ordinary course of business, the Debtors have incurred certain secured indebtedness, including mortgage liens, as permitted by their prepetition credit facilities (collectively, the "Permitted Encumbrances").  As described more fully below, the Permitted Encumbrances are not subject to the first priority priming liens granted pursuant to the Interim DIP Order.

### 2. Unsecured Indebtedness.

#### a. OpCo Notes.

40. NBC, as borrower, and BNY Midwest Trust Company, as trustee, are parties to that certain indenture (the "OpCo Indenture"), dated as of March 4, 2004. Pursuant to the OpCo Indenture, NBC issued $175 million senior subordinated notes (collectively, the "OpCo Notes"). The OpCo Notes require semi-annual interest payments at a fixed rate of 8.625% and mature on March 15, 2012. The OpCo Notes are guaranteed by each of NBC's subsidiaries, but are unsecured. As of the Petition Date, the outstanding principal balance of the OpCo Notes was $175 million.

#### b. AcqCo Notes.

41. AcqCo, as borrower, and BNY Midwest Trust Company, as trustee, are parties to that certain indenture, (the "AcqCo Indenture") dated as of March 4, 2004. AcqCo issued $77 million senior discount notes (collectively, the "AcqCo Notes"). The AcqCo Notes require semi-annual interest payments which began on September 13, 2008, at a fixed interest rate of 11% and mature on March 15, 2013. The AcqCo Notes are not guaranteed by any party and are unsecured. As of the Petition Date, the outstanding principal balance of the AcqCo Notes was approximately $77 million.

## II. Events Leading to the Chapter 11 Cases.

### A. Changing Market and Operational Initiatives.

42. The Debtors filed these chapter 11 cases after the Debtors' Bookstore Division suffered through several years of declining or stagnant levels of profitability, which in turn contributed to the Debtors' inability to fully refinance certain funded debt as it matures in 2011 and early 2012. While the Debtors' on-campus stores have maintained strong financial performance over the past several years, the Debtors' off-campus stores have struggled over the

same time period. This disparity is attributable, in large part, to advantages that the Debtors on-campus stores have when compared to the Debtors off-campus stores, including: better location, ties to the schools financial aid system, and school administration support. In addition, many of the Debtors' on-campus store customers are typically "convenience" shoppers, who value the ease of getting the right book at the right time with the least amount of time and effort expended on their part. In contrast, the Debtors' off-campus stores typically appeal to more price-conscious students who are willing to put forth more time and effort in obtaining their classroom materials. These "value shoppers" are willing to go through the trouble of comparison shopping and searching for used books, the historic value proposition for the Debtors' off-campus stores.

43.     Given the difference between the Debtors' on- and off-campus shoppers, the competitive environment for the Debtors' off-campus stores has made it more difficult to maintain market share, which is reflected in the declining performance of the Debtors' off-campus stores. The Debtors believe that the relative decline of their off-campus stores' performance is due to a combination of on-line textbook sales and more recently, online rental programs, which have been successful in attracting "value shoppers," the Debtors' primary customers in the off-campus stores.

44.     In response to this trend, the Debtors expended significant efforts to, among other things, improve the off-campus stores' online capabilities to both sell and acquire textbooks, improve the look and feel of these off-campus stores, and aggressively manage labor and other controllable costs. Despite those improvements, the Debtors' off-campus store performance continued to suffer, falling to $190 million in 2010. Specifically, the Debtors' EBITDA for their

off-campus stores peaked in 2008 at approximately $36 million, declined to approximately $31 million in 2009, and eventually fell to $19 million in 2011.

45.    After further analyzing recent market trends, the Debtors determined that student demand for textbook rental was significantly increasing. In response, the Debtors implemented trial programs at a limited number of stores, and based on the positive results of that program, are currently implementing an extensive rental strategy at all of their brick-and-mortar stores, especially the Debtors' off-campus locations. The Debtors' off-campus stores historically have had large numbers of used textbooks to price aggressively and make the value proposition once again attractive to the value shopper. As discussed above, the Debtors' "Rent Every Book" model has shown significant promise and the Debtors are optimistic that their off-campus stores will rebound as a result. However, it will require some time for the new strategy to prove out.

**B.    Debt Maturity.**

46.    Unfortunately, the Debtors do not have sufficient time to fully implement the rental model without refinancing significant portions of their capital structure given (a) the imminent maturities of the First Lien Facility in September 2011 and the Second Lien Notes Indenture in December 2011, and (b) the possible change in credit terms from the new textbook publishers, who have indicated that they will require an up front cash payment for the large purchases to begin in July and August 2011 due to the uncertainty surrounding the Debtors' refinancing efforts and capital structure.

