# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NEBRASKA BOOK COMPANY, INC., *et al.*,[1] | ) Case No. 11-12005 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND LETTERS OF CREDIT, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS AND APPROVING THE ADEQUATE PROTECTION STIPULATION, AND (D) SCHEDULING A FINAL HEARING

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a final order (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"), (a) authorizing the Debtors to obtain postpetition financing on a senior secured, priming, superpriority basis; (b) authorizing the Debtors to use Cash Collateral (as defined herein); (c) granting adequate protection to certain Prepetition Secured Lenders (as defined herein) for the priming of their existing liens on the Prepetition Collateral (as defined herein) and the Debtors' use of the Cash Collateral and approving the Adequate Protection Stipulation (as defined herein); and (d) scheduling a final

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number include: Nebraska Book Company, Inc. (9819); Campus Authentic LLC (9156); College Bookstores of America, Inc. (9518); NBC Acquisition Corp. (3347); NBC Holdings Corp. (7477); NBC Textbooks LLC (1425); Net Textstore LLC (6469); and Specialty Books, Inc. (4807). The location of the debtors' service address is: 4700 South 19th Street, Lincoln, Nebraska 68512.

hearing to consider entry of the Final DIP Order. In support of the Motion, the Debtors respectfully state as follows.[2]

## Jurisdiction

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## Introduction

4.      Prior to filing their pre-arranged chapter 11 cases, the Debtors pre-negotiated the terms of a chapter 11 plan (the "Plan") with the Plan Support Parties (as defined herein). The Debtors also obtained commitments for $200 million in postpetition financing, consisting of a $75 million revolving loan and a $125 million term loan, pursuant to the DIP Agreement (as defined herein) and the Commitment Letter (as defined herein). This financing, together with cash flow from operations, will enable the Debtors to fund the administration of these cases and help pave the way to a smooth and expeditious exit from chapter 11.

---

[2]      The facts and circumstances supporting this Motion are set forth in the *Declaration of Alan G. Siemek of Nebraska Book Company, Inc. In Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and the *Declaration of Todd R. Snyder in Support of the Motion of the Debtors for Entry of Interim and Final DIP Orders (A) Authorizing the Debtors to Obtain Postpetition Financing And Letters of Credit, (B) Authorizing the Debtors To Use Cash Collateral, (C) Granting Adequate Protection to Prepetition Secured Lenders, and (D) Scheduling a Final Hearing,* attached hereto as **Exhibit C** (the "Snyder Declaration").

5.     The college and university semester and quarterly schedules drive the Debtors' business cycle and require the Debtors to place large orders and receive large shipments of new textbooks and general merchandise between mid-June and August of each year in advance of the Fall "back-to-school" rush.   Historically, the Debtors' general merchandise vendors and the publishers allow the Debtors to purchase textbooks and other merchandise with substantial trade credit.  The Debtors' ability to procure the needed textbooks and other merchandise, however, is entirely based on the Debtors' liquidity and the perception of the Debtors' ability to re-pay publishers and general merchandise vendors for providing their products on credit.  The Debtors, therefore, must send a clear message that they are a healthy business worthy of trade credit on prepetition terms during their balance sheet restructuring.  Indeed, such message may not suffice to preserve prepetition levels of trade credit, thus requiring utilization of the DIP Facility to purchase critical inventory on a timely basis.

6.     The approval of the DIP Facility will substantially enhance the Debtors' ability to minimize disruption to their businesses and instill confidence in their various creditor constituencies, including publishers, general merchandise vendors, customers, employees, and service providers, allowing the Debtors to, among other things, continue operating their businesses in the ordinary course, thereby preserving value for the benefit of all stakeholders.  As a result, approval of the DIP Facility and authority to continue using Cash Collateral (as defined herein) is necessary for the Debtors to seamlessly transition their business into chapter 11 at this critical stage in their business cycle and ultimately reorganize in a successful and expedient manner.

3

## Summary of Relief Requested

7.     By this Motion, the Debtors request entry of the DIP Orders, which among other

things, provide the Debtors with the following relief:[3]

- Cash Collateral:   authority to use the Debtors' cash on hand, cash proceeds of Prepetition Collateral (as defined herein), and other cash that constitutes the Prepetition Secured Lenders' "cash collateral," as that term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral");

- DIP Facility:   authority to obtain postpetition loans in a principal amount not to exceed $125 million on an interim basis, and $200 million on a final basis, consisting of a $75 million revolving loan (the "Revolving DIP Loan") and a $125 million term loan (the "Term DIP Loan" and, together with the Revolving DIP Loan, the "DIP Facility") and other financial accommodations, pursuant to the terms and conditions of the Superpriority Debtor-in-Possession Credit Agreement (the "DIP Agreement"), substantially in the form attached hereto as **Exhibit D**.  The initial Term DIP Loan proceeds will be used, among other things, to repay the loans outstanding under the First Lien Credit Agreement (defined below);

- LC Facility:   authority to issue new letters of credit as well as cause certain letters of credit issued and outstanding prior to the closing date of the DIP Facility (the "Closing Date") pursuant to that certain credit agreement (the "First Lien Credit Agreement") dated as of October 9, 2009, (collectively, with any letters of credit thereafter deemed under the DIP Agreement, the "Letters of Credit") to be deemed to have been issued upon entry of this Order under the DIP Agreement.

- DIP Documents:   authority to execute and deliver the DIP Agreement and all agreements, documents, and instruments contemplated by each, including that certain Commitment Letter (the "Commitment Letter"), dated as of June 26, 2011, between the Debtor, the DIP Agent, and certain other DIP Lenders (as defined below) (collectively, the "DIP Documents"), and to take all actions necessary, appropriate, or required to comply with the Debtors' obligations thereunder and under the DIP Orders;

- DIP Liens and Claims:   authority to grant the DIP Agent, for its own benefit and the benefit of the DIP Lenders, senior, first priority, priming DIP liens on the DIP Collateral (as defined in the Interim DIP Order) securing, and the superpriority claims in respect of, the DIP Facility (the "DIP Liens");

---

[3]   This summary is qualified in its entirety by reference to the actual DIP Documents (including as such DIP Documents may be amended in connection with the syndication of the DIP Facility) and the DIP Orders. The DIP Documents and the DIP Orders shall control if there is any conflict between them and this summary.

4

- Adequate Protection:  approval of the Adequate Protection (as defined herein) to be provided to the First Lien Agent (as defined herein) and/or certain of the other Prepetition Secured Lenders, to protect the Prepetition Secured Lenders' interests in the personal and real property of such Debtors constituting "Collateral" under, and as defined in, the First Lien Credit Agreement (together with the Cash Collateral, the "Prepetition Collateral") and approval of the stipulation, attached hereto as **Exhibit B** granting Adequate Protection  (the "Adequate Protection Stipulation") between the Debtors and an ad hoc group of holders of Second Lien Notes (as defined herein) holding collectively more than 50% of the outstanding amount of Second Lien Notes (the "Ad Hoc Group"); and

- Final Hearing:  a date for a hearing on the Motion to consider entry of the Final DIP Order, to be held no sooner than 14 days after the date of service of this Motion, and no later than 25 days after the Petition Date.

## Summary of Principal Terms of DIP Facility

8.     Pursuant to Bankruptcy Rules 4001(b), (c), and (d), and Local Bankruptcy Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the DIP Documents and DIP Orders:[4]

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
| --- | --- |
| **DIP Agreement Parties**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Debtor Parties**:<br><br>Borrower:     Nebraska Book Company, Inc. (the "Borrower")<br><br>Guarantors:   HoldCo, AcqCo, Specialty Books, Inc., NBC Textbooks LLC, College Bookstores of America, Inc., Campus Authentic LLC, and Net Textstore LLC (collectively, the "Guarantors," and together with the Borrower, the "Loan Parties")<br><br>DIP Lead Arrangers:     JPMorgan Securities LLC<br><br>Administrative Agent:     JPMorgan Chase Bank, N.A. (in such capacity, the "DIP Agent")<br><br>DIP Lenders:     The several banks and other financial institutions or entities from time to time parties to this Agreement (collectively with the DIP Agent, the "DIP Lenders")<br><br>Issuing Lender:     JPMorgan Chase Bank N.A. (in such capacity, the "Issuing Lender") |

---

4    Capitalized terms used in this statement but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Documents or DIP Orders, as applicable.  This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents (including as such DIP Documents may be amended in connection with the syndication of the DIP Facility) or the DIP Orders, as applicable.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control.

5

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
| --- | --- |
| **Maturity**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Facility will mature on the first anniversary of the Closing Date.<br><br>(DIP Agreement, § 1.1) |
| **Purpose**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Facility**. The DIP Facility will be used for working capital purposes, repayment of loans under the First Lien Facility and the cash collateralization of Letters of Credit and the payment of fees and expenses incurred in connection with entering into this DIP Agreement and the transactions contemplated hereby.<br><br>(DIP Agreement, § 4.16) |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Interest Rate for Base Rate Revolving DIP Loans**. Base Rate + 2.50% *per annum*.<br><br>**Interest Rate for Base Rate Term DIP Loan**. Base Rate (with a floor of 2.25%) + 6.0% *per annum*<br><br>**Interest Rate for EuroLoan Revolving DIP Loans**. Eurodollar Rate + 3.50% *per annum*.<br><br>**Interest Rate for EuroLoan Term DIP Loans**. Eurodollar Rate (with a floor of 1.25%) + 7.0% *per annum*.<br><br>**Default Interest Rate**. 2% *per annum* above the then applicable rate.<br><br>(DIP Agreement, § 2.12) |
| **DIP Commitments**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | **DIP Agreement**. Total aggregate loan commitment of $200 million to be disbursed as:<br><br>• Revolving DIP Draw:    $75 million<br>• Term DIP Draw:    $125 million<br>• Initial DIP Draw:    $125 million<br>• Final DIP Draw:    Up to $200 million (less the amount of the initial DIP Loan actually borrowed)<br><br>(DIP Agreement, §§ 1.1, 5.1)<br><br>**Borrowing Base Formula**. Advances under the Revolving DIP Loans will be limited to the sum of: (a) the product of (i) 85% multiplied by (ii) the Eligible Accounts Receivable of the Loan Parties at such time *minus* the Dilution Reserve, *minus*, without duplication, any other Reserve related to Accounts, *plus* (b) the lesser of (i) the product of (x) 55% (65% during the Peak Period) multiplied by (y) the Eligible Inventory of the Loan Parties, valued at the lower of cost or market value, at such time, *minus*, without duplication, Inventory Reserves and (ii) the product of 85% *multiplied by* the Net Orderly Liquidation Value percentage identified in the most recent inventory appraisal ordered by the DIP Agent *multiplied by* the Eligible Inventory of the Loan Parties, valued at the lower of cost or market value, at such time *minus*, without duplication, Inventory Reserves, *minus* (c) the sum of (i) the Rent Reserve, (ii) the Carve-Out Reserve and (ii) without duplication, any other Reserve in the Permitted Discretion of the DIP Agent.<br><br>(DIP Agreement, § 1.1) |

