To demonstrate compliance with the "best interests test," the Debtors estimated a range of proceeds that would be generated from a hypothetical chapter 7 liquidation in their liquidation analysis included below (the "Liquidation Analysis"). In the Liquidation Analysis, the Debtors determined a hypothetical liquidation value of their businesses if a chapter 7 trustee were appointed and charged with reducing to cash any and all of the Debtors' assets. The Debtors compared this hypothetical liquidation value to the value and returns provided for under the Plan. *As reflected in more detail in the Liquidation Analysis, the Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would not be greater than the value of distributions under the Plan*.

The Debtors believe that Holders of Allowed Claims in each Impaired Class will receive at least as much under the Plan as they would if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs, which would be realized if the Debtors were to be liquidated in accordance with chapter 7 of the Bankruptcy Code.

The Liquidation Analysis reflects management's estimated net value of the Debtors' assets if the Debtors were liquidated under the provisions of chapter 7 of the Bankruptcy Code, and the net proceeds of the liquidation were applied in strict priority to satisfy Claims against the Debtors. The Liquidation Analysis assumes the Debtors' estates are substantively consolidated, and is based on the Debtors' projected balance sheets as of March 31, 2012 (except as indicated). The Liquidation Analysis assumes a range of recoveries for these assets assuming a forced liquidation asset sale process conducted by the Debtor's trustee. The value available for distribution to creditors as of the date of an actual liquidation may differ from the value used in this Liquidation Analysis, potentially by a material amount.

Conversion of the Chapter 11 Cases to chapter 7 likely would result in additional costs to the Estates. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset dispositions expenses, all unpaid expenses incurred by the Debtors in the Chapter 11 Cases (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the chapter 7 case, litigation costs, and Claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

In order to maximize total liquidation value, the Liquidation Analysis assumes that the Debtors continue to operate the business for a period of two months, then liquidates the remaining assets during a three–month–period after the filing of a chapter 7 bankruptcy petition. The Debtors' would then require an additional six months to wind down the estate. The Liquidation Analysis assumes distressed sales of the Debtors' assets as the basis for this liquidation.  There can be no assurance that the actual value realized in a sale of these assets would yield the balances assumed in the Liquidation Analysis.  If actual results were lower than those shown, or if the assumptions used in formulating the Analysis were not realized, distribution to each member of each class of Claims could be affected adversely.

The Liquidation Analysis assumes that proceeds would be distributed in accordance with section 726 of the Bankruptcy Code. If the Debtors were liquidated pursuant to chapter 7 proceedings, the amount of liquidation value available to creditors would be reduced by: (1) the costs of the liquidation, which includes the fees and expenses of the Chapter 7 Trustee appointed to manage the liquidation, the fees and expenses of other professionals retained to assist with the liquidation, and other asset disposition expenses; (2) letters of credit drawn down against the DIP Facility; (3) the DIP Facility; (4) Administrative Expense Claims, including administrative trade claims,  and employee benefit obligations, and Priority Tax Claims; (5) Senior Secured Notes; (6) any remaining residual value would be available to unsecured lender and general unsecured creditors pari passu with the deficiency secured claims; and (7) to the extent any value remains HoldCo Interests would be satisfied.

The Liquidation Analysis necessarily contains an estimate of Claims that ultimately will become Allowed Claims. Estimates for various Classes of Claims are based solely upon the Debtors' review of their books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected levels set forth in this Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected amounts of Claims that are consistent with the estimated Claims reflected in the Plan with certain modifications. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The Liquidation Analysis does contain estimates of potential damage Claims with respect to executory contracts that may be rejected; however, these estimates may be substantially different if, in fact, executory contracts are rejected. Nothing contained in the Liquidation Analysis is intended to be or constitutes a concession or admission of the Debtors. The actual amount of Allowed Claims in the Chapter 11 Cases could materially differ from the estimated amounts set forth in the Liquidation Analysis.

A.    **Scope, Intent, and Purpose of the Liquidation Analysis.**

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Debtors' assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. In addition, the Debtors' management cannot judge with any degree of certainty the effect of the forced liquidation asset sales on the recoverable value of the Debtors' Assets. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted in preparing the Liquidation Analysis. **NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY**.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Claims contained in the Debtors' books and records. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including Administrative Claims, chapter 7 trustee fees, and certain lease and contract rejection damages Claims. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. The Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan. **NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.**

B.    **Results of the Liquidation Analysis.**

The Debtors have eight legal entities that primarily engage in the procurement and sale of new and used textbooks on college campuses, as well as the sale of other types of education material to academic institutions. It is assumed that the orderly liquidation of the Debtors would commence following three months of normal business operations through the end of the Spring academic semester, in order to maximize recovery. Upon completion of the Spring academic semester, a liquidation process would proceed for a period of three months under the direction of the chapter 7 trustee, during which time all of the Debtors' major assets (consisting mostly of the inventory, receivables, and property plant, and equipment) would be sold or wound down in an expedited manner, the cash proceeds, net of liquidation related costs, would then be distributed to the creditors in accordance with section 726 of the Bankruptcy Code. This three-month assumption is primarily based on anticipated time pressure to liquidate inventory, dispose of land and buildings, and collect upon receivables. Following the sale of the assets, the Liquidation Analysis assumes the chapter 7 trustee will wind down the estate expeditiously over a six month period.

The estimated proceeds of a hypothetical chapter 7 liquidation for all assets of the eight Debtor entities were calculated based on assumptions provided herein and applied to estimated Claims values for these entities to determine recovery estimates among creditor Classes. In addition, these recovery estimates among creditor Classes were compared to estimated recoveries under the Plan.

As is demonstrated in the analysis, all impaired creditor Classes are estimated to receive less in the Liquidation Analysis than under the Plan. In both the "high recovery scenario" and the "low recovery scenario," Administrative Claims and Priority Tax Claims receive a 100% recovery, and the Senior Secured Claims and the Senior Unsecured Claims are both impaired.

Based on the estimated recoveries in the Plan and Liquidation Analysis, it is management's opinion that the Plan satisfies the "best interests test." Under the Plan, each creditor class will receive at least the same value or significantly more than they would if the business were to be subject to a chapter 7 liquidation.

# NBC HOLDINGS CORP.
## Liquidation Analysis
## As of March 31, 2012

### Estimated Recovery and Distribution to Claimants

($ in 000's)

| | Notes | Book Value | Estimated Recovery % Low | High | Estimated Recovery Low | High |
|---|---|---|---|---|---|---|
| **Liquidation Proceeds** | | | | | | |
| Cash & Cash Equivalents | A | $ 104,256 | 100% | 100% | $ 104,256 | $ 104,256 |
| Trade Receivables | B | 75,000 | 20% | 85% | 15,000 | 63,750 |
| Inventory | C | 98,080 | 40% | 70% | 39,232 | 68,656 |
| Prepaid Assets | D | 22,272 | 0% | 10% | - | 2,227 |
| Property Plant and Equipment | E | 37,906 | 15% | 30% | 5,686 | 11,372 |
| Other Assets | F | 1,112 | 0% | 10% | - | 111 |
| **Proceeds Available for Distribution** | | | | | 164,174 | 250,372 |
| | | | | | | |
| **Costs of Liquidation and Distribution** | | | | | | |
| Chapter 7 Trustee Fees | G | | | | 1,798 | 4,383 |
| Chapter 7 Professional Fees | H | | | | 3,647 | 2,984 |
| Winddown & Liquidation Costs | I | | | | 1,676 | 1,371 |
| Letter of Credit Facilities | J | | | | 4,104 | - |
| | | | | | 11,224 | 8,738 |
| | | | | | | |
| Adjusted Proceeds Available for Distribution | | | | | 152,950 | 241,634 |
| | | | | | | |
| **Superpriority Administrative Claims** | | | | | | |
| DIP Facility Claim | K | | | | 125,000 | 125,000 |
| Carve Out for Professional Fees | L | | | | 4,400 | 4,400 |
| | | | | | 129,400 | 129,400 |
| | | | | | | |
| Proceeds Available after Superpriority Administrative Claims | | | | | 23,550 | 112,234 |
| | | | | | | |
| Secured Debt Claims | M | 202,427 | 12% | 55% | 23,550 | 112,234 |
| | | | | | | |
| Proceeds Available after Secured Debt Claims | | | | | - | - |
| | | | | | | |
| **Chapter 11 Administrative Claims** | | | | | | |
| Liabilities incurred in Chapter 11 at the operating entities | N | 12,100 | 0% | 0% | - | - |
| Employee Benefit Obligations | O | 1,338 | 0% | 0% | - | - |
| Priority Tax Claims | P | 796 | 0% | 0% | - | - |
| 503(b)(9) and other miscellaneous | Q | 1,495 | 0% | 0% | - | - |
| Rejection of Assumed Leases | R | 15,157 | 0% | 0% | - | - |
| | | 30,886 | | | - | - |
| | | | | | | |
| Proceeds Available for Distribution to Pre-petition Unsecured Creditors | | | | | - | - |
| | | | | | | |
| Unsecured 8.625% Notes Claims | S | 190,765 | 0% | 0% | - | - |
| Unsecured AcqCo Notes Claims | T | 85,846 | 0% | 0% | - | - |
| Unsecured Claims sharing Pari Passu with Lenders | U | 13,089 | 0% | 0% | - | - |
| HoldCo Interests | V | 110,000 | 0% | 0% | - | - |
| | | $ 399,700 | 0% | 0% | $ - | $ - |

DOCS_DE:179342.1 59929-001
K&E 22166367

**C.      Notes to Liquidation Analysis.**

**(i)      *Note A – Cash and Cash Equivalents.***

Cash and cash equivalents are in the form of depository accounts and short term investments. These accounts are liquid, and a 100% recovery is assumed. The March 31, 2012 balance is based on the Debtors' business plan forecast.