47.    In response, the Debtors proactively undertook extensive efforts to position themselves for ongoing success in the current industry environment and right-size their capital structure. Initially, the Debtors' implemented a number of operational initiatives to improve earnings and their competitiveness, including cutting certain labor costs that ultimately will save

the Debtors' approximately $5 million over the next 12 months. In addition, the Debtors engaged a third-party operational consulting firm to analyze the Debtors' business practices and help implement inventory optimization models.

48.     While these efforts will streamline the Debtors' business operations, they cannot alone prevent a liquidity shortfall. In late 2010, the Debtors recognized that, given their possible loss of trade credit to finance the acquisition of books during July, and August 2011 and the imminent maturity of approximately $275 million of debt shortly thereafter, they faced an impending liquidity crisis.

### C.     Refinancing.

49.     To address the Debtors' imminent liquidity issue, the Debtors retained an investment banker, Rothschild, Inc. ("Rothschild"), and restructuring legal counsel, Kirkland & Ellis LLP, to potentially refinance certain of their debt obligations and, if necessary, engage creditors and other potential partners for a restructuring transaction. Beginning in January 2011, the Debtors and their advisors began an extensive review of strategic alternatives available in light of the Debtors' current operating environment and leverage constraints. The Debtors focused their initial efforts on refinancing all of the OpCo Notes debt obligations and seeking to extend the maturity of the Holdco Notes. However, lender demand was insufficient to support a refinancing transaction.

### D.     Party Discussions, Draft Plan, and the RSA.

50.     Shortly after it became clear that an Opco refinancing transaction was not available, the Debtors and their advisors began discussing the preliminary terms of a potential balance sheet restructuring with their major stakeholders, including certain holders of the OpCo and AcqCo Notes and their respective advisors. Upon execution of customary confidentiality

agreements, the Debtors provided parties with information regarding the Debtors' operations, projections, and business plan to facilitate their ability to develop a potential restructuring plan or to otherwise constructively participate in the process. After good-faith, arm's-length negotiations, the Debtors reached an agreement with the Plan Support Parties with respect to a consensual restructuring on the terms set forth in the Plan, and formalized the agreement with the RSA.[3] The Debtors received an executed RSA from holders of an aggregate amount of over 95% of the OpCo Notes and (b) holders of over 75% of the AcqCo Notes that contemplates a comprehensive reorganization through a pre-arranged plan of reorganization.

51.     In conjunction with the RSA, the Debtors have obtained commitments for the $200 million postpetition financing, $75 million of which is a revolving loan and $125 million of which is a term loan. This financing, together with cash flow from operations, will enable the Debtors to fund the administration of these cases, send a clear signal to their publisher and general merchandise vendors that they have sufficient liquidity to satisfy any outstanding obligations, and help pave the way to an expeditious and smooth exit from chapter 11.

52.     The Debtors filed these chapter 11 cases to effectuate the terms of the RSA and Plan. Based on the RSA, the Debtors are prepared to file a plan of reorganization and related disclosure statement shortly after the filing of these chapter 11 cases. Indeed, because the Plan is based on a consensual deal with the Debtors' key stakeholders, contemplates a significant de-leveraging of the Debtors' balance sheet, and provides a full recovery to holders of general unsecured claims, confirmation of the Plan is expected to occur over a relatively short timeframe. Specifically, the Debtors and the Plan Support Parties have agreed that: (a) the Plan within 5

---

[3]     A copy of the RSA is attached hereto as **Exhibit A** (including the Plan, which is attached as Exhibit B thereto) and incorporated by reference as though fully set forth herein.

days and Disclosure Statement must be filed within 20 days of the Petition Date; (b) the Disclosure Statement and accompanying solicitation materials must be approved and a hearing to confirm the Plan must be scheduled, within 55 days after the filing of the Plan; (c) the Plan must be confirmed within 60 days of the date on which the Disclosure Statement is approved (subject to a 14-day extension under certain circumstances); and (d) and the Plan must become effective within 16 days of the confirmation date (subject to a 14-day extension under certain circumstances).

53.     As noted above, the Debtors have filed these chapter 11 cases to implement a Plan in accordance with the draft Plan attached to the RSA as Exhibit B.  Among other things, the draft Plan provides that:[4]

- Claims under the First Lien Facility shall be paid in full in cash or otherwise unimpaired.

- To the extent that holders of Second Lien Notes agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 2, each such Holder shall be paid in full in Cash.[5]

- Claims under the Opco Notes will be allowed in an aggregate amount equal to approximately $175 million.  In satisfaction of each claim under the 8.625% Notes, each holder thereof shall receive its pro rata share of: (a) a $30.6 million cash payment from the proceeds of new second lien secured notes to be issued by Nebraska Book; (b) the new unsecured notes with a face value of $120 million; and (c) 78% of the New Common Equity.