DOCS_DE:171029.1

| MATERIAL TERMS OF THE POSTPETITION FINANCING |
| --- |

**Letters of Credit**

*Fed. R. Bankr. P. 4001(c)(1)(B)*

The Issuing Lender, in reliance on the agreements of the other DIP Lenders, will agree to issue Letters of Credit for the account of the Borrower on any Business Day during the Revolving Credit Commitment Period in such form as may be approved from time to time by the Issuing Lender; *provided* that the Issuing Lender shall have no obligation to issue any Letter of Credit if, after giving effect to such issuance (i) the L/C Obligations would exceed the L/C Commitment of $10,000,000, (ii) Revolving Credit Availability would be less than zero or (iii) the Revolving Credit Exposure would exceed $125,000,000 prior to the Second Availability Date. Each Letter of Credit shall (i) be denominated in Dollars and (ii) expire no later than the date which is five Business Days prior to the Maturity Date.

(DIP Agreement, § 3.1)

**Funding Conditions**

*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)*

**Initial Availability.** Conditions precedent to initial borrowings under the DIP Facility include: (i) the DIP Agent shall have received the DIP Agreement, executed and delivered by a duly authorized officer of HoldCo, AcqCo, and the Borrower; and the Guarantee and Collateral Agreement, executed and delivered by a duly authorized officer of HoldCo, AcqCo, the Borrower, and each Guarantor; (ii) the DIP Agent shall have received a long form good standing certificate for each Debtor from its jurisdiction of organization; (iii) the DIP Lenders shall have received: (a) audited consolidated financial statements of each of AcqCo and the Borrower; (b) unaudited interim consolidated financial statements of AcqCo and the Borrower and such financial statements shall be reasonably satisfactory to the DIP Agent; and (c) the Budget, in form and substance reasonably satisfactory to the DIP Agent; (iv) all material governmental and third party approvals necessary in connection with continuing operations of the Debtors shall have been obtained and be in full force and effect and all applicable waiting periods shall have expired; (v) the DIP Lenders, the DIP Agent, and the DIP Lead Arranger shall have received all fees required to be paid and all expenses for which invoices have been presented, on or before the Closing Date, or such fees and expenses shall have been designated for payment on the Closing Date from proceeds of the DIP Term Loan; (vi) the DIP Agent shall have received the results of a recent lien search in each of the jurisdictions of organization of the Loan Parties, and such search shall reveal no Liens on any of the assets of the Debtors except for Liens permitted by the DIP Agreement or Liens to be discharged on or prior to the Closing Date and the DIP Lead Arranger shall have received and be reasonably satisfied with appraisals of Inventory of the Loan Parties and field exams of the Account, Inventory, and related data processing and other systems of the Loan Parties, in each case from appraisers reasonably satisfactory to the DIP Lead Arranger; (vii) the DIP Agent shall have received a Closing Certificate for each Loan Party; (viii) the DIP Agent shall have received legal opinions from Kirkland and Ellis LLP and local counsel; (ix) the DIP Agent shall have received certificates representing the shares of pledged Capital Stock and each promissory note pledged to the DIP Agent by the pledgor thereof; (x) each document required by the Security Documents or under law or reasonably requested by the DIP Agent to be filed, registered, or recorded in order to create in a perfected Lien shall be in proper form for filing, registration or recordation; (xi) the DIP Agent shall be satisfied with the insurance program to be maintained by AcqCo and its subsidiaries and shall have received satisfactory insurance certificates; (xii) the DIP Agent shall have received a notice setting forth the deposit accounts of the Borrower to which the DIP Lender is authorized by the Borrower to transfer the proceeds of any Borrowings requested or authorized pursuant to the DIP Agreement; (xiii) the DIP Lenders shall have received all documentation requested by the DIP Agent and required under applicable "know your customer" and anti-money laundering rules and regulations at least three days prior to the Closing Date; (xiv) the Interim DIP Order shall have been

| MATERIAL TERMS OF THE POSTPETITION FINANCING |
|---|

|  |  |
|---|---|
|  | entered no later than five (5) days after the Petition Date and shall be satisfactory to the DIP Agent; (xv) all first day motions shall be in form and substance reasonably satisfactory to the DIP Agent and the DIP Agent shall be reasonably satisfied with any Cash Collateral arrangements applicable to any material pre-Petition Date secured obligations of the Loan Parties; (xvi) the DIP Agent shall have received a 13-week cash flow projection, which shall be in form and substance reasonably satisfactory to the DIP Agent; and (xvii) certain Letters of Credit outstanding under the First Lien Facility on the Petition Date shall have been cash collateralized at 101% of the face amounts thereof on terms reasonably satisfactory to the DIP Agent.<br><br>**Full Availability**. Conditions precedent to final borrowings under the DIP Facility include: (i) the Final DIP Order shall be in full force and effect and shall have been entered by the Bankruptcy Court no later than thirty-five (35) days after the Petition Date; (ii) all fees and expenses required to be paid shall have been paid in full in cash; and (iii) the Loan Parties shall have used and shall have caused their respective subsidiaries to use commercially reasonable efforts to obtain ratings on the DIP Facility by Moody's and S&P.<br><br>(DIP Agreement, §§ 5.1, 5.2) |
| **Fees**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **TO BE FILED UNDER SEAL** |
| **Liens, Priorities and Adequate Protection**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i), (ii); LBR 4001-2(a)(i)(B)* | The Debtors hereby covenant, represent and warrant that, upon entry of the Interim Order (and the Final Order, as applicable), the Obligations of the Debtors hereunder and under the other Loan Documents (including the obligations of the Debtors under the Guarantee and Collateral Agreement), (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed Superpriority Claims in the Cases, (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall be secured by a perfected first priority Lien on all Collateral that is otherwise not encumbered by a valid, perfected and non-avoidable Lien as of the Petition Date or a valid Lien perfected (but not granted) thereafter to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code, excluding claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code and the proceeds therefrom (it being understood that, notwithstanding such exclusion, upon entry of the Final Order, to the extent approved by the Bankruptcy Court, such Lien shall attach to any proceeds thereof), (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected junior Lien upon all Collateral that is subject to (A) valid, perfected and non-avoidable Liens (other than to secure the Debtors' Prepetition Obligations and Liens that are junior to the Liens securing the Debtors' Prepetition Obligations) in existence on the Petition Date or valid Liens perfected (but not granted) thereafter to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code and (B) other than as provided in clause (iv) below, post-Petition Date Liens permitted hereunder, and (iv) pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be secured by a perfected first priority senior priming Lien upon all Collateral (x) that is subject to a valid Lien or security interest in effect on the Petition Date to secure the Debtors' Prepetition Obligations, (y) that is subject to a Lien granted after the Petition Date to provide adequate protection in respect of the Debtors' Prepetition Obligations or (z) that is subject to a valid Lien in effect on the Petition Date that is junior to the Liens that secure the Debtors' Prepetition Obligations, subject and subordinate in each case with respect to subclauses (i) through (iv) above, only to the |

| MATERIAL TERMS OF THE POSTPETITION FINANCING |
|---|

Carve Out.

As to all Collateral, including without limitation, all cash, Cash Equivalents and real property the title to which is held by any Debtor, or the possession of which is held by any Debtor in the form of a leasehold interest, each Debtor hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto the Administrative Agent, for the benefit of the Lenders and the other holders of the Obligations, all of the right, title and interest of the Borrower and such Guarantor in all of such Collateral, including without limitation, all cash, Cash Equivalents and owned real property and in all such leasehold interests, together in each case with all of the right, title and interest of the Borrower and such Guarantor in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof. Notwithstanding anything herein to the contrary, the Collateral shall not include the L/C Cash Collateral, and the Liens granted to the Administrative Agent shall not attach to, the L/C Cash Collateral, and the L/C Cash Collateral shall not be subject to the Superpriority Claims granted to the Lenders. The Borrower and each Guarantor acknowledges that, pursuant to and upon entry of the Orders, the Liens granted in favor of the Administrative Agent (on behalf of the Lenders) in all of the Collateral shall be perfected without the recordation of any UCC financing statements, notices of Lien or other instruments of mortgage or assignment, subject to the terms and conditions set forth in the Orders. The Borrower and each Guarantor further agrees that (a) the Administrative Agent shall have the rights and remedies set forth in Sections 8 and 11 and in the Security Documents and the Orders in respect of the Collateral and (b) if requested by the Administrative Agent, the Borrower and each of the other Debtors shall enter into separate security agreements, pledge agreements and fee and leasehold mortgages with respect to such Collateral on terms reasonably satisfactory to the Administrative Agent.