**(ii)      *Note B – Trade Receivables.***

The trade receivables balance is based upon the business plan forecasted balances as of March 31, 2012. Low end recovery is based on the Revolving DIP Loan (as defined in the Interim DIP Order) advance ineligibles and advance rate (no advances are provided against retail receivables, which are due from schools that provide textbooks through financial aid). The high end is based on judgment to reflect the fact that majority of receivables are relatively new, and borrowing base calculations tend to be conservative by design.

**(iii)      *Note C – Inventory.***

The inventory balance is based upon the projected balance as of March 31, 2012. Low end recovery is based on the Revolving DIP Loan (as defined in the Interim DIP Order) advance ineligibles and advance rate (no advances are provided against rental inventory, which is in the hands of students and potentially very difficult to realize upon). The high end is based on judgment to reflect the fact that borrowing base calculations tend to be conservative by design.

**(iv)      *Note D – Prepaid Assets.***

Prepaid assets consist primarily of vendors requiring prepayment, prepaid consulting fees, insurance, maintenance, and leases and reflect the March 31, 2012 projected balance. There is assumed to be a minimal recovery for these assets. 0%-10% is based upon the assumption that a small percentage may be sold or refunded, however the majority will be exhausted prior to the conclusion of a liquidation.

**(v)      *Note E – Property, Plant, and Equipment.***

Property, plant, and equipment consists of land, buildings, furniture and fixtures, information systems, and leasehold improvements and reflect the March 31, 2012 business plan forecasted balance. The majority of the recovery relates to land and buildings. Land makes up less than 10% of the total value. The recovery for the buildings in a distressed sale is not expected to yield full value, and a recovery of 15%-30% is estimated, based on judgment.

**(vi)      *Note F – Other Assets.***

Other assets consist primarily of software development costs and reflects the March 31, 2012 business plan forecasted balance. There is minimal recovery assigned to this, however the software may be sold to other bookstores or have value to existing customers. Therefore, a recovery of 0%-10% is estimated.

**(vii)**    *Note G – Trustee Fees of Chapter 7 Estates.*

Compensation for the chapter 7 trustee will be limited to fee guidelines in section 326(a) of the Bankruptcy Code and is calculated at 3% of estimated recovery of assets available for distribution, excluding cash on hand.

**(viii)**    *Note H – Chapter 7 Professional Fees.*

Professional fees include ongoing Professional fees associated with winding down the business. These Professional fees include fees for legal and financial support. The cost to operate the business during the liquidation process is detailed in the winddown costs. Once the liquidation is complete, certain corporate and administrative functions would be required to oversee the distribution of proceeds, to maintain and close the accounting records and to prepare tax returns for the estates, among other things. For purposes of analysis, the low end recovery is 10% higher and the high end is 10% lower than the forecast of $3.3 million.

**(ix)**    *Note I – Winddown & Liquidation Costs.*

The estimated cost to operate the business during the liquidation process is detailed below. Once the liquidation is complete, certain corporate and administrative functions would be required to oversee the distribution of proceeds, to maintain and close the accounting records, and to prepare tax returns for the estates, among other things. For purposes of analysis, the low end recovery is 10% higher and the high end is 10% lower than the forecast of $1.524 million.

| ($ in 000's) | Monthly Actual | Apr-Jun 2012 Fcst | % of Act | Jul-Sep 2012 Fcst | % of Act | Oct-Dec 2012 Fcst | % of Act | Total | Low Recovery | High Recovery |
|---|---|---|---|---|---|---|---|---|---|---|
| Estimated Wind Down Expenses | | | | | | | | | | |
| Distribution Center Wage Expenses | $ 256 | $ 384 | 50% | $ - | 0% | $ - | 0% | $ 384 | $ 422 | $ 346 |
| Corporate Payroll Wind Down Costs | 200 | 299 | 50% | 150 | 25% | 75 | 13% | 524 | 576 | 471 |
| Distribution & Office Facility Expenses | 77 | 124 | 54% | 75 | 33% | 75 | 33% | 274 | 301 | 247 |
| Estimated Severance | | 267 | | 37 | | 37 | | 342 | 376 | 308 |
| Total | | $ 1,074 | | $ 262 | | $ 187 | | $ 1,524 | $ 1,676 | $ 1,371 |

**(x)**    *Note J – Letter of Credit Facilities.*

Letter of Credit Facilities consist of three letters in the amounts of $3 million, approximately $700 thousand, and $370 thousand. These letters are not funded and are collateralized against the DIP Facility. For purposes of the analysis, it is assumed that the letters of credit would both be drawn in the low recovery scenario and that neither would be drawn in the high recovery scenario.

**(xi)**    *Note K – DIP Facility Claim.*

Upon filing the Chapter 11 Cases, the company entered into a $200 million DIP facility. The Term portion of $125 million was drawn upon filing, the remaining $75 million DIP Revolving Loan remains unutilized and is assumed to remain undrawn through the liquidation period.

**(xii)    *Note L - Carve Out for Professional Fees***

The Final DIP Order stipulates a $5 million Carve Out Cap (as defined in the Final DIP Order). The fees incurred by various professionals in conjunction with the chapter 11 cases that remained unpaid as of the Chapter 7 conversion date are assumed to be $4.4 million.

**(xiii)    *Note M - Secured Debt Claims***

Represents the $200 million 10% Senior Secured Notes outstanding plus interest accrued through March 2012, approximately $200 thousand in outstanding mortgage obligations, $240 thousand in surety bonds for real property leases, and approximately $700 thousand in property tax claims.

**(xiv)    *Note N - Liabilities Incurred in Chapter 11 at the Operating Entities***

Represents business plan forecasted postpetition trade payables, accrued employee compensation, and accrued expenses incurred through March 31, 2012.

**(xv)    *Note O – Employee Benefit Obligations.***

Employee Benefit Obligations are the Debtors' obligations to fund the employee 401(k) program. The balance represents the actual liability as of November 30, 2011.

**(xvi)    *Note P – Priority Tax Claims.***

The balance represents the projected valid Claims based upon filed Proofs of Claim and scheduled Claims.

**(xvii)    *Note Q – 503(b)(9) and Other Miscellaneous Administrative Claims***

Represents the value of goods received by the Debtors 20 days prior to the commencement of these Chapter 11 Cases in which the goods were sold by the Debtors in the ordinary course, as well as other miscellaneous administrative claims.

**(xviii)    *Note R – Rejection of Assumed Leases***

On January 5, 2012, NBC assumed certain lease contracts. The Liquidation Analysis assumes rent calculations from April 1, 2012 through the earlier of the lease expiration date or 24 months per section 503(b)(7) of the Bankruptcy Code.

**(xix)    *Note S – Unsecured 8.625% Claims.***

Represents the $175.0 million 8.625% Notes outstanding plus interest accrued through March 31, 2012.

**(xx)    *Note T - Unsecured AcqCo Notes Claims***

Represents the $77.0 million AcqCo Notes outstanding plus interest accrued through March 31, 2012.

**(xxi)**    *Note U – Unsecured Claims.*

Unsecured claims consist of unpaid prepetition trade Claims and lease rejection Claims. Trade Claims are estimated based on filed Proofs of Claim and scheduled Claims, and lease rejection Claims are estimated based on one year's worth of rent expense, as follows:

| ($ in 000's) | | |
|---|---|---|
| Estimated Unsecured Vendor Claims | $ | 7,169 |
| Lease Rejection Claims | | 5,920 |
| | $ | 13,089 |

**(xxii)**    *Note V - HoldCo Interests.*

Represents an estimate of equity holders' investments into HoldCo and AcqCo.