---

[4]   The following summary is provided for convenience only and is qualified in its entirety by reference to the draft Plan. In the event of an inconsistency between this summary and the draft Plan, the draft Plan shall control in all respects.

[5]   The Second Lien Notes Indenture contemplates a "makewhole" payment if the Debtors satisfy the notes before maturity.  The "makewhole" amount changes on a day-to-day basis, and may not be payable after the Petition Date.

- Claims under the Acqco Notes will be allowed in an aggregate amount equal to approximately $77 million. In satisfaction of each claim under the AcqCo Notes, each holder thereof shall receive its pro rata share of 22% of the New Common Equity.

- Trade creditors and all other general unsecured claims will be paid in full.

- The Debtors' existing equity interests shall be cancelled and holders may be issued New Warrants if Weston Presidio and each of its affiliates which are Holders of HoldCo Interests either (i) executes a joinder to the Plan Support Agreement which binds at least 90% in amount of the Holdco Interests to support the Restructuring Transactions, or (ii) does not object to the Plan evidencing the Restructuring and votes to accept the Plan.

The Plan results in a full recovery by trade creditors and other general unsecured creditors (other than the OpCo and AcqCo notes). As a result, the Debtors believe that the consummation of the Plan is a remarkable result under the circumstances and will result in the highest possible recoveries for all stakeholders.

## III.     First Day Motions.

54.     To minimize the adverse effects of the commencement of these chapter 11 cases on their business, the Debtors have requested various types of relief in their First Day Motions.[6] The First Day Motions seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption to the Debtors' operations caused by their bankruptcy filings, thereby preserving the value of the Debtors' estates for the benefit of their stakeholders. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful reorganization; and (c) best serves the interests of

---

[6]    Capitalized terms used but not defined herein shall have the meanings set forth in the relevant First Day Motion.

the Debtors' stakeholders. The following paragraphs describe the factual bases for the relief requested in each of the First Day Motions.

### A. Matters Requested to Be Heard at First Day Hearing.

#### 1. Joint Administration Motion.

55. The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of lead Debtor Nebraska Book Company, Inc. Further, the Debtors request that an entry be made on the docket of each of the cases of the Debtors other than Nebraska Book Company, Inc., to indicate the joint administration of these chapter 11 cases.

56. Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will be filed in these chapter 11 cases will almost certainly affect each of the Debtors. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

57. The relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Joint Administration Motion should be granted.

## 2.     DIP Motion.

58.     The Debtors request entry of interim and final orders approving post-petition debtor in possession financing, which among other things, provides the Debtors with the following relief: (a) authorizing the Debtors to obtain postpetition financing on a senior secured, priming, superpriority basis; (b) authorizing the Debtors to use Cash Collateral; (c) granting adequate protection to certain Prepetition Secured Lenders for the priming of their existing liens on the Prepetition Collateral and the Debtors' use of Cash Collateral; and (d) scheduling a final hearing to consider entry of the Final DIP Order.

59.     In light of the Debtors' imminent liquidity needs, in the months prior to the Petition Date, the Debtors worked closely with their advisors to explore capital markets, as well as explore options with incumbent lenders in the Debtors' existing capital structure, in an effort to refinance the Debtors' prepetition debt obligations.  For six months, the Debtors and their advisors devoted their efforts to refinancing the Debtors' prepetition debt obligations or amending and extending the Debtors' various notes.  Simultaneously searching for potential sources of debtor-in-possession financing would have doomed the potential out-of-court refinancing.

60.     Once it became clear that an out-of-court refinancing was not possible, the Debtors and their advisors entered into extensive, arm's-length negotiations with the First Lien Agent regarding the terms of a potential debtor-in-possession financing, due to First Lien Agent's extensive knowledge of the Debtors' business and extensive experience with asset-backed revolving credit facilities, to ensure that the Debtors have sufficient liquidity to continue operations and to preserve the value of their estates.  The First Lien Agent's strong syndication desk gave the Debtors comfort that the universe of potential participants in the DIP Facility

would be well-canvassed, thereby providing for competition among potential participants and more favorable terms for the Debtors' DIP Facility.

61.     While the Debtors engaged other potential sources of debtor-in-possession financing, the potential lender universe was limited by the fact that many parties with the experience or appetite for lending to textbook companies were already participants in the Debtors' existing First Lien Facility. Further, debtor-in-possession financing from any other source would have required certain consents from the Debtors' Prepetition Secured Lenders as a condition to effectiveness, or would have required a contested priming fight in the first day of these chapter 11 cases. Accordingly, to avoid this high risk of distracting and costly priming and adequate protection disputes, the Debtors determined that a DIP Facility from the existing First Lien Lenders was the only viable alternative.