(DIP Agreement, § 2.24)

**First Lien Lenders.** For so long as any portion of the First Lien Obligations remains unpaid or outstanding, the First Lien Agent and the First Lien Lenders are entitled, pursuant to sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in value of their interests in the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming of the First Lien Agent's liens on the Prepetition Collateral (except on any L/C Cash Collateral) by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "First Lien Adequate Protection Obligations"). As adequate protection, the First Lien Agent and the First Lien Lenders are hereby granted the following:

(a) As security for the payment of the First Lien Adequate Protection Obligations, the First Lien Agent (for itself and for the benefit of the First Lien Lenders) is hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, intellectual property filings or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "First Lien Adequate Protection Liens"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out and (iii) Non-Primed Liens.

(b) The First Lien Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "First Lien 507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out and (ii) the Superpriority Claims each granted in respect of the DIP Obligations or First Lien Obligations, as applicable. Except to the extent expressly set forth in this Order, the First Lien Agent and the First Lien Lenders shall not receive or retain any payments, property or other amounts in respect of the First Lien 507(b) Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash.

(c) The Debtors are authorized and directed to (a) immediately pay as adequate protection to the First Lien Agent an amount equal to all accrued and unpaid interest on the loans constituting First Lien Obligations at the non-default LIBOR rate under the First Lien Credit Agreement all accrued and unpaid letter of credit fees and all other non-default pre-Petition Date accrued and unpaid fees, charges, costs and disbursements constituting First Lien Obligations owing to the First Lien Agent or the First Lien Lenders under the First Lien Documents, (b) on the last business day of each calendar month after the entry of this Order, pay as adequate protection an amount equal to all accrued and unpaid interest, fees or charges on the loans and other obligations constituting First Lien Obligations at the applicable non-default LIBOR rate (or other applicable non-default rate) set forth in the First Lien Documents (which payments and pricing shall be without prejudice to the rights of the First Lien Agent and any First Lien Lenders to assert a claim for the payment of additional interest or other applicable amounts calculated at any other rates applicable pursuant to the First Lien Credit Agreement, and without prejudice to the rights of the Debtors or other party in interest to contest any such additional claims) subject to Section 506(b) of the Bankruptcy Code and (c) pay to the First Lien Agent all reasonable fees and expenses payable to the First Lien Agent under the First Lien Documents, including without limitation, the reasonable fees and disbursements of one primary counsel, one Delaware counsel, and one financial advisor to the First Lien Agent. None of the fees and expenses payable pursuant to paragraph 16(c) of the Interim DIP Order shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto. The Debtors shall pay the fees and expenses provided for in paragraph 16(c) of the Interim DIP Order within ten (10) business days after receipt of reasonably detailed invoices therefor, and the Debtors shall promptly provide copies of such invoices to counsel to the Second Lien Ad Hoc Committee, the Unsecured Notes Ad Hoc Committee, counsel to the Committee, counsel to the JPMorgan Noteholders and the U.S. Trustee. In the event that within ten (10) days from receipt of such invoices the Debtors, the U.S. Trustee, counsel to the Ad Hoc Committee, counsel to the Committee, or counsel to the JPMorgan Noteholders notifies counsel for the First Lien Agent in writing, of an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees, costs and expenses included in such invoices, the Debtors, U.S. Trustee, counsel to the Second Lien Ad Hoc Committee, counsel to the Unsecured Notes Ad Hoc Committee, counsel to the Committee and counsel to the JPMorgan Noteholders may file with the Court and serve upon all counsel for the First Lien Agent a written objection to the reasonableness of such fees, costs and expenses.

(d) The Debtors shall promptly provide to the First Lien Agent, counsel to the Ad Hoc Committee, and counsel to the JPMorgan Noteholders any written financial information

10

or periodic reporting that is provided to, or required to be provided to, the DIP Agent or the DIP Lenders.

**Second Lien Noteholders.** The Second Lien Agent and the Second Lien Lenders are entitled, pursuant to sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in value of their interests in the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming of the Second Lien Agent's liens on the Prepetition Collateral (except on the L/C Cash Collateral) by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "Second Lien Adequate Protection Obligations", together with the First Lien Adequate Protection Obligations, the "Adequate Protection Obligations"). As adequate protection, the Second Lien Agent and the Second Lien Lenders are hereby granted the following:

(a) As security for the payment of the Second Lien Adequate Protection Obligations, the Second Lien Agent (for itself and for the benefit of the Second Lien Lenders) is hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, intellectual property filings, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "Second Lien Adequate Protection Liens", together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out, (iii) the First Lien Adequate Protection Liens, (iv) the liens securing the First Lien Obligations and (v) the Non-Primed Liens (as defined in the Interim DIP Order);

(b) The Second Lien Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "Second Lien 507(b) Claims", together with the First Lien 507(b) Claims, the "507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out, (ii) the Superpriority Claims (as defined in the Interim DIP Order) and (iii) the First Lien 507(b) Claims granted in respect of the DIP Obligations or First Lien Obligations, as applicable. The Second Lien Agent and the Second Lien Lenders shall not receive or retain any payments, property or other amounts in respect of the Second Lien 507(b) Claims unless and until all DIP Obligations, the First Lien Adequate Protection Obligations and the First Lien Obligations shall have indefeasibly been paid in full in cash. In addition to, and notwithstanding anything to the contrary contained in this Order, any Second Lien Adequate Protection Obligations may be satisfied in a plan of reorganization confirmed in the Cases in the manner set forth in the Intercreditor Agreement;

(c) To the extent the Second Lien Agent consents to the DIP Loans and the Debtors' use of Cash Collateral, the Debtors are authorized and directed to (a) on the first day of each calendar month after the entry of this Order, commencing on July 1, 2011, provided the DIP Agent shall not have delivered (and not withdrawn) a notice of payment of Default or Event of Default under the DIP Agreement to the Debtors, pay as adequate protection an amount equal to all accrued and unpaid interest on the indebtedness constituting Second Lien Obligations at the applicable non-default rate set

11

| MATERIAL TERMS OF THE POSTPETITION FINANCING |
|---|

Second Lien forth in the Second Lien Documents (which payments and pricing shall be without prejudice to the rights of the Second Lien Agent and any Second Lien Lenders to assert a claim for the payment of additional interest calculated at any other rates applicable pursuant to the Second Lien Credit Agreement, and without prejudice to the rights of the Debtors or other party in interest to contest any such additional claims) subject to Section 506(b) of the Bankruptcy Code and (b) pay to the Second Lien Ad Hoc Committee all reasonable fees and expenses of the Second Lien Ad Hoc Committee, including without limitation, the reasonable fees and disbursements of counsel and financial advisors to the Second Lien Ad Hoc Committee incurred (i) in June 2011 and, (ii) during each month thereafter provided that such reimbursement obligation shall not exceed $75,000 on a current pay basis for any month after June 2011 during the Cases (the "Monthly Current Pay Cap"); *provided, further, however,* that (x) the Second Lien Ad Hoc Committee shall be entitled to any additional fees and disbursements incurred hereunder in excess of the Monthly Current Pay Cap in connection with the conclusion of Cases, so long as such fees and disbursements are reasonable and in any dispute, the Ad Hoc Committee shall bear the burden of proof as to the reasonableness of the fees and disbursements and (y) nothing herein shall (a) require the Debtors to pay fees and expenses of the Second Lien Ad Hoc Committee in connection with litigating the entitlement to payment of interest at the default rate or any makewhole or early termination premium under the Second Lien Indenture; or (b) prohibit any party in interest from objecting to final approval of any payments to the Second Lien Ad Hoc Committee solely with respect to the reasonableness of the fees and disbursements received pursuant to this Section 18(c) or pursuant to any subsequent request for fees and disbursements. None of the fees and expenses payable pursuant to this paragraph 18(c) shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto. The Debtors shall pay the fees and expenses provided for in this paragraph 18(c) within ten (10) days after receipt of reasonably detailed invoices therefor, and the Debtors shall promptly provide copies of such invoices to the counsel to the Committee and to the U.S. Trustee. In the event that within ten (10) days from receipt of such invoices the Debtors, the U.S. Trustee, counsel to the Ad Hoc Committee, counsel to the Committee, or counsel to the 11% Noteholders notifies counsel and/or advisors for the Second Lien Ad Hoc Committee, as applicable, in writing, of an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees, costs and expenses included in such invoices, the Debtors, U.S. Trustee, counsel to the Ad Hoc Committee, counsel to the Committee and counsel to the 11% Noteholders may file with the Court and serve upon all counsel and/or advisors for the Second Lien Ad Hoc Committee a written objection to the reasonableness of such fees, costs and expenses; and

(d) The Debtors shall promptly provide to the Second Lien Agent any written financial information or periodic reporting that is provided to, or required to be provided to, the DIP Agent or the DIP Lenders.