## XII.    Projected Financial Information

Attached as **Exhibit B** are the unaudited pro forma financial statements (the "Financial Projections"), which consist of a statement of operations (the "Income Statement"), a statement of cash flow (the "Statement of Cash Flows"), and a statement of financial position (the "Balance Sheet") for the time period from March 31, 2012 through March 31, 2016. The Financial Projections assume an Effective Date of May 31, 2012 and are based on the Debtors' current business plan. A balance sheet (the "Pro Forma Balance Sheet") has been provided as of the Effective Date with pro forma adjustments to account for (a) the reorganizing and related transactions pursuant to the Plan and (b) the implementation of "fresh start" accounting pursuant to Statement of Position 90-7 ("SOP 90-7"), Financial Reporting by Entities in Reorganization Under The Bankruptcy Code, as issued by the American Institute of Certified Public Accountants (the "AICPA"). The Financial Projections may not be in accordance with generally accepted accounting practices.

THE DEBTORS' MANAGEMENT PREPARED THE FINANCIAL PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS. THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH FINANCIAL PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY AICPA OR THE RULES AND REGULATIONS OF THE SEC. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE FINANCIAL PROJECTIONS THAT ACCOMPANY THIS DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH FINANCIAL PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. THE FINANCIAL PROJECTIONS ARE QUALIFIED IN THEIR ENTIRETY BY THE DESCRIPTION THEREOF CONTAINED HEREIN AND IN THE NOTES ACCOMPANYING THE FINANCIAL PROJECTIONS.

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE CONSUMMATION AND

IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, MAINTENANCE OF GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS, AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED HEREIN), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE ON WHICH THIS DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AND INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

A.    **Notes to the Income Statement and Cash Flow Statement.**

(i)    *Approach.*

The Income Statement consolidates the financial performance of the Debtors' operations using an approach established by the Debtors' management and professionals to forecast operating results. The Income Statement accounts for conditions specific to each operating segment in which the Debtors' operate, including competitive pressures as well as the current state of the textbook industry. The Debtors' management team has considered various factors in developing the Financial Projections based on specific assumptions and information available to them. The Financial Projections should be reviewed in conjunction with the section entitled "Risk Factors" discussed herein.

The Financial Projections were prepared on a segment-level basis, taking into account trends within each operating segment. Revenue factors were developed specific to each segment and included drivers such as sales units, rental units, and price per unit. Gross margins were estimated based on current results and anticipated changes in the mix of sales versus rental and sales mix by new textbooks, used textbooks, general merchandise, and other items. Costs for each division were developed based on current relationships between actual costs and revenue and anticipated changes due to sales by source such as in-store, online third party marketplaces, or the Debtors' own online websites. Specific adjustments were made to some costs to account for operational initiatives implemented, or to be implemented, by the Debtors' management team.

### (ii)    *Operational Drivers.*

Total revenue represents gross revenues derived from the operation of college bookstores, the wholesale of used textbooks, and numerous businesses that complement the wholesale business. The Debtors' revenues from college bookstores are derived from both the number of bookstores that they operate, which fluctuate based on the acquisition or contract management of new stores net of any closed stores, plus expected changes in same store sales within those bookstores. The projections include certain assumptions about changes in the number of bookstores operated by the Debtors as well as certain trends in same store sales results. Estimates of same store sales were made for each primary revenue type within the college bookstore operations.

### (iii)    *Cost of Sales and Selling, General and Administrative Expenses.*

Cost of sales expenses primarily represent the direct operating expenses associated with generating revenue from sales of the Debtors' products and services. Those direct operating expenses are primarily derived from the cost of acquisition of new and used textbooks, as well as general merchandise, plus shipping costs incurred to get product to the appropriate bookstore or warehouse. Costs of sales for each primary sales category was estimated based on current trends. Cost of sales for the wholesale and complementary services businesses were estimated based on current trends.

Selling, general, and administrative ("SG&A") expenses are specific to each primary business operation, as well as the costs necessary to operate the corporate infrastructure. Each business operation includes labor and benefits, travel, outbound shipping, marketing and advertising, rent, and miscellaneous other costs, including commission payments to third party online marketplace operators. All of these costs were projected based on current operating levels, as adjusted for projected changes in the number of bookstores operated by the Debtors, and further adjusted for normal increases in each category of expense. Corporate SG&A primarily consists of the labor and benefits necessary to operate functions such as treasury, general accounting, information technology, senior management and the corresponding support structure related to these functions. Ongoing estimates for legal and other professional fees are included in the estimates for corporate SG&A.

### (iv)    *Gain on Retirement of Debt.*

Gain on retirement of debt relates to the extinguishment of the debt obligations as a result of the Plan. This amount includes amounts for the write off of accrued interest on certain liabilities subject to compromise as well as the write off of preferred stock balances – offset partially by an estimate for immediate write off of unamortized debt issuance costs associated with the prepetition obligations.

### (v)    *Interest Expense.*

Interest expense for the periods before May 31, 2012 includes interest accrued on all prepetition and post-petition debt for the assumed periods outstanding, excluding the 8.625% Notes and the AcqCo Notes. Interest expense after May 31, 2012 was estimated only for all post-petition obligations.

Interest expense for the projection period has been estimated based on terms of the Plan.

**(vi)    *Income Taxes.***

Income taxes were calculated based on an effective 40% blended United States federal and state tax rate. This tax rate assumes all Debtors will emerge as taxpayers. For purposes of forecasting provisions for taxes after the Effective Date, the Financial Projections assumes that the Debtors do not emerge with any available net operating losses ("NOLs"). A final assessment of the Debtors' cancellation of debt income ("CODI") and usable NOLs may vary based on the structure of the Plan and events occurring after the Effective Date.

**(vii)    *Capital Expenditures and Acquisitions.***

Capital expenditures projected in the Financial Projections are primarily maintenance in nature and include estimates to update leasehold improvements and computer infrastructure and replace machinery and equipment. While the projections do not contemplate any major new lines of business, there will be expenditures necessary to remodel stores and to maintain and existing equipment as it ages over the ordinary course of operations.

Investing activities also include estimated expenditures to acquire additional college bookstore operations including working capital investments and certain upfront bonus payments to colleges and universities who contract with the Debtors to operate their on campus bookstore, as well as certain investments in information systems for those new operations.

**B.    Balance Sheet and Pro Forma Balance Sheet.**

The Pro Forma Balance Sheet contains certain adjustments as a result of consummation of the Plan. Liabilities subject to compromise will be extinguished and receive treatment based on the Plan. Certain liabilities subject to compromise will be converted to equity as a result of the Reorganized Debtors' issuance of New Common Equity to satisfy certain Allowed Claims under the Plan.

The Pro Forma Balance Sheet reflects the Reorganized Debtors' pro forma projected consolidated Balance Sheet as of the Effective Date. The Pro Forma Balance Sheet was developed from the Debtors' March 31, 2012 estimated Balance Sheet, as adjusted for the projected income and cash flow for the two months ended May 31, 2012. Adjustments were made to the May 31, 2012 Balance Sheet for illustrative purposes only to demonstrate the effect of the Plan.

In addition, as part of the Debtors' emergence from bankruptcy protection, they will be required to adopt fresh start accounting. Accordingly, the Debtors' assets and liabilities will be recorded at fair value as of the fresh start reporting date. The fair value of the Debtors' assets and liabilities may differ materially from the recorded values of assets and liabilities in the Financial Projections.

On the Effective Date, the Reorganized Debtors will use existing Cash and a portion of the proceeds from the Senior Secured Notes to satisfy Allowed General Administrative Claims, Allowed General Unsecured Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims in full in Cash.

The Financial Projections assume the Debtors emerge with $1.5 million of reinstated capital leases, the $75 million New ABL Facility, up to $80 million of the New Money First Lien Term Loan, and the $100 million New Take-Back Notes, pursuant to the Plan.

## XIII.    Risk Factors

*Holders of Claims and Interests entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement, the Plan, and the documents delivered together herewith, referred to, or incorporated by reference herein, prior to voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.*

**A.    The conditions precedent to the Confirmation and Consummation of the Plan may not occur.**

As more fully set forth in Article IX of the Plan, the occurrence of Confirmation of the Plan and the Effective Date are each subject to a number of conditions precedent.

*-The Bankruptcy Court May Not Authorize Substantive Consolidation of the Debtors' Estates.*  The Plan provides for substantive consolidation of the Debtors' Estates into a single Estate for purposes of Confirmation and Consummation.  The Debtors, however, can provide no assurance that the Bankruptcy Court will authorize the Debtors to substantively consolidate all of their Estates.

*-Parties in Interest May Object to the Plan's Classification of Claims and Interests.*  Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

*-The Debtors May Not Be Able to Satisfy Vote Requirements.*  Pursuant to section 1126(c) of the Bankruptcy Code, section 1129(a)(7)(A)(i) of the Bankruptcy Code will be satisfied with respect to Classes 1, 4, and 5 if at least two-thirds in amount and more than one-half in number of the Allowed Claims that vote in each such Class, vote to accept the Plan.  In addition, the Debtors require the consent of Class 1 - Senior Secured Noteholders to give them New Common Equity in exchange for payment in full of their secured liens, and thus, the Debtors require their consent to confirm the Plan.  There is no guarantee that the Debtors will receive the necessary acceptances from Holders of Claims in Class 1, 4, and 5.  If Class 1, 4, or 5 vote to reject the Plan, the Debtors may elect to amend the Plan with the reasonable consent of the Plan Support Parties, seek Confirmation regardless of the rejection, or proceed with liquidation.