62.     After duly considering other potential sources of debtor-in-possession financing, the Debtors' advisors believe that the DIP Facility is the best debtor-in-possession financing package available to the Debtors. The DIP Facility provides an attractive financing package, with market terms comparable to those in similar debtor in possession financing packages.

63.     The Debtors need the funds provided under the DIP Facility to preserve the value of their estates for the benefit of all creditors and other parties of interest. This financing will help enable the Debtors to fund the administration of these cases and help pave the way to an expeditious and smooth exit from chapter 11. The college and university semester and quarterly schedules drive the Debtors' business cycle and require the Debtors to make large orders and receive large shipments of new textbooks and general merchandise between mid-June and August each year in advance of the "back-to-school" rush. The Debtors' general merchandise vendors and the publishers allow the Debtors to purchase textbooks and other merchandise on

trade credit. The Debtors' ability to procure the needed textbooks on these beneficial terms, however, is entirely based on the Debtors' liquidity and the perception of the Debtors' ability to re-pay publishers and general merchandise vendors for providing textbooks and merchandise on credit. Absent the postpetition financing the Debtors may be unable to operate their business or successfully reorganize under chapter 11, and may be forced to immediately shut down their operations, which I believe will threaten the Debtors' going concern value. I believe that providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these chapter 11 cases is in the best interest of all stakeholders.

64.     The DIP Facility will provide the Debtors with immediate access to $125 million in postpetition financing, which the Debtors and their advisors have independently determined is sufficient and necessary to allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these chapter 11 cases. Further, the DIP Facility provides the Debtors with use of the cash collateral, which will maintain the Debtors' ability to access liquidity in the same accounts as prior to the Petition Date, without the disruption or delay that would result if the Debtors were required to set aside that cash and re-fund their accounts with new postpetition borrowings. Accordingly, the terms of the DIP Facility are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these chapter 11 cases.

65.     The DIP Facility satisfies all of the requirements of section 5.2 of the Intercreditor Agreement. Because the First Lien Lenders are providing the DIP Facility, section 5.2(a) of the Intercreditor Agreement prohibits the Second Lien Noteholders from objecting to the DIP Facility or requesting adequate protection, except as specifically provided for in the Intercreditor Agreement. In addition, the First Lien Lenders' liens and the Second Lien Noteholders' liens

will both be subordinated to the new DIP Facility liens, as required by section 5.2(c) of the Intercreditor Agreement. Thus, the Second Lien Noteholders are deemed to consent to the Debtors' access to the DIP Facility and the Debtors' use of Cash Collateral.

66.     In addition, the Debtors and the Ad Hoc Group negotiated the terms of the Adequate Protection Stipulation prior to the Petition Date. Pursuant to the Adequate Protection Stipulation, the Ad Hoc Group agreed to direct the Second Lien Notes Indenture Trustee to accept, and not object, to the Debtors providing the Adequate Protection for in the Interim DIP Order to the Prepetition Secured Lenders.

67.     To prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and is necessary for the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the DIP Motion should be granted.

### 3.     Cash Management Motion.

68.     The Debtors request authority to:  (a) continue to use their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) open new debtor in possession accounts or close existing Bank Accounts, if needed; and (d) use, in their present form, all correspondence and business forms (including, letterhead, blank check stock, purchase orders, and invoices), and other documents related to the Bank Accounts existing immediately before the date hereof, without reference to their status as debtors in possession.

69.     The Debtors further request that the Court authorize the Banks at which they maintain the Bank Accounts to:  (a) continue to maintain, service, and administer the Bank

Accounts; (b) debit or credit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashiers' checks prior to the Petition Date, and (ii) checks or other items deposited in the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtors were responsible for such items prior to the Petition Date.

70.     Given the complexity of the Cash Management System, I believe that if the Debtors were required to comply with the guidelines established by the Office of the United States Trustee, the burden of opening new bank accounts, revising cash management procedures, and the immediate ordering of new business forms with a "Debtor In Possession" legend, would severely disrupt the Debtors' businesses and cause additional confusion, delay, and cost at this critical time.

71.     The Debtors use an integrated, centralized Cash Management System under which the Debtors collect and disburse funds in the ordinary course of business. As of Petition Date, the Cash Management System consists of approximately 333 Bank Accounts.  The Debtors' primary banks are Wells Fargo Bank, N.A. and M&I Bank.  In addition, because most of their stores deposit cash receipts, the Debtors maintain accounts at Banks other than the Primary Banks.