(Interim DIP Order, ¶¶ 16, 18)

| **Carve-Out**<br><br>*LBR 4001-2(a)(i)(F)* | The "Carve-Out" shall mean (a) any fees payable to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to section 1930(a) of title 28 of the United States Code; (b) up to $5,000,000 (the "Carve-Out Cap") of allowed fees, expenses and disbursements of professionals retained by order of this Court, incurred after the occurrence of a Carve-Out Event (defined in this paragraph 7(b) below), plus all unpaid professional fees, expenses and disbursements incurred prior to the |
|---|---|

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| | Occurrence of a Carve-Out Event and allowed at any time by this Court (regardless of when such fees, expenses and disbursements become allowed by order of this Court); and (c) any expenses incurred by any Chapter 7 trustee, such expenses not to exceed $100,000 in the aggregate. For the purposes hereof, a "Carve-Out Event" shall occur upon the occurrence and during the continuance of an Event of Default under the DIP Agreement or a material breach by the Debtors of this Order and, in each case, upon delivery of a written notice thereof by the DIP Agent to the Debtors and their lead counsel, the counsel for the Second Lien Ad Hoc Committee, the counsel for the Unsecured Notes Ad Hoc Committee, and counsel for the JPMorgan Noteholders specifying that such notice constitutes a "Carve-Out Event" notice (a "Carve Out Notice"). So long as no Carve-Out Event shall have occurred and be continuing, the Carve-Out shall not be reduced by the payment of fees, expenses and disbursements of professionals retained by order of this Court allowed by this Court and payable under Sections 328, 330 and 331 of the Bankruptcy Code. Upon the delivery of a Carve-Out Notice, the right of the Debtors to pay professional fees incurred under clause (b) above without reduction of the Carve-Out in clause (b) above shall terminate and upon receipt of such notice, the Debtors shall provide immediate notice by facsimile and email to all retained professionals informing them that a Carve-Out Event has occurred and that the Debtors' ability to pay professionals is subject to the Carve-Out; provided that (A) the Carve-Out shall not be available to pay any professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent, the DIP Lenders, the First Lien Lenders, the First Lien Agent, the Second Lien Lenders or the Second Lien Agent and (B) nothing in this Order shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates. Immediately upon delivery of a Carve Out Notice, the Debtors shall be required to transfer from their concentration account to a segregated account (the "Carve Out Account") not subject to the control of the Agent an amount equal to the Carve Out Cap.<br><br>(Interim DIP Order, ¶ 7(b)) |
| **Payments on Prepetition Debt**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ii)* | Subject to the Carve-Out, the Debtors will pay on a monthly basis all interest accruing on (i) the First Lien Facility at the non-default LIBOR rate; and (ii) the Second Lien Notes at the non-default rate.<br><br>(Interim DIP Order, ¶¶ 16, 18) |
| **Covenants**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Affirmative Covenants**. Usual and customary for financings of this type, including, without limitation: delivery of financial statements, cash flow forecasts, variance reports, hosting of lender conference calls, preservation of corporate existence, maintenance of properties, insurance, and corporate books and records, compliance with laws, and further assurances with respect to collateral.<br><br>(DIP Agreement, §§ 6.1 - 6.13)<br><br>**Negative Covenants**. Usual and customary for financings of this type, including, without limitation: limitations on liens, investments, indebtedness (including guarantees), fundamental changes, changes to the nature of the business, sales of assets, restricted payments, modifications of material documents, affiliate transactions, sale and leaseback transactions, changes in fiscal periods, negative pledge clauses, subsidiary distributions, lines of business, activities of AcqCo and HoldCo, swap agreements, chapter 11 claims, minimum liquidity, and minimum cumulative consolidated EBITDA. |

13

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| | (DIP Agreement, §§ 7.1-7.18) |
| **Limitations**<br>*LBR 4001-2(a)(ii)* | The First Lien Agent, the First Lien Lenders, the Second Lien Agent and the Second Lien Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to and effective upon entry of the Final DIP Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the First Lien Agent, First Lien Lenders, the Second Lien Agent and the Second Lien Lenders with respect to (i) proceeds, products, offspring or profits of any of the Prepetition Collateral or (ii) the extension of the Adequate Protection Liens to cover proceeds of the Prepetition Collateral.<br><br>The Debtors shall use the DIP Loans and the Prepetition Collateral (including the Cash Collateral) solely as provided in this Order and the DIP Documents. Notwithstanding anything herein or in any other order of this Court to the contrary, no DIP Loans, no DIP Collateral, no Prepetition Collateral (including the Cash Collateral) nor the Carve-Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the First Lien Documents, the Second Lien Documents, or the liens or claims granted under this Order, the DIP Documents, the First Lien Documents, or the Second Lien Documents, (b) assert any Claims and Defenses or any other causes of action against the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Agent's, the First Lien Agent's, the Second Lien Agent's assertion, enforcement or realization on the Prepetition Collateral or the DIP Collateral in accordance with the DIP Documents, the First Lien Documents, the Second Lien Documents or this Order, (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, First Lien Agent, the First Lien Lenders, the Second Lien Agent or the Second Lien Lenders hereunder or under the DIP Documents or the First Lien Documents, or the Second Lien Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents; provided that, notwithstanding anything to the contrary herein, no more than an aggregate of $100,000 of the Prepetition Collateral (including the Cash Collateral), the DIP Loans, the DIP Collateral or the Carve-Out may be used by the Committee to investigate the validity, enforceability or priority of the First Lien Obligations, the Second Lien Obligations, or the liens on the Prepetition Collateral securing the First Lien Obligations or the Second Lien Obligations, or investigate any Claims and Defenses or other causes action against the First Lien Agent or First Lien Lenders, the Second Lien Agent or the Second Lien Lenders.<br><br>(Interim DIP Order, ¶¶ 11, 22) |
| **Events of Default**<br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | Usual and customary for financings of this type, including, without limitation, non-payment of principal, interest and fees, defaults under affirmative and negative covenants, breaches of representations and warranties, failure to comply with ERISA rules and regulations, change of control, entry of an order granting superpriority claims to other creditors, relief from automatic stay, failure to comply with bankruptcy orders, and invalidation of superpriority claims.<br><br>(DIP Agreement, § 8.1) |

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| **Acknowledgements**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | The Debtors make certain customary admissions and stipulations with respect to (a) the aggregate amount of prepetition indebtedness owing to the Prepetition Secured Lenders, (b) the validity, enforceability and priority of the liens and security interests granted to the First Lien Agent to secure the Prepetition Obligations, (c) the binding nature of the First Lien Obligations in respect of the Debtors, and (d) the waiving of claims and defenses against the First Lien Lenders regarding the First Lien Obligations (Interim DIP Order, ¶ 4); *provided* that the above shall not be binding on any other party in interest if and to the extent such party (a) duly files an adversary proceeding with respect to all or a portion of the above on or before the earlier of (x) 75 days after the Petition Date, and (y) 60 days following the formation of the Committee, and (b) is successful in such adversary proceeding.<br><br>(Interim DIP Order, ¶ 21) |
| **Automatic Stay**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | **DIP Facility.** Five (5) days' prior notice to the Debtors, counsel for the Second Lien Ad Hoc Committee, counsel for the Unsecured Notes Ad Hoc Committee, counsel for the JPMorgan Noteholders, the automatic stay is vacated to permit the exercise of remedies by the DIP Agent and the DIP Lenders to the extent set forth in the DIP Orders.<br><br>(Interim DIP Order, ¶ 9) |
| **Waivers and Consents**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(v); Fed. R. Bankr. P. 4001(c)(1)(B)(vii-x)* | **Non-Bankruptcy Law.** The DIP Liens, Adequate Protection liens and other interests granted to the DIP Agent, the DIP Lenders or the First Lien Agent are deemed valid, binding, perfected, enforceable, first-priority liens, non-avoidable and not subject to re-characterization or subordination as of the date of the Interim DIP Order.<br><br>(Interim DIP Order ¶ 4(b))<br><br>**Indemnification.** Usual and customary for financings of this type, including that Borrower shall indemnify and hold harmless the DIP Agent and DIP Lead Arranger in their respective capacities as such from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind, in any way relating to the DIP Agreement and related transactions and negotiations.<br><br>(DIP Agreement, § 9.7)<br><br>**Section 506(c).** Subject to and effective upon entry of the Final DIP Order, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, as the case may be, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the First Lien Agent and the Second Lien Agent, as the case may be, and no such consent shall be implied from any other action or inaction by the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, or the Second Lien Lenders.<br><br>(Interim DIP Order, ¶ 10) |

DOCS_DE:171029.1

**Key Provisions**

9.     The DIP Agreement includes certain provisions the Debtors are required to highlight pursuant to Local Bankruptcy Rule 4001-2(a)(i).  As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved.

- **Local Bankruptcy Rule 4001-2(a)(i)(B) – *Validity, Perfection, and Amount of Prepetition Obligations,* Interim DIP Order at ¶ 4, Adequate Protection Stipulation ¶ 5.**  As part of the Interim DIP Order, the Debtors agree and stipulate that the First Lien Credit Agreement and the Second Lien Notes Indenture are valid and binding agreements and obligations of the Debtors, and the liens granted pursuant to the First Lien Credit Agreement and the Second Lien Notes Indenture constitute valid, binding, perfected, and enforceable liens, subject only to the permitted exceptions under the First Lien Credit Agreement and the Second Lien Notes Indenture.  Additionally, the Debtors have waived, discharged, and released any right they may have to challenge any of their obligations under the First Lien Credit Agreement or the Second Lien Notes Indenture.

- **Local Bankruptcy Rule 4001-2(a)(i)(B) – *Committee Challenge Period,* Interim DIP Order at ¶ 21, Adequate Protection Stipulation ¶ 6.**  All non-debtor parties in interest shall have until the earlier of (i) seventy-five (75) days from the Petition Date or (ii) sixty (60) days from the date a committee is first appointed to investigate the validity, enforceability, priority or extent of the obligations under the First Lien Facility, the Second Lien Notes Indenture, or the liens on the Prepetition Collateral securing the obligations under the First Lien Facility or the Second Lien Notes Indenture, and to assert any claims or causes of action against the First Lien Agent, any of the First Lien Lenders, the Second Lien Notes Indenture Trustee, or the Second Lien Noteholders, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors in connection with any matter related to the obligations under the First Lien Facility, the Second Lien Notes Indenture, or the Prepetition Collateral.

- **Local Bankruptcy Rule 4001-2(a)(i)(D) – *Waiver of Section 506(c) Claims,* Interim DIP Order at ¶ 10.**  Subject to entry of the Final DIP Order, with the exception of the Carve Out, no expenses of administration of the chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, as the case may be, pursuant to

16

section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the First Lien Agent and the Second Lien Indenture Trustee, as the case may be, and no such consent shall be implied from any other action or inaction by the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, the Second Lien Indenture Trustee, or the Second Lien Noteholders.

- **Local Bankruptcy Rule 4001-2(a)(i)(D) – *Liens on Avoidance Actions*, Interim DIP Order at ¶8(a).** The Interim DIP Order provides that subject to entry of the Final DIP Order, the DIP Lenders shall receive fully perfected and unavoidable first-priority senior priming security interests in and liens upon proceeds or property recovered in respect of any Avoidance Actions.