*-The Debtors May Not Be Able to Secure Confirmation of the Plan.*  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of

DOCS_DE:179342.1 59929-001

K&E 22166367

distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A dissenting Holder of an Allowed Claim or Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court still can decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to settlement, release, injunction, and related provisions, as described in Article VIII of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

-*The Debtors May Pursue Nonconsensual Confirmation.* In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class of claims has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation may result in, among other things, increased expenses relating to Professional Fee Claims.

-*The Debtors May Object to the Amount or Classification of a Claim or Interest.* Except as otherwise provided in the Plan, the Debtors and the Reorganized Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

-*The Effective Date May Not Occur.* Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

*-Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan*. The distributions available to Holders of Allowed Claims and Allowed Interests under the Plan can be affected by a variety of contingencies, including whether or not the Debtors are consolidated and whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the impaired Classes entitled to vote to accept or reject the Plan or require any sort of revote by such impaired Classes.

If the conditions precedent to Confirmation are not met or waived, the Plan will not be confirmed; and if the conditions precedent to Consummation are not met or waived, the Effective Date will not take place. In the event that the Plan is not confirmed or is not consummated, the Debtors may seek Confirmation of a new plan. However, if the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, the Debtors may be forced to liquidate their assets. While the Liquidation Analysis indicates that some Holders of Claims and Interests in Classes 1, 2, 3, 4, 5, 7, and 8 would receive a full or partial recovery, it also demonstrates that Holders of Claims in Classes 6 and 10 and Holders of Interests in Class 9 would receive no recovery in a hypothetical chapter 7 liquidation. For a more detailed description of the consequences of a liquidation scenario, see the Section herein entitled "Liquidation Analysis."

**B.      The Debtors cannot state with any degree of certainty the value of any recovery that will be available to Holders of Allowed Claims and Allowed Interests in voting Classes.**

No less than three unknown factors make certainty of creditor recoveries under the Plan impossible. *First*, the Debtors cannot know with any certainty, at this time, (i) how much money will remain after paying all Allowed Claims that are senior to the voting Classes or (ii) the value of the Reorganized Debtors. *Second*, the Debtors cannot know with any certainty, at this time, the number or amount of Claims that ultimately will be Allowed. *Third*, the Debtors cannot know with any certainty, at this time, the number or size of Claims senior to the voting Classes or unclassified Claims that ultimately will be Allowed.

**C.      The Debtors may not be able to achieve their projected financial results or meet post-reorganization debt obligations.**

The financial projections set forth on **Exhibit B** to this Disclosure Statement (the "Financial Projections") represent management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations, as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular, and there is no guarantee that the Financial Projections will be realized. The Debtors' actual financial results may differ significantly from the Financial Projections. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, may not be able to meet their operational needs, and the value of the New Common Equity may thereby be negatively affected. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required. Moreover, even if the Reorganized Debtors were able to obtain additional working capital, it may only be available on unreasonable or cost prohibitive terms. For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the

DOCS_DE:179342.1 59929-001

K&E 22166367

Reorganized Debtors.  If any such required capital is obtained in the form of equity, the interests of the holders of the then-existing New Common Equity could be diluted.

**D.     A liquid trading market for the New Common Equity is unlikely to develop.**

A liquid trading market for the New Common Equity is unlikely to develop.  As of the Effective Date, the New Common Equity will not be listed for trading on any stock exchange or trading system. Consequently, the trading liquidity of the New Common Equity will be limited.  The future liquidity of the trading market for the New Common Equity will depend upon, among other things, upon the number of holders of the New Common Equity, whether the stock is listed for trading on an exchange, and whether the New Common Equity is subject to the Shareholders Agreement, or Registration Rights Agreement, the terms of the New Common Equity, and the terms of the New Warrants, as applicable.

**E.     The Debtors May Face Tough and Increased Competition.**

The Debtors' industry is highly competitive.  A large number of actual and potential competitors exist, some of which are larger than the Debtors with substantially greater resources.  Revenue levels and profit margins could be adversely affected if the Debtors experience increased competition in the markets in which they currently operate or in markets in which they will operate in the future.   In addition, the increased competition may adversely impact the Debtors' ability to acquire an adequate supply of used textbooks.  Also, the Debtors may face increased competition from publishers or third parties providing electronic books in a more desirable format.

**F.     The Economy and Credit Markets May Further Deteriorate.**

As widely reported, the global credit markets and financial services industry have been experiencing a period of upheaval characterized by the bankruptcy, failure, collapse or sale of various financial institutions, diminished liquidity and credit availability, declines in consumer confidence, declines in economic growth, increases in unemployment rates, and uncertainty about economic stability. There can be no assurance that there will not be further deterioration in credit and financial markets and confidence in economic conditions or that any recovery, if and when achieved, will be sustained.  While the ultimate outcome of these events cannot be predicted, it may decrease student enrollment in colleges and universities due to the lack of financial aid and other sources of funding for education.  Spending by students on textbooks and other general merchandise may also decrease due to the economic downturn.

**G.     The Debtors May be Unable to Obtain a Sufficient Supply of Used Textbooks.**

The Debtors' ability to purchase a sufficient number of used textbooks largely determines their used textbook sales for future periods. Successfully acquiring books typically requires a visible presence on college campuses at the end of each semester, which requires hiring a significant number of temporary personnel. Textbook acquisition also depends upon college students' willingness to sell their used textbooks at the end of each semester. The unavailability of sufficient personnel or a shift in student preferences, could impair the Debtors' ability to acquire sufficient used textbooks to meet their sales objectives, thereby adversely affecting revenue levels and profit margins.

**H.     The Debtors May Not be Able to Successfully Contract-Manage Additional Bookstores.**

Part of the Debtors' business strategy is to expand sales for their college bookstore operations by being awarded additional contracts to manage institutional bookstores.   The Debtors may not be successful in competing for contracts to manage additional institutional bookstores. Due to their seasonal nature of business, the operations of the newly contract-managed bookstores may be affected by the time

of the fiscal year when a bookstore is contract-managed by us. In addition, the Debtors' integration of these future bookstores may not be successful, or the anticipated strategic benefits of these future bookstores may not be realized. If the Debtors are unable to successfully integrate their future bookstores, anticipated revenues and profit margins from these new bookstores could be adversely affected.

**I.      The Debtors May Not be Able to Successfully Renew Certain Contracts.**

As the Debtors expand their operations in contract-management of university bookstores, they will increasingly be competing for the renewal of contracts for those stores as the current contracts expire. The Debtors' contracts are typically three to five years, with various renewal and cancellation clauses. The Debtors may not be successful in renewing their current contracts or those renewals may not be on terms that provide them the opportunity to improve or maintain the profitability of managing the bookstore. If the Debtors are unable to successfully renew contracts on profitable terms, profit margins could be adversely affected.

**J.      Publishers May Not Continue to Increase Prices of Textbooks.**

The Debtors generally buy used textbooks based on publishers' prevailing prices for new textbooks just prior to the implementation by publishers of their annual price increases which historically have been 4% to 5%. The Debtors resell these textbooks shortly thereafter based upon the new higher prices, thereby creating an immediate margin increase. The Debtors' ability to increase their used textbook prices each fiscal year depends on annual price increases on new textbooks implemented by publishers. The failure of publishers to continue annual price increases on new textbooks could adversely impact the Debtors' revenue levels and profit margins.

**K.      Publisher Practices May Change.**

Publishers have historically produced new editions of textbooks every two to four years. Changes in the business models of publishers to accelerate the new edition cycle or to significantly increase the number of textbooks with other materials packaged or bundled with them could reduce the supply of used textbooks available to the Debtors, thereby adversely impacting the Debtors' revenue levels and profit margins.

**L.      Certain Laws and Regulations May Change.**

The Debtors' operations are subject to federal, state, and local laws relating to the protection of the environment and of human health and safety. As an owner and operator of real property, the Debtors can be found jointly and severally liable under such laws for costs associated with investigating, removing, and remediating any hazardous or toxic substances that may exist on, in, or about their real property. Some of the Debtors' properties may have been affected by the migration of hazardous substances released at neighboring third-party locations. Environmental conditions relating to any former, current, or future locations could adversely impact the Debtors' business and results of operations.

**M.      Estimated Valuation of the Reorganized Debtors, the New Common Equity, and the estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the potential market values (if any) of the New Common Equity.**

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Reorganized Debtors' securities, if any. The estimated

recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Reorganized Debtors), including:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Reorganized Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Reorganized Debtors' ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions.

**N.    Certain Holders of Claims will acquire the New Common Equity upon Consummation of the Plan.**

Upon Consummation of the Plan, certain Holders of Claims will receive distributions of outstanding shares of the New Common Equity, and certain Holders of Claims will be in a position to exercise substantial influence over the outcome of actions requiring stockholder approval, including, among other things, election of directors.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, affect the value of the New Common Equity.