72.     The Cash Management System has three main components: (a) cash collection, including the collection of payments made to the Debtors by their customers; (b) cash concentration; and (c) cash disbursements to fund the Debtors' operations, primarily consisting of (i) payments to vendors and service providers to ensure a steady supply of products available

for purchase by the Debtors' rental and wholesale customers, (ii) payments to individuals who buyback used textbooks from students, and (iii) payments to fund payroll.

73.     To prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

### 4.     KCC Retention Application.[7]

74.     The Debtors seek to retain Kurtzman Carson Consultants LLC ("KCC") as notice and claims agent. I believe that by retaining KCC in these chapter 11 cases, the Debtors' estates, and particularly their creditors, will benefit from KCC's service. KCC has developed efficient and cost-effective methods in its area of expertise. It is my understanding that KCC is fully equipped to handle the volume of mailing involved in properly sending the required notices to creditors and other interested parties in the chapter 11 cases and, therefore, I respectfully submit that the KCC Retention Application should be approved.

### 5.     Wages Motion.

75.     The Debtors request the entry of an order authorizing, but not directing, the Debtors to pay prepetition claims, to honor obligations, and to continue programs, in the ordinary course of business and consistent with past practices, relating to the Employee Obligations.

76.     As of the Petition Date, the Debtors employ approximately 2,500 employees. Although the Debtors have paid their wages, salary, and other Employee Obligations in

---

[7]     Other than their notice and claims agent, the Debtors do not seek authority to retain their professionals on a first day basis.

accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition Employees Obligations may nevertheless be due and owing.

77.     I believe the majority of the Debtors' Employees rely exclusively on their compensation, benefits, employee programs, and reimbursement of expenses provided by the Debtors to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations to the Employees for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical. In the absence of such payments, the Debtors' Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors, thereby hindering the Debtors' ability to meet their customer obligations, and likely diminishing customer confidence in the Debtors. It is my opinion that the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a massive and costly distraction at a time when the Debtors must focus on restructuring their operations and balance sheets.

78.     I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Thus, to prevent immediate and irreparable harm to the Debtors' business, I respectfully submit that the relief requested in the Wages Motion should be granted.

### 6.      Customer Programs Motion.

79.     The Debtors seek entry an order authorizing the Debtors to maintain and administer the Customer Programs (as defined in the Customer Programs Motion) and to honor,

in the ordinary course of business, approximately $24.1 million in prepetition commitments owing on account of the Customer Programs, including rebates, returns and exchanges, rewards, rental partnerships, payments to colleges and universities, gift certificates, and loyalty cards. The Debtors operate in a highly competitive industry and must actively cultivate customer support and ensure that they are able to respond to their customers' needs. The Debtors have entered bankruptcy to effectuate a balance sheet restructuring, thus I believe that it is essential that the Debtors quickly assure customers that the goods and services that they have come to expect from the Debtors will continue uninterrupted as a result of the Debtors' restructuring.

80. The Customer Programs generate customer loyalty and goodwill, increase the Debtors' competitive position, and ensure customer satisfaction. The loyalty and continued patronage of the Debtors' customers is critical to the Debtors' financial health and their ability to reorganize as a going concern. Absent authority to continue the Customer Programs in the ordinary course of business, customers may feel that the Debtors are no longer offering a level of service on par with that of the Debtors' competitors, inevitably leading to customer attrition due to the highly competitive nature of the used textbook industry. Additionally, I believe these programs help stave off fierce competition from competitors who will continue to pursue relationships with the Debtors' customers. Moreover, any loss of customers caused by failure to honor the Customer Programs will damage the Debtors' core business to a far greater extent than the costs associated with honoring prepetition obligations and continuing such practices.

81. Thus, to prevent immediate and irreparable harm to the Debtors' customer base, I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of

34

the Debtors, I respectfully submit that the relief requested in the Customer Programs Motion should be granted.

### 7. Taxes Motion.

82. The Debtors request authority to pay any Taxes and Fees that accrued or arose in the ordinary course of business prior to the Petition Date. In the ordinary course of business, the Debtors incur and collect certain Taxes and Fees and remit such Taxes and Fees to various Authorities, including Sales and Use Taxes, Franchise and Income Taxes, Vehicle Registration Fees, Real and Personal Property Taxes, and Business License Fees. The Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during these chapter 11 cases. Specifically, it is my understanding that the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' business operations because the Authorities could suspend the Debtors' operations, attempt to file liens, or seek to lift the automatic stay. In addition, certain Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which undoubtedly would distract those key employees from their duties related to the Debtors' restructuring.