- **Local Bankruptcy Rule 4001-2(a)(i)(E) – *Use of Postpetition Debt from Prepetition Creditor to Pay Such Prepetition Creditors' Prepetition Debt*, Interim DIP Order at ¶ 6(a).** The Interim DIP Order provides that the Debtors shall use the proceeds of the DIP Facility to pay interest, fees, and expenses in connection with the DIP Loans and to repay not less than $26,300,000 in loans made and $3,733,597 in letters of credit issued and outstanding of the obligations under the First Lien Facility (with non-default interest and other non-default fees and charges thereon to the extent payable under the terms of the First Lien Documents (as defined in the Interim DIP Order) in connection with such repayment).

- **Local Bankruptcy Rule 4001-2(a)(i)(F) – *Treatment of Committee Professionals*, Interim DIP Order at ¶ 7(b).** The DIP Agreement provides that any official committee's professional fees are included in the Carve-Out. As discussed above, each the DIP Liens are subject and subordinate to the Carve-Out.

### Background

10.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested joint administration of these chapter 11 cases and no official committees have been formed.

11.     As set forth in the First Day Declaration, the Debtors are one of the leading providers of new and used textbooks for college students in the United States. The Debtors

provide textbooks to students throughout the country using a sophisticated retail and wholesale distribution network, which includes approximately 280 on- and off-campus "brick and mortar" bookstores, numerous online and interactive channels, and wholesale textbook sales to secondary booksellers.

12.    The Debtors have a long history of stable growth, but over the last several years, certain student-buying habits shifted towards online textbook providers, including, most recently, online rental textbook providers, areas outside the Debtors' core business model. Specifically, the Debtors' EBITDA for their off-campus stores peaked in 2008 at approximately $36 million, declined to approximately $31 million in 2009, and eventually fell to $19 million in 2011.

13.    Recognizing the need to reposition themselves as the "go-to" source for all textbook and college merchandise needs, the Debtors have aggressively grown their online presence and textbook rental businesses to better fit student buying habits. In particular, the Debtors are implementing a new "Rent Every Book" model that capitalizes on their unique competitive strengths, namely their physical locations, supply of used books, and extensive pricing knowledge. The Debtors also have launched "Neebo.com," a proprietary-branded website that combines approximately 280 individual store websites into a single site and permits the Debtors to have a significant presence in the online marketplace without paying third-party transaction costs. Combining Rent Every Book and Neebo.com permits the Debtors to offer students the products they want, across every medium through which they shop for textbooks, at a competitive price point. In addition, the Debtors plan to continue expanding their on-campus stores and improve their general merchandise assortment and merchandising through the on- and off-campus stores and Neebo.com.

DOCS_DE:171029.1

14.     While the Debtors are confident that these operational initiatives will stabilize their financial performance and position them in the marketplace for the long-term, the Debtors still faced the near-term maturity of $200 million in secured second lien notes. And, in light of this pending maturity, the Debtors' publishers expressed concern regarding the Debtors' ability to honor their obligations for the "back-to-school" textbook and merchandise purchases. The Debtors engaged each of their lender constituents in negotiations regarding a refinancing or restructuring transaction. Despite their efforts, the Debtors were unable to reach an agreement with all of their lender constituents on an out-of-court refinancing. The Debtors were, however, able to obtain the support of (a) holders of an aggregate amount of over 95% of their 8.625% senior subordinated notes due 2012, (b) holders of over 75% of their 11% senior discount notes due 2013 (such holders, collectively, the "Plan Support Parties") on a consensual in-court transaction through a pre-arranged plan of reorganization. Thus, the Debtors commenced these chapter 11 cases to ensure that they could continue operating their businesses in the ordinary course while they consummate their balance sheet reorganization with the support of the Plan Support Parties.

15.     As of December 31, 2010, the Debtors reported assets of approximately $657.2 million in book value and liabilities of approximately $563.9 million in book value. Consolidated revenues for the quarter ending December 31, 2010 were approximately $69.2 million.   Consolidated annual revenues for the year ending March 31, 2010 were approximately $605.5 million. The Debtors' employ approximately 2,500 employees.

**I.     Prepetition Indebtedness.**

16.     As of December 31, 2010, the Debtors reported approximately $657.2 million in book value of total assets and approximately $564 million in book value of total liabilities. As of the Petition Date, the Debtors have approximately $450 million in funded debt and related

obligations, consisting of (a) secured obligations of $226.3 million under their First Lien Facility and the Second Lien Notes, and (b) unsecured obligations of (i) $175 million under the OpCo Notes, and (ii) $77 million under the AcqCo Notes (each as defined herein). These obligations are discussed in turn.

### A. Secured Indebtedness.

### 1. ABL Revolving Credit Facility.

17. Nebraska Book Company, Inc. ("NBC"), as borrower, NBC Holdings Corp. ("HoldCo"), NBC Acquisition Corp. ("AcqCo"), and all NBC subsidiaries, as guarantors, JP Morgan Chase Bank, N.A., as administrative agent (the "First Lien Agent"), and the lenders party thereto (the "First Lien Lenders") are parties to that certain Amended and Restated First Lien Credit Agreement (as amended, the "First Lien Facility"), dated as of October 2, 2009, as last amended on March 22, 2010.

18. The First Lien Facility provides the Debtors with an asset-based revolving credit facility with $75.0 million of maximum availability. The First Lien Facility is secured by a first priority interest in substantially all of the Debtors' property and assets, in addition to a pledge of all capital stock held by the Debtors. The First Lien Facility matures 91 days prior to the earliest maturity of the Second Lien Notes (as defined herein), or on September 1, 2011. Borrowings under the First Lien Facility are subject to the Eurodollar interest rate (with a 1.5% floor), plus an applicable margin ranging from 4.25% to 4.75%, or a base interest rate. In addition, the applicable margin increases by 1.5% during the time periods from April 15 to June 29 and from December 1 to January 29 of each year. The interest rate as of the Petition Date was 8.25%. As of the Petition Date, approximately $26.3 million was outstanding under the First Lien Facility (including $3.7 million in issued and undrawn letters of credit).

## 2. Second Lien Notes.

19. NBC, as borrower, and Wilmington Trust FSB (the "Second Lien Notes Indenture Trustee"), as trustee and collateral agent, are parties to that certain indenture (the "Second Lien Notes Indenture"), dated as of October 2, 2009. Pursuant to the Second Lien Notes Indenture, the Debtors issued $200 million senior secured notes at a discount of $1.0 million with unamortized bond discount of $0.5 million (collectively, the "Second Lien Notes" and the noteholders thereunder, the "Second Lien Noteholders," together with the First Lien Lenders, the "Prepetition Secured Lenders"). The Second Lien Notes are secured by a second priority interest in substantially all of the Debtors' property and assets and a subordinated pledge of all capital stock held by the Debtors. The Second Lien Notes require semi-annual interest payments at a fixed rate of 10%. The Second Lien Notes mature on December 1, 2011. Each of NBC's subsidiaries guarantees the Second Lien Notes. As of the Petition Date, the outstanding principal balance of the Second Lien Notes was $200 million.

## 3. Intercreditor Agreement.

20. The Debtors, the First Lien Agent, and the Second Lien Notes Trustee are parties to that certain intercreditor agreement (the "Intercreditor Agreement"), dated as of October 2, 2009, attached hereto as **Exhibit E**. The Intercreditor Agreement assigned relative priorities to claims arising under the First Lien Facility and the Second Lien Notes Indenture. The Intercreditor Agreement provides that claims arising under the Second Lien Notes Indenture are junior to claims arising under the First Lien Facility. The Intercreditor Agreement also imposes certain limitations on: (a) the rights and remedies available to the Second Lien Noteholders in an event of default under the Second Lien Notes Indenture; (b) the Second Lien Noteholders' ability

21

to challenge the validity or priority of liens arising under the First Lien Facility; (c) the Second Lien Noteholders' ability to object to debtor-in-possession financing under section 363 or section 364 of the Bankruptcy Code provided or consented to by one or more of the First Lien Lenders; and (d) the extent to which the Second Lien Noteholders may be entitled to request adequate protection during a bankruptcy proceeding.

21.     Even in the absence of the Adequate Protection Stipulation, in the event of a bankruptcy proceeding, the Second Lien Noteholders have agreed not to object to use of Cash Collateral permitted by the First Lien Lenders and to subordinate their liens in the Common Collateral (as defined in the Intercreditor Agreement) to secure postpetition financing provided or consented to by one or more of the First Lien Lenders.   Specifically, section 5.2 of the Intercreditor Agreement provides that:

> If any Loan Party becomes subject to any Insolvency Proceeding at any time prior to the First Priority Obligations Payment Date, and if the [First Lien Agent] or the other [First Lien Lenders] desire to consent (or not object) to the use of cash collateral under the Bankruptcy Code or to provide financing to any Loan Party under the Bankruptcy Code or to consent (or not object) to the provision of such financing to any Loan Party by any third party (any such financing, "DIP Financing"), then the Second Priority Representative agrees, on behalf of itself and the other [Second Lien Noteholders], that each [Second Lien Noteholders]:
>
> (a) will be deemed to have consented to, will raise no objection to, nor support any other Person objecting to, the use of such cash collateral or to such DIP Financing,
>
> (b) will not request or accept adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing except as set forth in Section 5.4 below,
>
> (c) will subordinate (and will be deemed hereunder to have subordinated) the [Second Lien Noteholders'] Liens on any Common Collateral (i) to such DIP Financing on the same terms as the [First Lien Lenders'] Liens are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (ii) to any adequate protection provided to the [First Lien Lenders] and (iii) to any "carve-out" agreed to by the [First Lien Agent] or the other [First Lien Lenders], and

(d) agrees that notice received two calendar days prior to the entry of an order approving such usage of cash collateral or approving such financing shall be adequate notice so long as (A) the Second Priority Representative retains its Lien on the Common Collateral to secure the Second Priority Obligations (in each case, including proceeds thereof arising after the commencement of the case under the Bankruptcy Code) and (B) all Liens on Common Collateral securing any such DIP Financing shall be senior to or on a parity with the Liens of the [First Lien Agent] and the [First Lien Lenders] on Common Collateral securing the First Priority Obligations."[5]

*See* Intercreditor Agreement, § 5.2.