**O.    Certain tax implications of the Debtors' bankruptcy and reorganization may increase the tax liability of the Reorganized Debtors.**

Holders of Allowed Claims and Allowed Interests should carefully review the Section herein entitled, "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors.

**P.    The Debtors' business is subject to seasonality.**

The Debtors' business experiences seasonal business swings.   The college and university semester and quarterly schedules drive the Debtors' business cycle and require the Debtors to make large orders and receive large shipments of new textbooks and general merchandise between mid-June and August and again between mid-October and December each year in advance of the "back-to-school" rush. This seasonality requires that the Debtors manage their cash flows over the course of the year.  If sales were to fall substantially below what the Debtors would normally expect during certain periods, the Debtors' annual financial results would be adversely affected and the Debtors' ability to service their debt may also be adversely affected.

**Q.    The Debtors are subject to litigation, which, if adversely determined, could result in substantial losses.**

As described in the Section herein entitled "Summary of Legal Proceedings," the Debtors are, from time to time, during the ordinary course of operating their business, subject to various litigation claims and legal disputes, including contract, lease, and employment claims.

Certain litigation claims may not be covered entirely or at all by the Debtors' insurance policies or their insurance carriers may seek to deny coverage.  In addition, litigation claims can be expensive to defend and may divert the Debtors' attention from the operations of their business.  Further, litigation, even if without merit, can attract adverse media attention.  As a result, litigation can have a material adverse effect on the Debtors' business and, because the Debtors cannot predict the outcome of any action, it is possible that adverse judgments or settlements could significantly reduce the Debtors' earnings or result in losses.

**R.    The Debtors are subject to the credit risk of their customers.**

The Debtors provide credit to their customers in the normal course of business and generally do not require collateral in extending such credit. This exposure could have an adverse effect on the Debtors' business, financial condition, results of operations, and cash flow. In addition, the Debtors may need to make credit decisions that could cause their business to decline or the collection of certain receivables could become impossible and they would need to write those off.

**S.    Increased prices for raw materials or finished goods used in the Debtors' products and/or interruptions in deliveries of raw materials or finished goods could adversely affect the Debtors' profitability, margins, and revenues.**

The principal raw materials used by the Debtors' suppliers include paper, various fabrics, and plastics. The prices the Debtors pay their suppliers for new textbooks, clothing, and general merchandise are dependent in part on the market price for raw materials used to produce them. The price and availability of such raw materials may fluctuate substantially, depending on a variety of factors, including demand, crop yields, weather, supply conditions, transportation costs, energy prices, work stoppages, government regulation, economic climates, and other unpredictable factors. Any and all of these factors may be exacerbated by global climate change. Fluctuations in the price and availability of raw materials to their suppliers have not materially affected the Debtors' profitability in recent years. However, increases in raw material costs, together with other factors, might cause an increase in the cost of goods for the Debtors' suppliers which may be passed onto the Debtors through higher prices.

**T.    Increases in labor costs, potential labor disputes, and work stoppages at the Debtors' facilities or the facilities of their suppliers could materially adversely affect the Debtors' financial performance.**

The Debtors' financial performance is affected by the availability of qualified personnel and the cost of labor. The Debtors employ approximately 1,100 full time employees, 700 part time employees, and 900 temporary workers. If the Debtors' workers were to engage in a strike, a work stoppage, or other slowdowns, the Debtors could experience disruptions of their operations. Such disruptions could result in a loss of business and an increase in operating expenses, which could reduce profit margins. In addition, the Debtors' labor force, which currently is non-unionized, may become subject to labor union organizing efforts, which could cause the Debtors to incur additional labor costs and increase the related risks currently faced. Strikes, work stoppages, or slowdowns experienced by these suppliers and customers could result in slowdowns or closures of facilities where components of the Debtors' products are manufactured or delivered. Any interruption in the production or delivery of these components could reduce sales, increase costs, and have a material adverse affect on the Debtors' business.

**U.    The Debtors' business will suffer if certain of their key officers or employees discontinue their employment.**

The success of the Debtors' business is materially dependent upon the skills, experience, and efforts of certain of their key officers and employees. The loss of key personnel could have a material adverse effect on the Debtors' business, operating results, or financial condition. The Debtors may not succeed in attracting and retaining the personnel they need to generate sales and to expand their operations successfully, and, in such event, the Debtors' business could be materially and adversely affected. The loss of the services of any key personnel, or the Debtors' inability to hire new personnel with the requisite skills, could impair the Debtors' ability to develop new products or enhance existing products, sell products to their customers, or manage their business effectively.

V.     **The Debtors' historical financial information may not be comparable to the financial information of the Reorganized Debtors.**

As a result of the Consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

W.     **The financial information is based on the Debtors' books and records and, unless otherwise stated, no audit was performed.**

The financial information contained in this Disclosure Statement has not been audited.   In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.   Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

X.     **No legal or tax advice is provided by this Disclosure Statement.**

This Disclosure Statement is not legal advice to any Entity.   The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.   Each Holder of a Claim or Interest should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.   This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation of the Plan.

Y.     **No admissions made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims and Allowed Interests, or any other parties in interest.

Z.     **Failure to identify litigation claims or projected objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement.   The Debtors or the Reorganized Debtors, as applicable, may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

AA.     **Information was provided by the Debtors and was relied upon by the Debtors' advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.   Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

**BB.**   **No representations outside this Disclosure Statement are authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.   You should promptly report unauthorized representations or inducements to counsel to the Debtors, counsel to the Ad Hoc Group of Senior Secured Noteholders, the ABL Agent, counsel to the Consenting 8.625% Noteholders, counsel to the JPMorgan Noteholders, and the Office of the United States Trustee for the District of Delaware.

## XIV.   Confirmation of the Plan

**A.**   **The Confirmation Hearing.**

The Bankruptcy Court has scheduled the Confirmation Hearing for May 30, 2012 at 9:30 a.m., prevailing Eastern Time, before the Honorable Peter J. Walsh, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 N. Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or by any notice of adjournment of the Confirmation Hearing filed by the Debtors and posted on their website at www.kccllc.net/nbc.

**B.**   **Requirements for Confirmation of the Plan.**

The Debtors must satisfy various requirements to confirm the Plan, including those set forth in section 1129 of the Bankruptcy Code.

(i)   *Requirements of Section 1129(a) of the Bankruptcy Code.*

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponents of the plan comply with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

- The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policies.

- The proponent of the plan has disclosed the identity of any "insider" (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such insider.

- With respect to each holder within an impaired class of claims or interests —

  - each such holder (a) has accepted the plan or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date – the "best interests of creditors" test; or

  - if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class due to its election to retain a lien, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

- With respect to each class of claims or interests, such class (a) has accepted the plan or (b) is not impaired under the plan (subject to the "cramdown" provisions discussed below).

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

  - with respect to a claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim, unless otherwise agreed;

  - with respect to a class of claim of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (a) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (b) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

  - with respect to a priority tax claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding five years from the Petition Date, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

- If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any "insider," as defined in section 101 of the Bankruptcy Code.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

- All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan—the "feasibility" requirement.

- The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(i)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

The Debtors believe that the Plan will be able to satisfy each of the 1129(a) confirmation requirements. To determine whether the Plan meets the feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases, and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### (ii)    *Requirements of Section 1129(b) of the Bankruptcy Code.*

The Debtors believe the Plan can be confirmed even if certain classes of Claims or Interests vote to reject the Plan. The Bankruptcy Code permits confirmation of a plan of reorganization notwithstanding rejection of the plan by an impaired class so long as (a) the plan of reorganization otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan of reorganization without taking into consideration the votes of any insiders in such class, and (c) the plan of reorganization is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted such plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

### (1)    "Fair and Equitable".

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors, and interest holders as follows:

### *Secured Creditors.*

A plan of reorganization is fair and equitable as to an impaired class of secured claims that rejects the plan if the plan provides: (a) that each of the holders of the secured claims included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, to the extent of the allowed amount of such claims, whether the property subject to those liens is retained by the debtor

or transferred to another entity, and (ii) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan of reorganization, at least equal to the value of such Holder's interest in the Estate's interest in such property; (b) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds in accordance with clause (a) or (b) of this paragraph.

### *Unsecured Creditors.*

A plan of reorganization is fair and equitable as to an impaired class of unsecured claims that rejects the plan if the plan provides that: (i) each Holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan of reorganization, equal to the amount of its allowed claim; or (ii) the holders of claims and Interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan of reorganization on account of such junior claims or interests.

### *Holders of Interests.*

A plan of reorganization is fair and equitable as to an impaired class of Interests that rejects the plan if the plan provides that: (a) each holder of an Interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan of reorganization, equal to the greatest of the allowed amount of (i) any fixed liquidation preference to which such holder is entitled, (ii) the fixed redemption price to which such Holder is entitled, or (iii) the value of the Interest; or (b) the Holder of any Interest that is junior to the Interests of the rejecting class will not receive or retain any property under the plan of reorganization on account of such junior interest.