83. Thus, to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Taxes Motion should be granted.

### 8. Shippers Motion.

84. The Debtors request the entry of an order (a) authorizing the Debtors to grant administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed

obligations of the Debtors for goods ordered prepetition and delivered postpetition and authorizing the Debtors to satisfy such obligations in the ordinary course, and (b) authorizing, but not directing, the Debtors to pay prepetition claims of Shippers, Warehousemen, and Materialmen. Prior to the Petition Date, the Debtors ordered goods for which delivery will not occur until after the Petition Date. As a result of the commencement of these chapter 11 cases, suppliers may be concerned that the goods ordered prior to the Petition Date will render the suppliers general unsecured creditors of the Debtors' estates with respect to such goods. As a result, the Suppliers may refuse to ship or transport such orders unless the Debtors issue substitute purchase orders postpetition or the Court permits the Debtors to meet their obligations under the Outstanding Orders.

85.     In addition, the Debtors contract with a number of counterparties for the acquisition of goods necessary for the day-to-day operation of the Debtors' business. Such items include (most importantly) textbooks, as well as computer components, e-commerce software, office supplies, packing materials for customers, and other merchandise. Timely delivery of these items is vital to the Debtors' efforts to stock their on-campus and off-campus bookstores and to maintain quality standards under their management and operating agreements.

86.     The Debtors store their textbooks and other inventory in secure offsite storage space with certain warehouse facilities. The availability of these warehoused goods is critical to the Debtors' ongoing efforts to maintain and to improve their properties. In particular, any efforts by the Debtors to successfully cure defaults under their management and operating agreements with respect to property improvement requirements will likely require unfettered access to the warehoused inventory. Finally, the Debtors do business with a number of third parties who could potentially assert liens against the Debtors and their property for amounts the

Debtors owe to those third parties, including mechanic's liens and materialmen's liens. The Debtors must have continued access to their property during these chapter 11 cases and, therefore, believe it is appropriate to have authority to satisfy such obligations, to the extent they determine satisfaction is necessary.

87. To prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Shippers Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Shippers Motion should be granted.

### 9. Critical Vendor Claims Motion.

88. The Debtors request entry of an order authorizing the Debtors to pay, in their sole discretion, (a) Critical Vendor Claims and (b) Section 503(b)(9) Claims. The college and university semester and quarterly schedules drive the Debtors' business cycle and require the Debtors to make large orders and receive large shipments of new textbooks and general merchandise between late-June and August in advance of the "back-to-school" rush. To be clear, the Debtors are not seeking authority to pay all prepetition trade claims at this time. Rather, the Debtors seek authority by the Critical Vendor Claims Motion to pay only certain prepetition trade claims that are necessary to maintain business operations without interruption while in chapter 11 and to ensure the Debtors' survival as a going concern.

89. The Debtors' trade relationships with their Critical Vendors are not generally governed by long-term contracts, thus, the Debtors believe that they may materially deteriorate causing disruption to the Debtors' operations if the Debtors are unable to pay Critical Vendor Claims as provided herein. In addition, certain Critical Vendors have small operations with

limited access to working capital and may be highly dependent upon the Debtors' business for a substantial portion of their revenues. The failure to pay certain Critical Vendor Claims could result in Critical Vendors either filing their own bankruptcy cases or ceasing operations altogether. These Critical Vendor candidates generally include:

- Publishers: The Debtors purchase their supply of new textbooks from two subsets of Publishers. First, the Debtors rely on hundreds of large Publishers who provide numerous textbook titles required by the Debtors at their on- and off-campus stores. Second, the Debtors buy textbooks from certain Publishers that print only a small number of titles or even a single textbook, which provide the Debtors with rare and uncommon textbooks requested by professors. Both groups of the Publishers are sole-source providers for the textbooks they print. Furthermore, in the aggregate, $216.5 million of the Debtors' revenues or 34% is derived from new textbook sales from these Publishers, all of which could be lost if the Publishers refuse to ship textbooks to the Debtors.

- General Merchandise Vendors: The Debtors also rely on a core group of vendors for numerous items the Debtors sell in their on-campus bookstores, including backpacks, binders, notebooks, folders, food, required tools for technical colleges, apparel vendors and licensing counterparties for "sideline" apparel (official school apparel bearing each school's officially licensed logos and marks), and other related items. These vendors are essential to the continued operation of the Debtors' stores and also enable the Debtors to maintain the individual school offerings in each of their retail on- and off-campus stores. In the aggregate, $79.8 million of the Debtors' revenues or 12.48% is derived from general merchandise and apparel sales from these General Merchandise Vendors, all of which would disappear if the General Merchandise Vendors refuse to ship general merchandise and clothing and apparel to the Debtors.

- Systems Vendors: The Debtors offer for license or purchase technology solutions that are custom-made systems running on very specific hardware to their wholesale textbook customers. Customers purchasing these solutions from the Debtors are required to also purchase from a list of approved computer brands and models provided from a core group of vendors.