22.     The DIP Facility satisfies all of the requirements of section 5.2 of the Intercreditor Agreement.  Because the First Lien Lenders are providing the DIP Facility, section 5.2(a) of the Intercreditor Agreement prohibits the Second Lien Noteholders from objecting to the DIP Facility or requesting adequate protection, except as specifically provided for in the Intercreditor Agreement.  In addition, the First Lien Lenders' liens and the Second Lien Noteholders' liens will both be subordinated to the new DIP Facility liens, as required by section 5.2(c) of the Intercreditor Agreement.  Thus, the Second Lien Noteholders are deemed to consent to the Debtors' access to the DIP Facility and the Debtors' use of Cash Collateral as described in this Motion.

23.     In addition, section 5.4(a) of the Intercreditor Agreement provides that the Second Lien Noteholders will not contest the First Lien Lenders' ability to request adequate protection in a bankruptcy proceeding.  Section 5.4(b) also provides that the Second Lien Noteholders will not contest any objections made by the First Lien Lenders to any motions based on a claim of a lack of adequate protection.  Further, section 5.4(c) provides that the Second Lien Noteholders will not contest the payment of any interest or fees owed to the First Lien Agent or the First Lien Lenders under section 506 of the Bankruptcy Code.

---

[5]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Intercreditor Agreement.

DOCS_DE:171029.1

24.     Even in the absence of the Adequate Protection Stipulation, Section 5.4 of the Intercreditor Agreement also limits the Second Lien Noteholders' ability to request adequate protection of their security interests in the Debtors' assets. In particular section 5.4 provides that the only forms of adequate protection the Second Lien Noteholders may seek are: (a) subordinated replacement liens or (b) superpriority claims that are junior to the superpriority claims granted to the First Lien Lenders. However, the Debtors and the Ad Hoc Group negotiated the terms of the Adequate Protection Stipulation prior to the Petition Date. Pursuant to the Adequate Protection Stipulation, the Ad Hoc Group agreed to direct the Second Lien Notes Indenture Trustee to accept, and not object, to the Debtors providing the Adequate Protection provided for in the Interim DIP Order to the Prepetition Secured Lenders.

### 4.     Other Liens.

25.     In the ordinary course of business, the Debtors have incurred certain secured indebtedness, including mortgage liens, as permitted by their prepetition credit facilities (collectively, the "Permitted Encumbrances"). As described more fully below, the Permitted Encumbrances are not subject to the first priority priming liens granted pursuant to the Interim DIP Order.

### B.     Unsecured Indebtedness.

### 1.     OpCo Notes.

26.     NBC, as borrower, and BNY Midwest Trust Company (the "Opco Notes Indenture Trustee"), as trustee, are parties to that certain indenture (the "OpCo Indenture"), dated as of March 4, 2004. Pursuant to the OpCo Indenture, NBC issued $175 million of senior subordinated notes (collectively, the "OpCo Notes"). The OpCo Notes require semi-annual interest payments at a fixed rate of 8.625% and mature on March 15,

2012. The OpCo Notes are guaranteed by each of NBC's subsidiaries, but are unsecured. As of the Petition Date, the outstanding principal balance of the OpCo Notes was $175 million.

   **2.     AcqCo Notes.**

27.     NBC, as borrower, and BNY Midwest Trust Company, as trustee, are parties to that certain indenture (the "AcqCo Indenture"), dated as of March 4, 2004. Pursuant to the AcqCo Indenture, AcqCo issued $77 million senior discount notes (collectively, the "AcqCo Notes"). The AcqCo Notes require semi-annual interest payments, which began on September 13, 2008, at a fixed interest rate of 11%. The AcqCo Notes mature on March 15, 2013. The AcqCo Notes are not guaranteed by any party and are unsecured. As of the Petition Date, the outstanding principal balance of the AcqCo Notes was approximately $77 million.

## II.    The Debtors' Marketing Efforts for Postpetition Financing.[6]

28.     As described in the Snyder Declaration, on January 24, 2011, the Debtors retained Rothschild, Inc. ("Rothschild") as their financial advisor to assist with their evaluation of strategic alternatives, including a potential restructuring transaction. In the months prior to the Petition Date, the Debtors worked closely with their advisors to explore the capital markets, as well as explore options with incumbent lenders in the Debtors' existing capital structure, in an effort to refinance the Debtors' prepetition debt obligations. For six months, the Debtors and their advisors devoted their efforts to refinancing the Debtors' prepetition debt obligations or amending and extending the Debtors' various notes. Simultaneously searching for potential sources of debtor-in-possession financing would have doomed the potential out-of-court refinancing. Snyder Declaration, ¶ 11.

---

[6] This subsection describes the Debtors' efforts to obtain financing, the basis on which the Debtors determined that the proposed financing is on the best terms available, and the material facts bearing on the issue of whether the credit is being extended in good faith.

29.    Once it became clear that an out-of-court refinancing was not possible, the Debtors and their advisors entered into extensive, arm's-length negotiations with the First Lien Agent regarding the terms of potential debtor-in-possession financing, due to First Lien Agent's extensive knowledge of the Debtors' business and extensive experience with asset-backed revolving credit facilities, to ensure that the Debtors have sufficient liquidity to continue operations and to preserve the value of their estates.  The First Lien Agent's strong syndication desk gave the Debtors comfort that the universe of potential participants in the DIP Facility would be well-canvassed, thereby providing for competition among potential participants and more favorable terms for the Debtors' DIP Facility.  Snyder Declaration, ¶ 12.

30.    While the Debtors engaged other potential sources of debtor-in-possession financing, the potential lender universe was limited by the fact that many parties with the experience or appetite for lending to textbook companies were already participants in the Debtors' existing First Lien Facility.  Further, debtor-in-possession financing from any other source may have required certain consents from the Debtors' Prepetition Secured Lenders as a condition to effectiveness, or would have required a contested priming fight in the first day of these chapter 11 cases.  Accordingly, to avoid this high risk of distracting and costly priming and adequate protection disputes, the Debtors determined that a DIP Facility from the existing First Lien Lenders was far and away the most viable alternative.

31.    After duly considering other potential sources of debtor-in-possession financing, the Debtors' advisors believe that the DIP Facility is the best debtor-in-possession financing package available to the Debtors.  Snyder Declaration, ¶ 14. The DIP Facility provides an attractive financing package, with market terms comparable to those in similar debtor-in-possession financing packages.  Snyder Declaration, ¶ 14.

DOCS_DE:171029.1

### III. The Debtors' Negotiations Regarding the Adequate Protection Stipulation.

32.     In addition, prior to the Petition Date, the Debtors and the Ad Hoc Group negotiated the terms of the Adequate Protection Stipulation. Pursuant to the Adequate Protection Stipulation, the Ad Hoc Group consented to the DIP Facility and agreed to the Adequate Protection set forth in the Interim DIP Order and discussed in further detail below.

### Basis for Relief

### I. The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.

#### A. Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.

33.     The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and to continue using the Cash Collateral.

34.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See, e.g.*, *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[c]ases

27

consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment."); *see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

35.     Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

36.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's

finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames*, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

37.     The Debtors' execution of the DIP Documents is an exercise of their sound business judgment that warrants approval by the Court.   Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of these chapter 11 cases, and determined that the Debtors would require significant postpetition financing to support their operational and restructuring activities.   Further, while the Debtors' general merchandise vendors and the publishers with whom the Debtors do business typically allow the Debtors to purchase textbooks and other merchandise on credit, the Debtors' ability to continue this practice is dependent upon their having access to sufficient liquidity to assure the general merchandise vendors and the publishers that the Debtors are not a credit risk. Accordingly, the Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of their advisors, to obtain the required postpetition financing on terms favorable to the Debtors.   Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Documents provide a greater amount of financing on more favorable terms than any other reasonably available alternative.   The Debtors' advisors have canvassed the market to find interested parties to participate in the debtor-in-possession financing and have assisted the Debtors in negotiations to obtain the best terms available to ensure that the DIP Facility was fully subscribed.

38.     Specifically, as noted above, the DIP Facility will provide the Debtors with access to up to $125 million immediately after entry of the Interim DIP Order and up to an aggregate

amount of $200 million after entry of the Final DIP Order, which the Debtors and their advisors have independently determined should be sufficient to solidify their credit-worthiness to their publishers and general merchandise vendors and support the Debtors' ongoing operations and reorganization activities through the pendency of these chapter 11 cases. Additionally, the DIP Documents provide the Debtors with access to the Cash Collateral, which relieves the Debtors of the cost of borrowing additional amounts to replace that cash.

**B.      The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.**

39.      Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

(1)   with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];

(2)   secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)   secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

40.      To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also*

*Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

      41.    Rothschild's discussions with various potential sources of debtor-in-possession financing revealed that such financing on a junior or unsecured basis was not available. The Debtors' significant secured debt and lack of unencumbered assets precludes them from obtaining postpetition financing in the amount they require on terms other than on a secured and superpriority basis. The Court should therefore authorize the Debtors to provide the DIP Agent, on behalf of itself and the other DIP Lenders, senior liens on the Debtors' unencumbered property as provided in section 364(c)(2) of the Bankruptcy Code, and junior liens on the Debtors' property that is subject to valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date (other than the Permitted Encumbrances) or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, as provided in section 364(c)(2) of the Bankruptcy Code; as well as to grant the Debtors' repayment obligations

31

DOCS_DE:171029.1

under the DIP Documents superpriority administrative expense status as provided for in section 364(c)(1) of the Bankruptcy Code.

**C.      The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens.**

42.      In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1).

43.      When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets.   Courts consider a number of factors, including, without limitation:

(a)      whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

(b)      whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

(c)      whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

(d)      whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10;

*see also* 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 364.04[1] (16th ed.). The DIP Documents satisfy each of these factors.