The Plan is fair and equitable as to Holders of Claims in Class 1 because the Senior Secured Noteholders will either be paid in full pursuant to the Plan or will be otherwise receive a 100% recovery. The Plan is fair and equitable as to Holders of Claims in Classes 4 and 5, pursuant to the absolute priority rule, the Debtors have sufficient support from such Holders so that such Classes vote to accept the Plan. The Plan is fair and equitable as to Holders of Claims in Classes 2, 3, 4, and 7 and Holders of Interests in Class 8 because the Plan provides that their Allowed Claims and Allowed Interests are Unimpaired. The Plan is fair and equitable as to Holders of Claims in Class 10 and Holders of Interests in Class 9 because the Holder of any Claim or Interest that is junior to Classes 10 and 11 will not receive or retain any property under the Plan on account of such junior interest. The Debtors believe the Plan is fair and equitable as to Holders of Claims in Class 10 and Holders of Interests in Class 9, who are conclusively deemed to have rejected the Plan, because there are no Claims or Interests junior to Class 9 Interests and Class 10 Claims and, as such, the Plan does not provide any distribution to such Claims or Interests.

### (2)    "Unfair Discrimination".

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally to other classes similarly situated and no such class receives more than it is legally entitled to receive for its claims or interests. The Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Interests.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

DOCS_DE:179342.1 59929-001

K&E 22166367

## XV.    Effect of Confirmation of the Plan

### A.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the following Causes of Action, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date: (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan; and (ii) all Causes of Action that arise under (A) sections 544, 547, and 548 of the Bankruptcy Code and (B) state fraudulent conveyance law, in each case, solely related to payments made in the 90 days prior to the Petition Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### B.    Retention of Jurisdiction by the Bankruptcy Court.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the extent provided under applicable law, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code; and

9.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to 365(d)(4) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan.

This list of matters over which the Bankruptcy Court will retain exclusive jurisdiction following the Confirmation and Consummation of the Plan is not exhaustive.  For a full list of the matters over which the Bankruptcy Court retains jurisdiction through and after the Effective Date, please see Article XI of the Plan.

**C.      Settlement, Release, Injunction, and Related Provisions.**

(i)      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any

Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

      (ii)    *Release of Liens.*

**Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.2 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.**

      (iii)    *Releases by the Debtors.*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out**

DOCS_DE:179342.1 59929-001

K&E 22166367

of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.

(iv)    *Releases by Holders of Claims and Interests.*

As of the Effective Date, except as otherwise provided in the Plan, the Releasing Parties are deemed to have released and discharged the Debtors, the Reorganized Debtors, their Estates, and the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

(v)    *Exculpation.*

Except as otherwise specifically provided in the Plan, no Released Party shall have or incur, and each Released Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any Exculpated Claim, except for gross negligence or willful misconduct (including actual fraud), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Released Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation and distribution of the New ABL Facility, the New Money First Lien Term Loan, the New Take-Back Notes, the New Common Equity, and the New Warrants pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(vi)    *Injunction.*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan (including any obligations under the New ABL Facility, the New Money First Lien Term Loan, the New Take-Back Notes, the New Common Equity, the New Warrants, and documents and instruments related thereto), or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Articles VIII.C or VIII.D of the Plan, discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors or the

**Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

## XVI.    Important Securities Laws Disclosure

Under the Plan, shares of New Common Equity will be distributed to Holders of Claims in Class 1 and shares of the New Warrants will be distributed to Class 4.

The Reorganized Debtors will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements of the Securities Act the offer, issuance, and distribution of the New Common Equity, the New Take-Back Notes, the New Money First Lien Term Loan, and the New Warrants. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash.  In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (a) with a view to distributing those securities, and (b) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that Entities who receive the New Common Equity or the New Warrants are deemed to be "underwriters," resales by those Entities would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code.  Those Entities would, however, be permitted to sell New Common Equity, New Warrants, or other securities without

registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.

**You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

Under certain circumstances, holders of New Common Equity or New Warrants deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker," and that notice of the resale be filed with the SEC.

## XVII.   Nominee Voting Instructions

Only the Holders of Claims in Classes 1, 4, and 5 are entitled to vote to accept or reject the Plan, and such Holders may do so by completing the appropriate Ballots and returning them in the envelope provided. The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting to accept or reject the Plan, and such abstentions will not be counted as votes to accept or reject the Plan. Voting instructions are attached to each Ballot.

With respect to certain Holders of Claims in Classes 1 and 4, a broker, dealer, commercial bank, trust company, or other agent or nominee of beneficial holders (each, a "Nominee") should deliver the Ballot and other documents relating to the Plan, including this Disclosure Statement, to each beneficial owner of the eligible Claims for which they serve as Nominee ("Beneficial Owner").

A Nominee has two options with respect to voting. Under the first option, the Nominee will forward the solicitation package, including the Ballot and related subscription forms, to each Beneficial Owner for voting and include a return envelope provided by and addressed to the Nominee so that the Beneficial Owner may return the completed Beneficial Owner Ballot to the Nominee. Upon receipt of the Ballots, the Nominee will summarize the individual votes of its respective Beneficial Owners on the appropriate Master Ballot and then return the Master Ballot to the Claims and Balloting Agent before the Voting Deadline.

Under the second option, if the Nominee elects to "pre-validate" Ballots:

- The Nominee shall forward the solicitation package or copies thereof (including (a) this Disclosure Statement (together with the Plan attached thereto as Exhibit A, and all other exhibits), (b) an individual Ballot that has been pre-validated, as indicated in the paragraph immediately below, and (c) a return envelope provided by and addressed to the Claims and Balloting Agent) to the Beneficial Owner within five business days of the receipt by such nominee of the solicitation package;

- To "pre-validate" a Ballot, the Nominee shall complete and execute the Ballot and indicate on the Ballot the name of the registered Holder, the amount of securities held by the Nominee for the Beneficial Owner, and the account number(s) for the account(s) in which such securities are held by the Nominee; and

- The Beneficial Owner shall return the pre-validated Ballot to the Claims and Balloting Agent by the voting deadline.

If a Master Ballot is received after the Voting Deadline, the votes and elections on such Master Ballot may be counted only in the sole and absolute discretion of the Debtors in consultation with Ad Hoc Group of Senior Secured Noteholders. The method of delivery of a Master Ballot to be sent to the Balloting Agent is at the election and risk of each Nominee. Except as otherwise provided in this Disclosure Statement, such delivery will be deemed made only when the executed Master Ballot is actually received by the Balloting Agent. Instead of effecting delivery by mail, it is recommended, though not required, that such entities use an overnight or hand delivery service. In all cases, sufficient time should be allowed to assure timely delivery. No Ballot should be sent to the Debtors, or the Debtors' financial or legal advisors, but only to the Claims and Balloting Agent as set forth under "How do I vote for or against the Plan?" in the Section herein entitled "Questions and Answers Regarding this Disclosure Statement and the Plan."

Nominees must provide appropriate information for each of the items on the Master Ballot, including identifying the votes to accept or reject the Plan.

By returning a Master Ballot, each Nominee will be certifying to the Debtors and the Bankruptcy Court, among other things, that:

- it has received a copy of this Disclosure Statement and other solicitation materials attached to this Disclosure Statement, and it has delivered the same to the Beneficial Owners;

- it has received a completed and signed Ballot from each Beneficial Owner whose vote is reflected on such Master Ballot;

- it is a bank, broker, or other nominee (or agent thereof) that holds the securities being voted on behalf of the Beneficial Owners identified on such Master Ballot;

- it has properly disclosed (a) the number of such Beneficial Owners, (b) the amount of securities held by each such Beneficial Owner, (c) each Beneficial Owner's respective vote, if any, concerning the Plan, and (d) the customer account, serial number, and/or other identification number for each such Beneficial Owner;

- each such Beneficial Owner has certified to the nominee that such Beneficial Owner has not submitted any other Ballots for such Claims held in other accounts or other names, or, if it has submitted another ballot held in other accounts or names, that the Beneficial Owner has certified to the Nominee that such Beneficial Owner has cast the same vote for such Claims, and the undersigned has identified such other accounts or owner and such other Ballots;

- it has been authorized by each such Beneficial Owner to vote on the Plan; and

- it will maintain the original Beneficial Owner Ballot returned by each Beneficial Owner (whether properly completed or defective) for one year after the Voting Deadline (or such other date as is set by subsequent Bankruptcy Court order) for disclosure to the Bankruptcy Court or the Debtors, if so ordered.

Except as otherwise provided herein, each Master Ballot must be returned in sufficient time to allow it to be RECEIVED by the Claims and Balloting Agent by no later than the Voting Deadline.