- Construction Services Providers: In an attempt to uniformly design their campuses, certain colleges and universities require the Debtors to use only certain architectural service firms for on-campus remodel projects. If the Debtors do not use the required Construction Services Providers, they will be in violation of their contracts with those certain colleges and universities. Any violation of the terms of the contracts with the colleges and universities may result in termination of those contracts, and the Debtors would lose the ability to manage many college

bookstores, a significant loss of revenue and jobs and ultimately value for creditors.

90.     The second category of prepetition claims the Debtors seek authority to pay in the ordinary course of business are Section 503(b)(9) Claims—claims on account of goods received by the Debtors within 20 days prior to the Petition Date. The creditors holding such claims are entitled to request payment as an administrative expense under section 503(b)(9) of the Bankruptcy Code on account of such goods. During June, July, and August of each year, the Debtors' primary expenditures are for textbooks and general merchandise in advance of the back-to-school rush. As a result, a substantial portion of Section 503(b)(9) Claims are held by Critical Vendors.

91.     I believe that if the Debtors fail to honor their prepetition obligations to the Critical Vendors, including those with Section 503(b)(9) Claims, the Critical Vendors may permanently deny the Debtors access to essential goods or services or be forced to locate alternative sources of such (which may not be, and in the case of the Publishers are not, readily available), thereby incurring additional expenses and delays and jeopardizing key customer relationships. Especially, in the context of textbook sales, disruption at any point of the Debtors' business model would spell disaster for the Debtors' operations.

92.     Non-payment of Critical Vendor Claims that are currently outstanding or will become due and payable could jeopardize key relationships and undermine the Debtors' efforts to reorganize. It is imperative that the Debtors send a clear message to their essential business partners and customers by paying the Critical Vendor Claims as provided herein to secure their access to the goods and services upon which the Debtors rely, thereby preserving the Debtors' ability to retain customers and maintain their vast selection of textbooks.

93.     In addition, any disruption to the relationship with the Publishers will drastically affect the ability of the Debtors to satisfy their obligations under the agreements allowing the Debtors' to operate the various on-campus bookstores and to compete with other on-campus and on-line textbook businesses. The Debtors' operations would cease in dramatic fashion, causing an inevitable loss of jobs, revenue, and ultimately value for creditors, if they are unable to procure textbooks from the Publishers. The inability of the Debtors to secure required textbooks from the Publishers would cause immediate and irreparable harm to the Debtors' reputation and ability to reorganize as a going-concern. As of the Petition Date, the Debtors estimate that they owe a substantial amount on account of the prepetition claims owed to the Publishers. The Debtors, however, also have outstanding credit requests that can be used against the outstanding balance owed to the Publishers. The Debtors are making their best efforts to receive the benefit of 100% of those credit requests, however, request authority, but not direction, to pay the Publishers the full amount in the Debtors' business judgment to ensure the Publishers continue to fill the Debtors' textbook orders.

94.     Thus, to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and is necessary for the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Critical Vendors Motion should be granted.

### 10.     Utilities Motion.

95.     By the Utilities Motion, the Debtors request entry of an interim and final orders: (a) determining that the Utility Providers have been provided with adequate assurance of

payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the final order; and (d) determining the Debtors are not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion, pending entry of the Final Order.

96.     In the ordinary course of business, the Debtors incur utility expenses for electric, gas, water, telephone, Internet, and other similar utility services provided by approximately 336 utility providers.  I believe that uninterrupted utility services are essential to the Debtors' ongoing operations.  Additionally, any interruption of utility services, even for a brief period of time, likely would negatively affect the Debtors' reorganization efforts.  Therefore, it is critical that utility services continue uninterrupted during these chapter 11 cases.

97.     I believe that the proposed procedures are necessary in these chapter 11 cases because, if such procedures are not approved, the Debtors could be forced to address numerous requests by the Utility Providers for adequate security in a disorganized manner during the critical first weeks of these chapter 11 cases.  Moreover, absent the relief sought in the Utilities Motion, a Utility Provider could blindside the Debtors by unilaterally deciding—on or after the 30th day following the Petition Date—that it is not adequately protected and threaten to discontinue service or make an exorbitant demand for payment to continue service. Discontinuation of utility service could essentially shut down operations, and any significant disruption of operations could put these chapter 11 cases in jeopardy.

98.     Thus, to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the relief requested in the Utilities Motion should be granted.