44.     *First,* as described above, the Debtors and their advisors determined that the DIP Lenders offered the best option for obtaining the postpetition financing the Debtors require. The Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility, and those agreements reflect the most favorable terms on which the DIP Lenders were willing to offer financing. The Debtors are not able to obtain financing on equal or better terms from the DIP Lenders other than financing secured by first priority priming liens.

45.     *Second*, the Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest. Specifically, the Debtors need the funds to be provided under the DIP Facility to signal to the publishers and the general merchandise vendors that they are credit-worthy and that they should continue to provide their products to the Debtors on substantially the same credit terms as during the prepetition period. Absent the DIP Facility and use of the Cash Collateral, the Debtors will be unable to operate their business or prosecute these chapter 11 cases, and the publishers and general merchandise vendors may refuse to provide textbooks or merchandise unless the Debtors pay for such items in advance. This could result in an immediate liquidity crisis and may force the Debtors to shut down operations and default under virtually all of their on-campus bookstore operating agreements due to an inability to provide the necessary textbooks, which will destroy the Debtors' significant going concern value. Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these chapter 11 cases is in the best interest of all stakeholders.

46.    *Third*, upon entry of the Final DIP Order, the DIP Facility will provide the Debtors with access to $200 million in postpetition financing, which the Debtors and their advisors have independently determined is sufficient and, necessary to allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these chapter 11 cases. The DIP Orders also provide the Debtors with continued use of the Cash Collateral, which will maintain the Debtors' ability to access liquidity in the same accounts as prior to the Petition Date, without the disruption or delay that would result if the Debtors were required to set aside that cash and re-fund their accounts with new postpetition borrowings. Accordingly, the terms of the DIP Documents and the DIP Orders are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these chapter 11 cases.

47.    *Fourth*, as described in greater detail above and in the Snyder Declaration, the Debtors and the DIP Lenders negotiated the DIP Documents in good faith and at arm's-length, and the Debtors' entry into the DIP Documents is an exercise of their sound business judgment and is in the best interests of their estates, creditors, and other parties in interest.

48.    *Fifth*, as described below, the Debtors will provide Adequate Protection for the Prepetition Secured Lenders' interests in the Prepetition Collateral in a manner consistent with the terms agreed to by such parties pursuant to the Intercreditor Agreement, the First Lien Credit Agreement, and the Adequate Protection Stipulation, respectively. Furthermore, pursuant to the Adequate Protection Stipulation, the Ad Hoc Group, on behalf of the Second Lien Noteholders, consented to (a) the use of Cash Collateral; (b) the priming liens; and (c) the Adequate Protection set forth in the Adequate Protection Stipulation and provided for in the Interim DIP Order.

DOCS_DE:171029.1

**D.     The Interests of the Prepetition Secured Lenders Are Adequately Protected.**

49.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *See, e.g., In re Continental Airlines Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

50.     The Debtors have offered a fair and reasonable adequate protection package to the Prepetition Secured Lenders (collectively, the "Adequate Protection"). To the extent not rolled up by the DIP Facility, and subject to the Carve-Out in all respect, the First Lien Lenders shall receive as Adequate Protection:

- a valid, perfected, replacement security interest in and lien on all of the DIP Collateral (the "First Lien Adequate Protection Liens"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out, and Non-Primed Liens (as defined in the Interim DIP Order);

- superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "First Lien 507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any

35

provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331, and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out and (ii) the Superpriority Claims (as defined in the Interim DIP Order) each granted in respect of the obligations under the DIP Facility or the obligations under the First Lien Facility, as applicable;

- immediate payment, and payment on a monthly basis after entry of the Interim DIP Order, of all interest accruing on the First Lien Facility at the non-default LIBOR rate;

- payment of all reasonable fees and expenses of the First Lien Agent (including the reasonable fees and disbursements of its counsel and financial advisors); and

- any written financial information or periodic reporting provided to, or required to be provided to the DIP Agent or the DIP Lenders.

51.     Pursuant to the Adequate Protection Stipulation, the Debtors and the Ad Hoc Group, who represent that they can direct the Second Lien Notes Indenture Trustee, came to an agreement regarding the Adequate Protection to be provided to the Second Lien Noteholders. The Debtors will provide, and the Ad Hoc Group agrees to direct the Second Lien Notes Indenture Trustee to accept, and not object to, the Debtors providing, Adequate Protection pursuant to the Adequate Protection Stipulation and provided for in the Interim DIP Order. The parties have agreed to the following Adequate Protection, subject to the Carve-Out in all respects:

- replacement liens, on all of the Debtors' postpetition property and assets that secure the DIP Facility and the First Lien Facility and liens on all other property and assets of the Debtors that secure the DIP Facility and the First Lien Facility (that do not already secure the Second Lien Notes), which liens will be junior to the liens of the DIP Lenders under the DIP Facility, the Carve-Out, the First Lien Adequate Protection Liens, the liens securing the obligations under the First Lien Facility, and the Non-Primed Liens (as defined in the Interim DIP Order);

- superpriority claims as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331, and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve Out, (ii) the Superpriority Claims (as

defined in the Interim DIP Order), and (iii) the First Lien 507(b) Claims each granted in respect of the DIP Obligations or First Lien Obligations, as applicable;

- payment on a monthly basis after entry of the DIP Orders, on the first day of each month, commencing on July 1, 2011, of all interest accrued on the Second Lien Notes prior to such payment date, at the non-default rate, which upon receipt by the Second Lien Notes Indenture Trustee shall be taken into account (to the extent it has any impact on the computation pursuant to the terms of the Second Lien Notes Indenture) in determining the computed amount of any makewhole or other early termination premium, including the Makewhole Premium (as defined in the Adequate Protection Stipulation), in accordance with the terms of the Second Lien Notes Indenture;

- payment of all reasonable fees and expenses of the Ad Hoc Group, including the reasonable fees and disbursements of counsel and financial advisors to the Ad Hoc Group incurred (i) in June 2011 and (ii) during each month thereafter provided that such reimbursement obligation shall not exceed $75,000 in the aggregate on a current pay basis for any month after June 2011 during these chapter 11 cases (the "Monthly Current Pay Cap"); *provided, further, however,* that (x) the Ad Hoc Group shall be entitled to payment of any additional fees and disbursements incurred hereunder in excess of the Monthly Current Pay Cap in connection with the conclusion of these chapter 11 cases, so long as such fees and disbursements are reasonable and in any dispute, the Ad Hoc Group shall bear the burden of proof as to the reasonableness of the fees and disbursements and (y) nothing in this Stipulation shall: (a) require the Debtors to pay fees and expenses of the Ad Hoc Group in connection with litigating the entitlement to payment of interest at the default rate or the Makewhole Premium (as defined in the Adequate Protection Stipulation); or (b) prohibit any party in interest from objecting to final approval of any payments to the Ad Hoc Group solely with respect to the reasonableness of the fees and disbursements received pursuant to this Stipulation or pursuant to any subsequent request for fees and disbursements; and

- provision to the Ad Hoc Group of any written financial information or periodic reporting provided, or required to be provided, to the DIP Agent or the DIP Lenders, concurrently with the delivery (or when otherwise required to be delivered) of such financial information or periodic reporting to the DIP Agent or the DIP Lenders.

52. The Adequate Protection summarized above and set forth in the DIP Orders and the Adequate Protection Stipulation is fair and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code. And significantly: (a) the First Lien Agent has consented to the Adequate Protection to be provided to the First Lien Lenders

pursuant to the applicable provisions of the First Lien Credit Agreement and (b) the Ad Hoc Group has consented, on behalf of the Second Lien Noteholders, to the Adequate Protection to be provided to the Second Lien Noteholders. Accordingly, the Court should (a) find that the Adequate Protection is fair and reasonable and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code and (b) approve the Adequate Protection Stipulation.

## II.   The Debtors Should Be Authorized to Use the Cash Collateral.

53.   Section 363(c) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral. Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A)  each entity that has an interest in such cash collateral consents; or
>
> (B)  the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

54.   The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral. *First*, pursuant to the DIP Documents, the First Lien Agent has consented to the Debtors' use of the Cash Collateral. In addition, pursuant to the Adequate Protection Stipulation, the Ad Hoc Group has consented to the Debtors' use of Cash Collateral. Furthermore, even in the absence of the Adequate Protection Stipulation, the Second Lien Noteholders are deemed to consent to the use of the Cash Collateral according to the terms of the Intercreditor Agreement. *See* Intercreditor Agreement at § 5.2.

38

55.     Moreover, courts in this jurisdiction and others have generally held that intercreditor agreements are enforceable. *See In re Elec. Components Int'l, Inc.*, No. 10-11054, 2010 WL 66347116, at *8 (Bankr. D. Del. Apr. 27, 2010) (finding an "intercreditor agreement constitutes a 'subordination agreement' under section 510 and is enforceable on its terms"); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 140 (Bankr. D.N.J. 2010) (finding section 510 provides that a "subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law"); *In re Curtis Ctr. Ltd. P'ship*, 192 B.R. 648, 660 (Bankr. E.D. Pa. 1996) (finding "the language of the subordination agreement is plain and unambiguous. The terms of this pre-petition agreement are fully enforceable in this Bankruptcy case pursuant to 11 U.S.C. § 510(a)"); *see also In re Boston Generating, LLC*, 440 B.R. 302, 318 (Bankr. S.D.N.Y. 2010) (finding an "[i]ntercreditor [a]greement is an enforceable agreement under section 510(a) of the Bankruptcy Code to the extent that it is a subordination agreement"); *In re Erickson Retirement Cmty, LLC*, 425 B.R. 309, 314 (Bankr. N.D. Tex. 2010) (finding "subordination agreements are fully enforceable"); *Ion Media Networks, Inc.*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) (finding intercreditor agreements are enforceable contracts under section 510(a) "and the Court will not disturb the bargained-for rights and restrictions governing the second lien debt"); *In re Aerosol Packaging, LLC*, 362 B.R. 43, (Bankr. N.D. Ga. 2006) (finding that "unless the [s]ubordination [a]greement is not enforceable under applicable nonbankruptcy law, the [s]ubordination [a]greement should be enforced by its terms.").