## XVIII.  Certain U.S. Federal Income Tax Consequences of the Plan

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtors and Reorganized Debtors and certain Holders of Claims.  This summary does not address the United States federal income tax consequences to Holders (i) whose Claims or Interests are Unimpaired or otherwise entitled to payment in full under the Plan or (ii) that are deemed to reject the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations thereunder (the "Treasury Regulations"), and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan discussed below.  This summary is not binding on the IRS or the courts.  There can be no assurance that the IRS will not assert, or that a court will not sustain, a different position than any position discussed below.

This summary does not address all aspects of United States federal income taxation that may be relevant to the Debtors and Reorganized Debtors or to certain Holders in light of their individual circumstances, nor does it discuss tax issues applicable to Holders of Claims that are not "United States persons" (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, brokers, dealers and traders in securities, financial institutions, governmental authorities or agencies, insurance companies, mutual funds, pass-through entities, regulated investment companies, small business investment companies, tax-exempt organizations, and trusts and those holding, or who will hold, Claims, Interests, New Common Equity, or New Warrants as part of a hedge, straddle, conversion or constructive sale transaction).  This summary assumes (i) each Holder of a Claim holds its Claim, New Common Equity, or New Warrants as a "capital asset" (generally, property held for investment) within the meaning of Section 1221 of the Internal Revenue Code and (ii) the debt obligations(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the Debtors.  Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtors and Reorganized Debtors and Holders of Claims based upon their particular circumstances.  Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, estate, gift, foreign, or other tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, ESTATE, GIFT, FOREIGN, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**:    TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE.  TAX

ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**A.     Certain United States Federal Income Tax Consequences to the Debtors.**

The Debtors expect to report consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes of approximately $3 million as of the Petition Date.  As discussed below, the amount of the Debtors' NOL carryforwards is expected to be significantly reduced or eliminated upon implementation of the Plan.

> **(i)     *Transfer of Business Assets.***

The Debtors intend to take the position that the transaction undertaking pursuant to the Plan constitutes a taxable sale of substantially all of the assets of NBC to the Reorganized Debtors.  As a consequence, New NBC should obtain a tax basis in the assets received from NBC equal to their cost to New NBC, which generally should equal the fair market value of New NBC stock transferred to NBC plus the amount of liabilities assumed by New NBC.

Provided the transaction undertaken pursuant to the Plan constitutes a taxable transfer, NBC would recognize gain or loss upon the transfer of assets to New NBC in an amount equal to the difference between the fair market value of its assets and its tax basis in such assets.  The Debtors believe that no significant federal, state, or local tax liability, if any, should be incurred upon the transfer.  However, this conclusion is based in part on the amount of NBC's deductions and losses that will arise during the current taxable year and next taxable year.  The amount of those deductions and losses is uncertain.

There is no assurance that the exchange will be treated by the IRS as a taxable sale of assets by NBC to New NBC.  Instead, the IRS may take the position that the exchange qualifies as a tax-free reorganization, and, therefore, NBC would not recognize any gain or loss on the exchange.  Instead, New NBC would succeed to certain tax attributes of NBC, including NBC's tax basis in the assets transferred to New NBC, but only after taking into account the reduction in such tax attributes and tax basis on account of the discharge of indebtedness pursuant to the Plan.  Thus, New NBC would generally have no NOL carryforwards (as described below) and would have a significantly diminished tax basis in the assets received from NBC, with the result that future tax depreciation and amortization with respect to New NBC's reveal and personal property would be substantially reduced.  Indeed, to the extent that the property is inventory, it is possible that New NBC could realize income from the sale of such inventory.

> **(ii)     *Reduction of NOLs.***

The Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes, such as NOL carryforwards, current year NOLs, tax credits, and tax basis in assets, by the amount of any cancellation of indebtedness ("COD") realized upon consummation of the Plan.  COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the canceled debt would have given rise to a tax deduction).  Assuming that the transaction is treated as a taxable purchase by New NBC of the assets of NBC, this COD and attribute should not result in any tax liability for the Debtors or New NBC.

> **(iii)     *Limitation on NOL Carryforwards and Other Tax Attributes.***

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of any remaining NOL and tax credit carryforwards and, possibly, certain other tax attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. Because (i) substantially all of the Debtor' Pre-Change Losses will likely be eliminated or substantially reduced and (ii) the Debtors intend to take the position that the transaction undertaken pursuant to the Plan constitutes a taxable sale of substantially all of NBC's assets to the Reorganized Debtors, New NBC should not succeed to any of the Pre-Change Losses of NBC and hence the section 382 limitation will not be relevant to NBC or New NBC.

**B.    Certain United States Federal Income Tax Consequences to the Holders of Allowed Claims.**

As described above, the Debtors intend to take the position that the transaction undertaken pursuant to the Plan constitutes a taxable sale of substantially all of NBC's assets to the Reorganized Debtors. As a consequence, Holders of Claims will be treated as exchanging such Claims for Cash, New Common Equity, New Take-Back Notes, and/or New Warrants, if any, in a taxable exchange.

**(i)    *Consequences to Holders of Class 1 Claims.***

Pursuant to the Plan, and in full satisfaction of its Claim, a Holder of an Allowed Class 1 Claim will receive its Pro Rata share of 100% of the New Common Equity and its Pro Rata share of the New Take-Back Notes, and the right to participate in the New Money First Lien Term Loan on a Pro Rata basis, based on holding of Senior Secured Notes Claims. A Holder that receives New Common Equity and New Take-Back Notes should be treated as exchanging its Claims for such Cash and New Take-Back Notes in a fully taxable exchange. In that case, the Holder should recognize gain or loss equal to the difference between (1) the sum of the fair market value as of the Effective Date of the New Common Equity received and the "issue price" (as defined below) of the New Take-Back Notes received to the extent that such Equity and Notes are not allocable to accrued interest and (2) the Holder's tax basis in the Claims surrendered by the Holder. Such gain or loss should be capital in nature and should be long term capital gain or loss if the Claims were held for more than one year by the Holder. To the extent that a portion of the New Common Equity and New Take-Back Notes received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income. *See* "accrued interest," below. A Holder's tax basis in the New Common Equity and New Take-Back Notes received should equal their fair market value as of the Effective Date. A Holder's holding period for the New Common Equity and New Take-Back Notes received should begin on the day following the Effective Date.

The IRS may take the position that the exchange constitutes a tax-free reorganization. If the IRS were to succeed in asserting that exchange qualifies as a tax-free reorganization, the tax consequences to Holders of Claims that receive New Common Equity and New Take-Back Notes received may differ from the consequences described above.

**(ii)    *Consequences to Holders of Class 4 Claims.***

Pursuant to the Plan, and in full satisfaction of its Claim, a Holder of an Allowed Class 4 Claim will receive its Pro Rata share of the New Warrants (the "Warrants"). A Holder that receives Warrants should be treated as exchanging its Claims for such Warrants in a fully taxable exchange. In that case, the Holder should recognize gain or loss equal to the difference between (1) the fair market value as of the Effective Date of the Warrants received that is not allocable to accrued interest and (2) the Holder's tax basis in the Claims surrendered by the Holder. Such gain or loss should be capital in nature and should be long term capital gain or loss if the Claims were held for more than one year by the Holder. To the extent that a portion of the Warrants received in the exchange is allocable to accrued interest, the Holder may

recognize ordinary income. *See* "accrued interest," below. A Holder's tax basis in the Warrants should equal their fair market value as of the Effective Date. A Holder's holding period for the Warrants should begin on the day following the Effective Date.

The IRS may take the position that the exchange constitutes a tax-free reorganization. If the IRS were to succeed in asserting that the exchange qualifies as a tax-free reorganization, the tax consequences to Holders of Claims that receive Warrants may differ from the consequences described above.

**(iii)** *Consequences to Holders of Class 5 Claims.*

Pursuant to the Plan, and in full satisfaction of its Interests, each Holder of an Allowed Class 5 Claim will receive its Pro Rata share of Cash.

A Holder who receives Cash in exchange for its Claim pursuant to the Plan generally will recognize income, gain, or loss for federal income tax purposes in an amount equal to the difference between (1) the amount of Cash received in exchange for its Claim and (b) the Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, the extent to which any portion of the Cash received in the exchange is allocable to accrued interest (*see* "accrued interest" below), and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.

**(iv)** *Accrued Interest.*

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instrument(s) constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debt instrument(s) constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of Allowed Claims will be allocated first to the principal amount of such claims (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE UNITED STATES FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

**(v)** *Consequences to Holders of New Take-Back Notes.*

(a)    **Treatment of the New Take-Back Notes as Debt or Equity.**

Whether the New Take-Back Notes are treated as debt or equity for U.S. federal income tax purposes will depend on the number of factual considerations, including the likelihood that scheduled payments will be made on the New Take-Back Notes and the Reorganized Debtors' intent to repay the New Take-Back Notes. The Reorganized Debtors expect to treat the New Take-Back Notes as debt, but the Reorganized Debtors' ultimate determination as to how to characterize the New Take-Back Notes may change depending on these other considerations. Furthermore, regardless of how the Reorganized Debtors characterize the New Take-Back Notes, the IRS could challenge their characterization.