**B.     Matters Requested to be Scheduled For Future Hearing.**

**1.     Kirkland Retention Application.**

99.     The Debtors seek to retain Kirkland & Ellis LLP ("Kirkland") as their restructuring attorneys. Kirkland has extensive experience and knowledge in, and an excellent reputation for providing high-quality legal services in the field of debtor protections, creditor rights, and business reorganizations under chapter 11 of the Bankruptcy Code. In preparing for these chapter 11 cases, Kirkland has become familiar with the Debtors' business and the legal issues that may arise in these chapter 11 cases. I believe that Kirkland is well-qualified and uniquely able to represent the Debtors in these chapter 11 cases and respectfully submit that the Kirkland Retention Application should be approved.

**2.     Rothschild Retention Application.**

100.     The Debtors seek to retain and employ Rothschild, Inc. ("Rothschild") as their financial advisor and investment banker because, among other things, Rothschild has extensive experience in, and an excellent reputation for, providing high-quality investment banking and financial advisory services to debtors in bankruptcy reorganizations and other restructurings. Broadly speaking, Rothschild will assist in the evaluation of strategic alternatives and render investment banking services to the Debtors in connection with their ongoing restructuring efforts. For these reasons, the Debtors require the services of a capable and experienced

investment bank and financial advisor such as Rothschild. Rothschild has been providing the Debtors with financial advisory services since January 2011, and has played a key role in negotiations with the Debtors' key constituencies in preparation for these chapter 11 cases. I believe that Rothschild is well-qualified to address the complex financial issues that the Debtors are likely to confront during these chapter 11 cases and respectfully submit that the Rothschild Retention Application should be approved.

### 3.      AlixPartners Retention Application.

101.    The Debtors seek to retain and employ AlixPartners LLP ("AlixPartners") as their restructuring advisor based upon, among other things, (a) the Debtors' need to retain a restructuring advisory firm to provide advice with respect to the Debtors' restructuring efforts and (b) AlixPartner's professional standing, excellent reputation, and wealth of experience in providing restructuring advisory services in complex restructurings. AlixPartners has been providing the Debtors with restructuring advisory services since May 2011 and has assisted in preparation of these chapter 11 cases. I believe that AlixPartners is well-qualified to address the complex issues that the Debtors are likely to confront during the chapter 11 cases and respectfully submit that the AlixPartners Retention Application should be approved.

### 4.      Deloitte Retention Application.

102.    The Debtors seek to retain and employ Deloitte & Touche LLP ("Deloitte") as their auditor based upon, among other things, Deloitte's considerable expertise in the field. I believe that Deloitte is well-qualified to perform audit and quarterly review services related to the Debtors' public financial reporting with the Securities and Exchange Commission, as well as tax consultation services needed by the Debtors and respectfully submit that the Deloitte Retention Application should be approved.

### 5. OCP Motion.

103.     The Debtors request authority to retain and compensate professionals used in the ordinary course of their businesses. The Debtors retain various attorneys in the ordinary course of their businesses (each, an "OCP" and, collectively, the "OCPs"). The OCPs provide legal services to the Debtors in a variety of matters unrelated to these chapter 11 cases, including providing legal services related to specialized areas of the law.

104.     Due to the number of OCPs that are regularly retained by the Debtors, I believe it would be unwieldy and burdensome to both the Debtors and the Court to request each such OCP to apply separately for approval of its employment and compensation. While I believe that some OCPs may wish to continue to represent the Debtors on an ongoing basis, others may be unwilling to do so if the Debtors cannot pay them on a regular basis. Without the background knowledge, expertise, and familiarity that the OCPs have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating replacement professionals about the Debtors' business and financial operations. Moreover, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business.

105.     I believe that the continued retention and compensation of the OCPs is in the best interests of the Debtors' estates, creditors, and other parties in interest, and that the Ordinary Course Professionals Motion should be granted. Thus, to prevent immediate and irreparable harm to the Debtors' business, I respectfully submit that the relief requested in the OCP Motion should be granted.

### 6. Interim Compensation Procedures Motion.

106. The Debtors request authority to establish procedures for the interim compensation and reimbursement of expenses for Professionals and Committee Members. I believe that establishing orderly procedures for addressing issues related to payment of Professionals and Committee Members will streamline the administration of these chapter 11 cases and otherwise promote efficiency for the Court, the U.S. Trustee, and all parties in interest. I also believe that the Compensation Procedures Motion will permit the Debtors to manage payments efficiently to the Professionals and Committee Members and will allow all parties to monitor appropriately the cost of administration of these chapter 11 cases. Accordingly, I believe the approval of the Compensation Procedures Motion is in the best interests of the Debtors' estates, creditors, and other parties in interest and respectfully submit that the relief requested in the Compensation Procedures Motion should be granted.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Dated:     June 21, 2011

By: _____
Alan G. Siemek
Chief Financial Officer
Nebraska Book Company, Inc.