56.     *Second*, even in the absence of consent, the Prepetition Secured Lenders' interests in the Cash Collateral are adequately protected in satisfaction of section 363(e) of the

Bankruptcy Code.[7]  As described above, the Debtors are providing the Prepetition Secured

Lenders with Adequate Protection, which is fair and reasonable, and adequately protects the

Prepetition Secured Lenders' interests in the Prepetition Collateral from diminution caused by

the DIP Facility, including by the Debtors' use of the Cash Collateral pursuant to the terms

thereof.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under

section 363(c)(2) of the Bankruptcy Code.  In addition, even in the absence of the Adequate

Protection Stipulation, the Second Lien Noteholders are prohibited from objecting to the use of

Cash Collateral because the First Lien Lenders have consented to such use on the terms provided

herein.  *See* Intercreditor Agreement at §§ 5.2, 5.4.

### III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and Honor Obligations Under the Commitment Letter.

57.    As described above, the Debtors have agreed, subject to Court approval, to pay a

syndication fee to the DIP Agent in exchange for the DIP Agent syndicating the DIP Facility.

Prior to the Petition Date, the Debtors entered into a fee letter, which formalized the DIP Agent's

commitment to syndicate the DIP Facility provided that the Debtors fulfilled certain obligations,

including seeking Court approval to pay the fees described above.  In addition, prior to the

Petition Date, the Debtors entered into the Commitment Letter, which formalized the DIP

Agent's commitment to syndicate the DIP Facility provided that the Debtors fulfilled certain

obligations, including seeking Court approval to pay the fees described above.

58.    The fees the Debtors have agreed to pay to the DIP Agent, and other obligations

under the Commitment Letter, together with the other provisions of the DIP Agreement,

represent the most favorable terms to the Debtors on which the DIP Agent would agree to make

---

[7]    The Debtors are not aware of any entity other than the Debtors and the Prepetition Secured Lenders that has or purports to have an interest in the Cash Collateral.

the DIP Facility available. The Debtors considered the syndication fee when determining in their sound business judgment that the DIP Documents constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute these chapter 11 cases, and paying these fees in order to obtain the DIP Facility, is in the best interests of the Debtors' estates, creditors, and other parties in interest.

59.     Courts routinely authorize debtors to pay fees similar to those the Debtors propose to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtors' estates.[8] *See, e.g., In re Sea Launch Co., L.L.C.,* Case No. 09-12153 (BLS) (Bankr. D. Del. May 12, 2010) [Docket No. 697] (approving 3.75% DIP break-up fee); *In re Aleris Int'l. Inc.,* No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) [Docket No. 299] (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Dura Auto. Sys., Inc.,* No. 06-11202 (Bankr. D. Del. Jan. 30, 2008) [Docket No. 2696] (approving a 2.5% fees related to refinancing and extending a postpetition financing facility); *see also In re Great Atl. & Pac. Tea Co.,* Case No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011) [Docket No. 479] (approving 3% letter of credit fee); *In re InSight Health Services Holdings Corp.,* Case No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011) [Docket No. 105] (approving 2.5% DIP closing fee); *In re NR Liquidation III. Co. (f/k/a Neff Corp.),* Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) [Docket No. 207] (approving 3.1% DIP and exit facility fee); *In re The Reader's Digest Assoc.,* No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) [Docket No. 152] (approving 3% exit fee), *In re Lear Corp.,* No. 14326 (ALG) (Bankr. S.D.N.Y. August 4, 2009) [Docket No. 282] (approving 5.0% up front fee and a 1.0% exit/conversion fee); *In re Gen. Growth Prop., Inc.,* No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) [Docket No. 527] (approving

---

[8]     Because of the voluminous nature of the orders cited herein, they are not attached to the Motion. Copies of these orders are available on request of the Debtors' counsel.

3.75% exit fee); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Feb. 9, 2009) [Docket No. 151] (approving an up-front 3% facility fee). Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

**IV.    The DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e).**

60.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

61.    As explained in detail herein and in the First Day Declaration and the Snyder Declaration, the DIP Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length, good faith negotiations between the Debtors and the DIP Lenders. The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Documents other than as described herein. Accordingly, the Court should find that

42

the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## V.     Modification of the Automatic Stay Is Warranted.

62.     The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Agreement, and to take various actions without further order of or application to the Court. However, the DIP Agent must provide the Debtors and various other parties, including the U.S. Trustee, with five (5) business days written notice prior to exercising any enforcement rights or remedies in respect of the Collateral or upon a shorter period of time after notice and a hearing.

63.     Stay modification provisions of this sort are ordinary and usual features of DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Agreement and the proposed DIP Orders.

## VI.     The Debtors Require Immediate Access to the Cash Collateral and DIP Facility.

64.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

43

65.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than [15] days after service of the motion. If the motion so requests, the court may conduct a hearing before such [15] day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

66.     In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 36; *Simasko*, 47 B.R. at 449. Under this standard, the Debtors' request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate. Moreover, courts in this jurisdiction have granted similar relief in other chapter 11 cases. *See e.g.*, *In re Corrozi-Fountainview, LLC*, Case No. 10-11090 (KG) (Bankr. D. Del. June 6, 2011); *In re Ambassadors Int'l, Inc.*, Case No. 11-11002 (KG) (Bankr. D. Del. Apr. 28, 2011); *In re Atrium Corp.*, Case No. 10-10105 (BLS) (Bankr. D. Del. Mar. 17, 2010); *In re Constar Int'l Inc.*, Case No. 11-10109 (CSS) (Bankr. D. Del Mar. 10, 2011); *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (KG) (Bankr. D. Del. Feb. 23, 2011) *In re ACG Holdings, Inc.*, Case No. 08-11467 (CSS) (Bankr. D. Del. Jul. 16, 2008); *In re Hilex Poly Holding Co. LLC*, Case No. 08-10890 (KJC) (Bankr. D. Del. May 7, 2008); *In re Holley Performance Prods. Inc.*, Case No. 08-10256 (PJW) (Bankr. D. Del. Feb. 12, 2008); *In re Remy Worldwide Holdings, Inc.*, Case No. 07-11481 (KJC) (Bankr. D. Del. Oct. 10, 2007); *In re Foamex Int'l Inc.*, Case No. 05-12685 (PJW) (Bankr. D. Del. Sept. 20, 2005).

67.     The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to borrow up to $125 million under the DIP Facility is not granted promptly after the Petition

Date. The Debtors have no material source of liquidity other than the DIP Facility. To operate their business in the ordinary course, the Debtors require access to the DIP Facility to maintain operations and fund their cash management system to a level sufficient to support their business activities. However, substantially all of the Debtors' cash is subject to the dominion of the Prepetition Secured Lenders. Thus, the Debtors have insufficient cash to fund operations without immediate use of Cash Collateral and access to the DIP Facility. Access to the DIP Facility will also hopefully allow the Debtors to continue to procure textbooks and other merchandise on credit from the general merchandise vendors and publishers. The Debtors' ability to procure the textbooks on credit is entirely based on the Debtors' liquidity and the perception of the Debtors' ability to re-pay publishers and general merchandise vendors, for providing their products on credit. The DIP Facility will signal the Debtors' ability to satisfy any and all obligations to publishers and general merchandise vendors during the 2011 back-to-school rush.

68.     Further, the Debtors anticipate that the commencement of these chapter 11 cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these chapter 11 cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these chapter 11 cases. Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain their relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest.

### Request for a Final Hearing

45

69.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no sooner than 14 days after the date of this Motion and no later than 25 days after the Petition Date, to hold a hearing to consider entry of the Final DIP Order and the permanent approval of the relief requested in this Motion.[9]  The Debtors also request authority to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of objections, if any, to entry of the Final DIP Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final DIP Order under Bankruptcy Rule 4001(c)(2).

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

70.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of a property under Bankruptcy Rule 6004(h).

### Notice

71.     The Debtors have provided notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (c) counsel to JP Morgan Chase Bank, N.A., in its capacity as agent under the Debtors' asset-backed revolving credit facility; (d) counsel to Wilmington Trust FSB, as indenture trustee under the Debtors' 10% senior secured notes due 2011; (e) BNY Midwest Trust Company, as indenture trustee under the Debtors' (i) 8.625% senior subordinated notes due 2012 and (ii) 11% senior discount notes due 2013; (f) counsel to the ad hoc group of the Debtors' 8.625% senior subordinated notes due 2012; (g) counsel to J.P. Morgan Investment Management Inc., in its capacity as a holder of the Debtors' 8.625% senior

---

[9]     The DIP Documents require that the Final DIP Order be entered no later than 25 days after the Petition Date.

subordinated notes due 2012 and 11% senior discount notes due 2013; (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors respectfully submit that no further notice is necessary.

**No Prior Request**

72.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

DOCS_DE:171029.1

WHEREFORE, for the reasons set forth herein and in the First Day Declaration and the Snyder Declaration, the Debtors respectfully request that the Court enter the DIP Orders as provided herein, granting the relief requested herein and such other and further relief as the Court deems appropriate.

Wilmington, Delaware
Dated: June 27, 2011

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone:   (302) 652-4100
Facsimile:    (302) 652-4400
E-mail:       ljones@pszjlaw.com
              joneill@pszjlaw.com
              pkeane@pszjlaw.com

And

**KIRKLAND & ELLIS LLP**
Marc Kieselstein, P.C. (*pro hac vice* pending)
Chad J. Husnick (*pro hac vice* pending)
Daniel R. Hodgman (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:   (212) 446-4800
Facsimile:    (212) 446-4900
E-Mail:       marc.kieselstein@kirkland.com
              chad.husnick@kirkland.com
              daniel.hodgman@kirkland.com

Proposed Co-Counsel to the Debtors and
Debtors in Possession