To the extent that the New Take-Back Notes are classified as equity, they will be treated for U.S. federal income tax purposes as described in "Consequences to Holders of New Common Equity," below, and any interest on the New Take-Back Notes will likely be taxable as a dividend as it accrues. The remainder of this discussion describes the treatment of the New Take-Back Notes if they are respected as debt.

(b)    **Issue Price of the New Take-Back Notes.**

The determination of the "issue price" of the New Take-Back Notes will depend, in part, on whether the New Take-Back Notes or the Class 1 Claims are traded on an "established market" at any time during the 60-day period ending 30 days after the exchange. In general, a debt instrument (or the property exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems, or (iii) certain qualifying foreign securities exchanges, (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value, or (c) the price quotations are readily available from dealers, brokers or traders. The issue price of a debt instrument that is traded on an established market or that is issued for another debt instrument so traded would be the fair market value of such debt instrument or such other debt instrument, as the case may be, on the issue date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for another debt instrument so traded would be its stated principal amount.

Accordingly, if neither the New Take-Back Notes nor the Class 1 Claims are "publicly traded" within the meaning of the applicable Treasury Regulations, the "issue price" of the New Take-Back Notes should equal their stated principal amount. However, if the New Take-Back Notes or Class 1 Claims are "publicly traded" within the meaning of the applicable Treasury Regulations, the issue price of the New Take-Back Notes would be the fair market value, at the time of the exchange, (1) of the New Take-Back Notes if they are treated as publicly traded or (2) of the Class 1 Claims if they are treated as publicly traded and the Convertible A Notes are not treated as publicly traded.

(c)    **Qualified Stated Interest.**

A Holder generally will be required to recognize and include in gross income qualified stated interest on the New Take-Back Notes as ordinary income at the time it is paid or accrued on the New Take-Back Notes in accordance with such holder's method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or, subject to certain conditions, based on one or more interest indices. The New Take-Back Notes currently provide for qualified stated interest of 15% on an annual basis.

(d)    **Original Issue Discount.**

Under the rules governing original issue discount ("OID"), regardless of a Holder's method of accounting, a Holder will be required to accrue its pro rata share of OID on the New Take-Back Notes on a constant yield basis and include such accruals in gross income, whether or not such Holder receives a payment of interest solely in cash on the New Take-Back Notes on the scheduled interest payment date. The amount of OID on the New Take-Back Notes is the difference between their "stated redemption price at maturity" (i.e., the sum of all payments to be made on the New Take-Back Notes other than "qualified stated interest," as defined above) and their "issue price" (as defined above). Because the "stated redemption price at maturity" on the New Take-Back Notes will likely exceed their "issue price" by more than a de minimis threshold, the New Take-Back Notes will be considered as issued with OID.

The amount of OID that a Holder is required to include in income is the sum of the "daily portions" of OID with respect to the New Take-Back Notes for each day during the taxable year in which the Holder is the beneficial owner of the New Take-Back Notes. The "daily portions" of OID in respect of the New Take-Back Notes are determined by allocating to each day in an "accrual period" the ratable portion of interest on the New Take-Back Notes that accrues in the "accrual period." The "accrual period" for the New Take-Back Notes may be of any length and may vary in length over the term of the New Take-Back Notes, provided that each "accrual period" is no longer than one year and that each scheduled payment of interest or principal occurs on the first or final day of an "accrual period."

The amount of OID on the New Take-Back Notes that accrues in an "accrual period" is the product of the "yield to maturity" on the New Take-Back Notes (determined on the basis of compounding at the close of each accrual period and adjusted to reflect the length of the accrual period) and the "adjusted issue price" of the New Take-Back Notes at the beginning of such accrual period, reduced by any qualified stated interest allocable to the accrual period. The "yield to maturity" on the New Take-Back Notes is the discount rate that, when used in computing the present value of all payments to be made under the New Take-Back Notes, produces an amount equal to their issue price. The "adjusted issue price" of the New Take-Back Notes at the beginning of the first "accrual period" will equal their "issue price" (as described above) and for any "accrual periods" thereafter will be (x) the sum of the "issue price" of the New Take-Back Notes and any OID previously accrued thereon minus (y) the amount of any payments previously made on the New Take-Back Notes other than payments of qualified stated interest.

**The rules regarding OID are complex and the rules described above may not apply in all cases. Accordingly, Holders are urged to consult their own independent tax advisors regarding the application of the OID rules to the New Take-Back Notes.**

(e)     **Bond Premium.**

If a Holder's initial tax basis in a New Take-Back Note is greater than its stated principal amount, such Holder will be treated as having acquired the New Take-Back Note with "amortizable bond premium" equal in amount to such excess. A Holder may elect (with respect to the New Take-Back Note and all of the Holder's other obligations with amortizable bond premium held on or acquired by such Holder after the first day of the first taxable year to which such election applies) to amortize such premium using a constant yield method over the remaining term of the New Take-Back Note and may offset interest income otherwise required to be included in respect of the New Take-Back Note during any taxable year by the amortized amount of such excess for the taxable year. This election may only be revoked with the consent of the IRS.

(f)     **Sale, Conversion, Exchange, Redemption or Retirement of the New Take-Back Notes.**

DOCS_DE:179342.1 59929-001

K&E 22166367

Upon a sale, or exchange of a New Take-Back Note for cash or other property, a Holder will generally recognize capital gain or loss equal to the difference between the amount of cash and the fair market value of any property realized on the sale or exchange (less an amount equal to any accrued but unpaid interest, which will be taxable as ordinary interest income to the extent not previously included in income by the Holder) and such Holder's adjusted tax basis in the New Take-Back Note. Such capital gain or loss should be long-term capital gain or loss if the New Take-Back Note was held for more than one year. A Holder's adjusted tax basis in a New Take-Back Note will generally be equal to the Holder's purchase price for the New Take-Back Note, increased by any accrued OID.   Capital gains of non-corporate Holders (including individuals) derived in respect of capital assets held for more than one year are eligible for reduced rates of taxation. The deductibility of capital losses is subject to certain limitations.

**(g)       Medicare Tax.**

Certain Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, interest and gains from the sale or other disposition of capital assets for taxable years beginning after December 31, 2012.  Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of New Take-Back Notes.

**(vi)      *Consequences to Holders of New Common Equity.***

**(a)       Dividends on New Common Equity.**

Any distributions made on account of the New Common Equity will constitute dividends for United States federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under United States federal income tax principles. To the extent that a Holder receives distributions that would otherwise constitute dividends for United States federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its shares. Any such distributions in excess of the Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.  Subject to certain exceptions, dividends received by noncorporate Holders prior to 2013 will be taxed under current law at a maximum rate of 15%, provided that certain holding period requirements and other requirements are met.

Dividends paid to Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

**(vii)     *Sale, Redemption, or Repurchase of New Common Equity.***

Unless a non-recognition provision applies, Holders generally will recognize capital gain or loss upon the sale, redemption or other taxable disposition of New Common Equity.

**(a)       Medicare Tax.**

Certain Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, dividends and gains from the sale or other disposition of capital assets for taxable years beginning after December 31, 2012. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of New Common Equity.

(viii)    *Tax Consequences to Holders who Exercise Warrants.*

A Holder of an Allowed Claim who receives Warrants generally will not recognize gain or loss upon the exercise of such Warrants to acquire New Common Equity. New Common Equity that such a Holder acquires pursuant to the exercise of the Warrants will have a tax basis equal to the Holder's adjusted basis in the Warrants so exercised, increased by any amount paid to exercise the Warrants. If the Warrants are allowed to lapse unexercised, a Holder will have a loss equal to such Holder's adjusted basis in the Warrants. Such loss could be a capital loss even if a Holder did not hold its original Claim as a capital asset. The deductibility of capital losses is subject to certain limitations.

(ix)    *Information Reporting and Backup Withholding.*

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Internal Revenue Code. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder complies with the applicable requirements of the backup withholding rules and:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided, however*, that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its United States federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, ESTATE, GIFT, FOREIGN, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XIX.    <u>Recommendation of the Debtors</u>

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors and other parties in interest than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Allowed Interests than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote to accept or reject the Plan support Confirmation of the Plan and vote to accept the Plan.

DOCS_DE:179342.1 59929-001

K&E 22166367

Dated:  April 10, 2012

Respectfully submitted,

NEBRASKA BOOK COMPANY, INC.
(for itself and on behalf of each of its affiliated
debtors)


By:   _/s/ Barry S. Major_____
    Name:  Barry S. Major
    Title:  President and Chief Operating Officer


Prepared by:


KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
(212) 446-4800 (telephone)

- and -

PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
Wilmington, Delaware  19899-8705
(302) 652-4100 (telephone)

Counsel to the Debtors and
 Debtors in Possession